## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DANIEL W. MAHON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 00-CV-1008-E |
| | ) | |
| | ) | |
| AMERICAN AIRLINES, INC., | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

*FILED*

*JAN 1 9 2004*

*Phil Lombardi, Clerk*
*U.S. DISTRICT COURT*

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT APPENDIX

---

**CONNER & WINTERS, P.C.**
DAVID R. CORDELL, OBA #11272
JASON S. TAYLOR, OBA #17755
3700 First Place Tower
15 East Fifth Street
Tulsa, Oklahoma   74133-4344
(918) 586-5711 (Telephone)
(918) 586-8547 (Facsimile)

**ATTORNEYS FOR DEFENDANT
AMERICAN AIRLINES, INC.**

## TABLE OF CONTENTS

TWU Notice-Union Membership ........................................................................... A

Tulsa Area Board of Adjustment, Arbitration Opinion and Award,
dated March 8, 2000 .................................................................................... B

Dial-A-Racist Business Card ............................................................................. C

Deposition of Daniel W. Mahon, dated October 29, 2003 ............................................ D

AMR's Diversity Advisory Council Pamphlet ......................................................... E

AMR's Diversity Advisory Council (DAC)
Questions and Answers for Diversity Information Fairs ..............................................F

AMR's Diversity Advisory Council (DAC) Special Session,
Talking Points for ERG Members 3/25/99 ............................................................. G

CERG Flyer ................................................................................................. H

The Turner Diaries T-Shirt ................................................................................ I

Final Advisory (Discharge) dated May 10, 1999 ....................................................... J

Daniel W. Mahon Letter to Rex Thompson, Esq. ...................................................... K

i

AA FORM C88C
PRINTED IN U.S.A.

## NOTICE — UNION MEMBERSHIP

To: <u>Daniel W. Mahon</u>          <u>56628</u>                <u>TULE</u>
        (NAME)                    (EMPL. NO.)              (STATION)

You are being employed as a <u>Mech/Overhaul</u>  Effective <u>3-17-86</u>
                        (CLASSIFICATION)                    (DATE)

Your job classification is covered by an agreement between American Airlines and the Transport Workers Union of America, AFL–CIO.

All new employees are required by the terms of the agreement to become members of the union within 60 days of employment and, as a condition of employment, to maintain membership in the union so long as the agreement remains in effect to the extent of paying initiation fees and membership dues.

You must pay your initiation fee directly to the Union. You may pay your membership dues either directly to the union or by having them deducted from your paycheck. If you want your dues deducted from your paycheck, you may sign a "Check-off Form" which will be furnished to you by the union. Please see the local union representative (but not on company time). His name and address:

<u>Mr. Ed Wilson</u>

<u>Local 514, TWU, AFL–CIO</u>            Signed _____
                                                 (COMPANY REPRESENTATIVE)
<u>11929 E. Pine, Tulsa, OK 74116</u>

I have read the above notice and I understand it.       Date <u>3-17-86</u>

Signed _____
             (EMPLOYEE)                          Original To:   Employee
Employee ___<u>Daniel W. Mahon</u>___              Duplicate To:  Union Representative
                                                 Triplicate To: Field Personnel File
Address <u>KOA, 193rd, CATOOSA, OKLA.</u>
                                                 SHOP _____<u>225-4</u>_____


EXHIBIT
Arbitration
Company 7

# TULSA AREA BOARD OF ADJUSTMENT

************************************************************************

**IN THE MATTER OF ARBITRATION**          **OPINION AND AWARD**

**between**

**AMERICAN AIRLINES, INC.**                **Case No. M-766-99**
                                           **(Discharge of Daniel Mahon)**

**and**

**TRANSPORT WORKERS UNION OF AMERICA**
**Local 514**

************************************************************************

## APPEARANCES:

**On behalf of the Employer:**   Joseph P. Harkins, Attorney-Littler
Mendelson and David Stewart, Human Resources-American Airlines

**On behalf of the Union:**   Mike Rial and Kevin Creaser-Local 514 and
Steve Hickman, Attorney

## I.   ISSUE

The issue before the Board can be framed as follows:

'Did the Employer have just cause to terminate the Grievant, and if not,
what shall be the remedy?'

DEFENDANT'S DEPOSITION
EXHIBIT
9

## II. BACKGROUND AND FACTS

The Grievant Daniel Mahon was first employed in 1986. His assignment at the time of termination was on Dock 2-B as an Avionics Technician. His job performance was good throughout his tenure.

The Final Advisory sets forth the basis of the discharge. To understand the advisory letter, it is necessary to provide some background. The backdrop for the factual scenario leading up to termination is the Company's corporate diversity program. In simple terms, the principal objectives are to (1) promote tolerance and respect among a diverse workforce and (2) to identify business objectives as they relate to the Company's diverse customers. At the grassroots level, these objectives were addressed by self-organized groups (within a specific structure and procedure). These groups, called Employee Resource Groups (ERG), represented groups of employees with "unique racial, ethnic, cultural or lifestyle differences." For purposes of illustration, some of the groups at Tulsa were: (1) the African-American ERG, (2) the Asian Cultural Association, (3) the Christian ERG, (4) Employees with Disabilities ERG, (5) Gay, Lesbian, Bisexual, Transgender ERG, (6) Indian ERG and (7) Jewish ERG.

Any employee could join any ERG or form an ERG. There was a set of

2

guidelines for groups. For example, each group was required to support company policies on a harassment-free workplace and non-discrimination. Another rule was that the ERGs were to have no relationship (financial or organizational) with outside groups.

In addition to promoting tolerance and respect among the diverse groups, the Employer hoped these groups would provide ideas on how to develop and promote business relationships with diverse groups in the marketplace. For example, an ERG of employees with disabilities might make suggestions to the Company on how disabled customers could be better served by the airline.

One of the opportunities the Company provided to ERGs to promote diversity was to hold "Diversity Fairs". ERGs were encouraged to get a booth at the fair and to do some project that would provide information about their particular group with the object of promoting understanding. The Diversity Fair in question was March 11, 1999.

One of the diversity groups with a booth at this fair was the Caucasian Employee Resource Group (CERG) of which Grievant was a member. Grievant was not present that day but he did write the pamphlet handed out at the fair. The Company found the flyer objectionable and ultimately it formed part of the basis for the Grievant's discharge.

3

The history of the pamphlet is relevant. There is no dispute that Grievant suggested in a meeting of the CERG that the group do a flyer on "Caucasians in Aviation" for the diversity fair. There is no dispute he volunteered to write it. There is no dispute he wrote the flyer with no assistance from other group members.

The exact nature of the conversation amongst the group during which the Grievant volunteered to write the flyer is disputed. A management employee (K. Kelly) testified he attended the CERG meeting. According to his testimony, when the Grievant raised the idea of doing a flyer on "Caucasians in Aviation", Grievant also said his brother could help him, that his brother had research skills at the library and on the Internet, that his brother could make the flyer "mild to wild" and that he would ask his brother to keep it "mild". Two employee witnesses (G. Nichols, and L. Dill ) sharply deny the Grievant said any of these things and in fact claim he had left the CERG meeting by the time the remainder of the group became engaged in a conversation with the management employee.

The Grievant's brother (Dennis Mahon-an identical twin to Grievant) is well known in the Tulsa area and has seen some national and international attention in connection with his white supremacy and neo-nazi beliefs and activities. He ran for Mayor of Tulsa. He was the founder of the Oklahoma White Knights of the

Ku Klux Klan. He is the Oklahoma leader of the White Aryan Resistance (WAR). He operates a *Dial-a-Racist Hotline*. He was quoted in a Tulsa newspaper editorial as saying the Oklahoma City bombing of the Federal Building in which 160 people died was "a fine thing".

When the flyer was handed out at the Diversity Fair, it caught the attention of several management employees. The flyer raised several concerns. To summarize, in the Board's words, there were concerns that the flyer had white supremacist/neo-nazi overtones. This related among other things to the use of the term "White Race" and "noble Race" and the fact that the terms white and race were capitalized.

The two-page flyer is described as follows: the heading of the first sheet printed on 8 ½ x 11 plain paper read "American Airlines Caucasian Employees Resource Group Salute the Following Aviation Pioneers". Pictures of the following people along with a graphic of a plane appeared on the first page with their name and a brief description of their aviation accomplishment: Wilbur Wright, Bleriot, James Doolittle, Fransisco Brack-Papa, Werner Von Braun, Hugo Junkers, Amelia Earhart and Helene Dutrieu. The top two-thirds of the second page contained four pictures of people (Edward Rickenbacker, Chuck Yeager, Charles Lindbergh and a fourth person whose name did not print clearly) and five

5

pictures of airplanes. Below these pictures was the following verbiage:

"These famous men and women who made aviation history all have one thing in common. They are all members of the White Race. A race of EXPLORERS, discoverers, scientists, and philosophers. We are proud of the accomplishments of our noble Race in the past, present, and future."

The Company decided to suspend the privileges of the CERG for six

months. A meeting was held in Tulsa on April 20, 1999, to explain to the CERG

the Company's decision to suspend the group. The meeting was conducted by

Robert Hosey, Manager of Diversity Programs, and was attended by, among

others, the Vice President in charge of the Tulsa base. Information concerning the

meeting was posted by the officers of the CERG well in advance (perhaps as much

as two weeks earlier). There is testimony in the record from two officers of the

CERG that they had separate conversations with the Grievant in advance of the

meeting asking that he not attend.

The Grievant did attend the April 20 meeting. The decision to suspend the

group was explained. The base Vice President explained the Company did not

condone the flyer and would not condone or tolerate white supremacist activity on

the base. At one point, the Grievant acknowledged being the author of the flyer.

The Grievant questioned what was wrong with the flyer and didn't understand why

anybody would take issue with its language.

6

Robert Hosey noticed at the April 20 meeting that Grievant was wearing a T-shirt that showed the cover to a book titled "The Turner Diaries" by Andrew MacDonald. This concerned Hosey. He explained at the hearing that he was familiar with the book. In his view, it was a "manifesto" on violence, racism and white supremacy. It also needs to be noted that this is the book that Timothy McVeigh read prior to the Oklahoma City bombing and that was found in his car at the time of his arrest. Hosey, an African-American was concerned that Grievant was sending a message by wearing the shirt. After the meeting, Hosey shared his concerns with the Vice President and officers of the CERG.

Subsequently, the Company conducted an investigation into the flyer and the Grievant's wearing of the T-shirt. This included two interviews with Grievant (April 26 and May 10, 1999) and one written interrogatory under the umbrella of Section 29-F of the contract. The interrogatory was presented to Grievant on April 26, 1999. It consisted of 15 written questions to which the Grievant answered in his own handwriting. Of the fifteen questions and answers, some are ultimately irrelevant to the discharge. The other questions vary in relevance. For example, Grievant acknowledged discussing at the CERG the subject of his brother's termination. It is not clear whether this discussion pertained to his brother's discharge at TWA (that related in part to an appearance he made with

7

other white supremacists on the Oprah Winfrey Show) or his brother's more recent
termination from American during his probationary period. He also stated in one
of his written answers that he believed his brother was discharged because of his
political beliefs.

There were also questions on the interrogatory about the "Turner Diaries".
To summarize, Grievant only had a passing familiarity (having read only the first
chapter). It seemed to him to be "controversial in nature". The T-shirt was
purchased at a gun show along with several other shirts. He received a discount
for buying five T-shirts at the same time and this was merely one of the shirts he
picked up in order to get the discount. The last five questions and answers are
particularly relevant:

"11. Why did you wear the "Turner Diaries" T-shirt on that particular day?

A-No particular reason, only clean shirt I had that day.

12. Are you a member of a white supremacist organization?

A-No

13. Do you have ties to a white supremacist organization?

A-Have a brother who has ties to a white separatist group.

14. What personal philosophies regarding white supremacism do you discuss at work?

A-Don't discuss supremacist topics at work, only current events, and plane talk.

15. Are you known in the community as being associated with white supremacists or

8

white supremacists groups?

A-Don't really know."

The interviews were more detailed. To Grievant the T-shirt stood for "anti-government" or "anti-establishment". (It is noted that on the back of the T-shirt was an anti-gun control message). When asked whether there was some relationship between his attendance at the April 20 meeting and his wearing of the T-shirt, he had "no idea". When asked when he learned of the April 20 meeting and if anyone told him about the meeting, the Grievant (according to non-verbatim notes taken by a Human Resources representative) said he learned of the meeting that morning from a flyer and did not discuss the meeting with anybody. He also said that he didn't believe in white supremacist organizations at all. There was no particular reason that the words race and white were capitalized in the flyer he created. He suggested it was a typographical error.

The May 10, 1999 interview concluded with the Grievant being given his final advisory. It read as follows:

"On Tuesday, April 20, 1999, you attended a meeting of the Caucasian Employee Resource Group. The purpose of the meeting, which senior Maintenance and Engineering management also attended, was to discuss the role of American Airlines' employee resource groups in supporting diversity in our workplace and to discuss the recent 6-month suspension of the Caucasian Employee Resource Group. American suspended the Group after it handed out a flyer that advocated white supremacy at the Diversity Info Fair, a company event. The Group's conduct violated a basic tenet of the AMR Diversity Advisory Council. This tenet is that no group can form and be recognized as an Employee Resource Group that is in opposition to another group. You

9

admitted during the April 20 meeting that you wrote the flyer and supplied it to the group for distribution.

At the meeting, and at work on the day of the meeting, you wore a T-shirt with the words "The Turner Diaries" printed on it. "The Turner Diaries" is a book written by a leader of one of the largest and most organized neo-Nazi groups in the country. It is widely regarded as a white supremacist and anti-Semitic terrorist manual. "The Turner Diaries" describes the systematic killing of "Jews", "non-whites", and "race traitors" in order to establish an "Aryan" world. The book is also infamous as having been found in the car of Timothy McVeigh at the time of his arrest for bombing the Murrah Federal Building in Oklahoma City. The cover of the book shows a drawing of two people pointing firearms as if in combat. Your T-shirt also showed a rendition of that cover.

American received a number of complaints from other employees regarding your T-shirt, as well as the flyer that you wrote. In response to your actions and to the complaints received, American conducted an investigation. The 29(f) investigation was initiated on Monday, April 26, 1999. The investigation covered the complaints received, as well as your actions with white supremacist organizations and their members.

As a result of this investigation, American has concluded that:

By writing the flyer and supplying it for distribution at the Diversity Info Fair and by wearing your "The Turner Diaries" T-shirt to work and to the April 20 meeting, you harassed and intimidated other employees in a manner that tended to create a racially hostile work environment.

Your actions have adversely impacted the perception and reputation of American Airlines within our employee groups and in the community at large.

Your actions as described above are a direct violation of American Airlines' Policy on Unlawful Harassment, which prohibits conduct that is harassing and that "creates an intimidating, hostile, or offensive work environment."

Your actions are also a direct violation of the following American Airlines' Policies and Procedures:

Rule 32 -   "Threatening, intimidating, interfering with, or violent behavior toward another employee while either on or off duty is prohibited."

Rule 24 -   "Consider the welfare of the Company and your fellow employees. Perform no act that is detrimental to either."

Rule 22 -   "See that your conduct reflects credit upon AA. This includes

10

paying your just debts, thereby avoiding complaint from creditors or garnishment proceedings."

As an employer of a widely diverse workforce, as an employer in an industry that must guarantee the highest standard of safety to the flying public, as an employer in the Tulsa, Oklahoma Community, American Airlines cannot and will not tolerate conduct of this type.

You are hereby discharged from your employment with American Airlines, effective this date. All Company property, including but not limited to, AA identification cards, badges of any kind, and keys assigned to you, are to be returned to me and are not to be used for any purpose after the date of this letter. Any pay due to you will be paid upon surrender of all Company property. Please contact me about any questions regarding benefits, Credit Union membership, etc., which you may have."

A grievance was subsequently filed protesting the Company's decision. The matter could not be resolved and was ultimately appealed to the Area Board. A hearing was conducted in Tulsa, Oklahoma on November 2, 3 and 4, 1999. The transcript was received December 10, 1999. The board discussed the case in executive session in Dallas, Texas on January 20, 2000 and March 8, 2000 in Tulsa, Oklahoma.

## III.    OPINION AND DISCUSSION

Most discipline cases present two fundamental questions. The first is whether, and if so to what extent, did the Grievant commit misconduct. The second question is dependent on the first: If there was misconduct, is the designated disciplinary penalty appropriate? The answer to these questions define in any particular set of facts and circumstances whether just cause exists. These

11

questions will be addressed in order.

## A.   The Question of Misconduct

Before addressing the first of these two questions (whether misconduct occurred) it is appropriate to state what conduct the Grievant cannot be disciplined for. He cannot be discharged for being Dennis Mahon's brother. He cannot be disciplined for how he thinks. He cannot be disciplined merely for holding unpopular political views or those that are contrary to the mainstream. The Grievant can only be disciplined for his conduct and behavior as it affects the Employer's legitimate business interest.

The Grievant's conduct is basically undisputed. He wrote the flyer knowing it would be distributed to employees. He wore the T-shirt to a meeting with high level management. The record offers two alternative explanations for his conduct.

The Company's view is (1) that the flyer was purposefully written and reflects neo-nazi/white supremacist ideology and (2) that the T-shirt was intentionally worn to send an intimidating and threatening message to management. Since the Grievant chose not to testify at the arbitration hearing, his explanation for his conduct must be gleaned from his statements made during the investigation. It was his position the flyer did not express white supremacist

12

ideology. He claimed not to be a white supremacist. The capital R in Race (and evidently the W in White) were probably typographical errors. He only wore the "Turner Diaries" T-shirt because it was his only clean shirt that day and that he only found out about the meeting that morning at work. In short, the Union suggested in essence that the nature of the flyer and wearing of the T-shirt were coincidental and had no ill intent.

The Board's job is to decide which of these two alternative views of Grievant's actions is correct. More precisely, the critical question is–whether there is more evidence supporting the Company's view than the Union's view that Grievant's conduct was innocent. It is the conclusion of the Board that there is much more evidence supporting the Company's view than suggestions to the contrary.

A review of the record demonstrates the preponderance of the evidence, to a convincing degree, supports the view the flyer was a product of neo-nazi/white supremacist ideology and that the wearing of the T-shirt was purposeful and was intended to be a statement. The Grievant's explanation simply didn't deserve as much weight and was not as credible as other evidence. A review and comparison of the evidence presented by the Company with that presented by the Union shows

13

this to be true.[1] The evidence discussed below relates to the nature of his conduct

not the separate question of penalty.

---

[1] The Union objected to certain evidence (such as examples of white supremacist literature written by Dennis Mahon that were introduced through an expert witness) because it was not in possession of the Employer at the time of the discharge decision. The Board overruled the objection noting that both parties are free to collect and present evidence, even if it was not known at the time of the discharge, that support their respective positions so long as the evidence is not presented to establish a new or additional basis for discharge. This is particularly true if the evidence reflects on credibility. Arbitrators generally admit new proof of the old conduct (that is known at the time of the discharge letter) but not new evidence of new conduct unknown at the time of discharge as an additional basis for discharge. Some arbitrators even make exceptions to this rule. For a general discussion see Chapter 5 on "Evidence in Arbitration" in Labor and Employment Arbitration 2nd Edition Bornstein, Gosline and Greenbaum, General Editors (Matthew Bender Publisher, Chapter by Steven Wolf). The Employer's evidence objected to by the Union was accepted for credibility purposes. This evidence was relevant and admissable not as a new basis for discipline but because it reflected on the credibility of Grievant's defense in the 29-F hearings.

## The Company's Evidence

The significant evidence on the issue of misconduct submitted by the

Company includes and is summarized below.

(1) Submitted by the Company were various white supremacist publications

(KKK) written by Dennis Mahon thanking Daniel Mahon for his work and

numerous financial contributions to various white supremacist projects and

causes. This included nomination as "White Patriot of the Month". One

publication stated:

"Daniel M. of the Tulsa area is white patriot of the month for his tremendous efforts in
the financial support of this struggle. Daniel has purchased for this Order a professional duty
state of the art VHS camcorder to help us with our cable TV programs and to video tape our
gatherings. Daniel also built the cross, supplied the public address system, portable generator,
and large tent for our rally in Oklahoma on Sept. 23. Dan also has a large collection of Klan and
National Socialist white power merchandise. Dan has also supplied many white resistance
groups with "T" shirts. Dan is one of those unsung heros who for the last 8 years has given
sacrificially in money, sweat, and blood, who never asks for glory or power. Every organization
needs more men like Daniel. These people are the back bone of the movement. Thank you Dan.

(2) There was testimony from two Union witnesses that Grievant knew

about the April 20 meeting well in advance and was counseled not to come. This

contradicts Grievant's statement in the 29-F hearing that he only found out about

the meeting that day and had not discussed the meeting with anyone. It also

significantly undermines his claim that the wearing of the "Turner Diaries" T-shirt

was coincidental. Clearly he was sending a message.

(3) The "Turner Diaries" is rank with tales of murder and terrorism based on ethnic and racial matters reaped upon minorities. It also contains a virtual bomb making recipe used to create the source of "immense" damage reaped upon a government building. While technically fictitious, it is all too real to the some 160 victims (and their families) of Timothy McVeigh. Such references have a special significance in Oklahoma which cannot immediately be appreciated by others from other areas of the country.

(4) The Grievant's flyer was nearly identical in essential style and substance to a flyer distributed by the White Knights of the Ku Klux Klan controlled at the time by Dennis Mahon. The words "White" and "Race" were capitalized throughout. It had pictures of an old airplane and a rocket and extolled the virtues of named historical figures (all Caucasian) as members of a mighty race described as "explorers, philosophers and cultivators". The Company presented expert testimony by a researcher who had followed and collected vast amounts of information on neo-nazi and white supremacist groups. He has been an expert witness in many court proceedings through the United States and Canada. It was his opinion that the kind of conjunctive use of capitalization of "White" and "Race" is only found in the popular literature of white supremacists and neo-nazi groups. The concept of a noble race and superior race is at the heart of nazism. It

16

was his opinion the capitalization was no typographical error and the theme was clearly white superiority. The expert also produced a Tulsa newspaper article about Dennis Mahon's neo-nazi activities in Canada and Germany. The article quoted Grievant and indicated he supported his brother's views.

(5) There was testimony by two supervisors that on two separate occasions in the past the Grievant had been warned about bringing KKK/White Aryan symbols into the workplace. One incident involved the wearing of a KKK hat and KKK belt buckle. Another incident involved employee complaints about using a KKK knife in the workplace. The knife is an accepted tool in the shop but the symbols on it were the problem. Although Grievant denied it was his knife, he was told hate symbols at work would not be tolerated.

(6) There was testimony by a now supervisor who spoke about his first day on the job as a mechanic in the bargaining unit in 1986. The Grievant talked about the government and social problems with "jews and niggers." He was invited to Grievant's house where a similar conversation occurred. On another occasion Grievant and his brother showed a racially violent movie. Also in the fall of 1988 this same employee was employed in his off-duty hours as a reserve police officer. He worked as security at a gun show. He had a conversation there with the Grievant who was working at a booth where Aryan Nation materials and

17

T-shirts were displayed and sold. In fact, Grievant tried to give a Aryan Nation T-shirt to the witness.

(7) There was post-discharge evidence that Grievant's discharge was discussed in local and national neo-nazi/white supremacists communiques. This is not a basis for discharge but the fact it drew so much attention undermined Grievant's claims that he had no ties to white supremacist groups. Dennis Mahon was heard publicly stating that if his brother didn't get his job back "We're going to blow the place up." This implied violence was reinforced in other communiques.

## The Union's Evidence

(1) On cross examination the discharging manager admitted Grievant was a good mechanic and there had been no problems with his performance.

(2) Three crew chiefs testified that Grievant was an exceptional if not model mechanic. They also testified that he had never talked about the KKK or his political views at work, never was intimidating and in one case was described as the most polite and courteous mechanic he had ever worked with.

(3) A number of other employees echoed the crew chiefs' sentiment. The Grievant was kind to animals and helpful to people. He would "give you the shirt off his back".

15

(4) Nichols and Dill strongly dispute Kelly's statement about what Grievant supposedly said in the CERG meeting about writing the flyer.

(5) The Grievant denied having ties to white supremacist groups in his 29-F. It was also not his decision to distribute the flyer.

(6) The word "African-American" is capitalized through other employee resource group literature.

(7) Several employees weren't offended by the wording of the CERG flyer.

## A Weighing of the Evidence: The True Nature of the Grievant's Conduct

Was the flyer an expression of neo-nazi/white supremacist ideology or was the wording innocent and coincidental? Similarly, was the wearing of the shirt coincidental or was it a message? As noted above, the Board concluded the clear weight of evidence shows that the flyer was an expression of his social and political views and that the T-shirt was a message.

The evidence is convincing that the flyer was an expression of neo-nazi/white supremacist ideology. The wording of the White Knights of the Ku Klux Klan literature and the Grievant's flyer are strikingly similar. They are different to some degree, but nonetheless are spots on the same leopard. There is also the expert's testimony that the flyer was consistent with neo-nazi/white

19.

supremacist verbiage and themes. There was no countervailing evidence or testimony offered.

It is true that much of the Company's evidence showing the Grievant was personally involved in neo-nazi/white supremacist activities and financially supported them is not recent. However, it is very significant that Grievant chose not to testify. He did not come forward to deny or repudiate these actions. He did not come forward and say I did not do these things or say I did them but I am a changed man and no longer act in this manner.

Again the Board stresses Grievant cannot be disciplined because he is involved in unpopular political and social activities. His activities are relevant only to the credibility of his denial that the flyer (which is on duty conduct) wasn't racist and that the T-shirt wasn't a message of intimidation. The credibility of these denials in turn rests indirectly on the credibility of his claim that he was not a white supremacist and did not have ties to white supremacist activities.

The evidence shows the Grievant's defense in the 29-F proceeding was not credible. Clearly he holds white supremacist beliefs and has ties and involvement in such organizations. This reflects highly unfavorably on the underlying intent of the flyer. He cannot be disciplined for being Dennis Mahon's brother but the fact they live together in the same small house, share the same phone number (used in

20

various White Aryan/KKK communiques) taken together with Daniel's financial support and personal involvement in these activities also sheds unfavorable light on any question as to the underlying nature of the flyer. There was also evidence that Grievant's involvement with these activities had the hallmark of independence as demonstrated by his manning a White Aryan booth at a gun show. Even without having to resolve the conflict in Kelly's testimony and the testimony of Nichols and Dill as to whether Grievant said he would enlist his brother's help, the evidence is clear as to what tone the wording of the flyer took on.

As for the T-shirt, the most glaring evidence is the lack of credibility of Grievant's claim in the 29-F hearing that he did not have notice of the meeting and had not discussed it with anybody. Clearly he had discussed it and knew when the meeting was. This in turn undermines the notion that the wearing of the "Turner's Diaries" T-shirt was just an accidental function of what was clean or not clean in his closet.

The Grievant wore the shirt on purpose. Given his failure to testify, given all the other evidence about his personal and political beliefs and given the nature of this book, the Board is left to conclude it was purposefully worn for its intimidating and threatening effect.

The Union's character testimony was accepted as sincere and truthful.

However, the fact he was technically proficient and nice to some people doesn't outweigh all the other evidence nor is it directly related to the specific nature of his conduct in this case.

In summary, the wearing of the T-shirt and authoring of the flyer constitute misconduct for which discipline is appropriate.

## The Penalty

The question now before the Board is whether discharge is an appropriate disciplinary penalty for authoring a flyer for distribution by the CERG with neo-nazi/white supremacist overtones and wearing a T-shirt for its intimidating and threatening effect.

A substantial part of the Union's evidence related to the fact that many employees wear what can be categorized as offensive T-shirts and are never disciplined. Instead, employees are either told to change them or turn them inside out. However, the Board notes many of these T-shirts were sexual in nature or related to internal union matters. T-shirts making a word play on the phrase "Big Johnson" are hardly comparable to T-shirts related to ethnic, racial and political terrorism.

There were T-shirts about black pride and Malcolm-X and in fact, another

22

employee claims to have worn a "Turner Diaries" T-shirt. Indeed the Company should be concerned about double standards. However, the Malcolm-X shirt is equivocal. As far as the others, ultimately they do not establish a basis for a convincing disparate treatment argument since the facts do not show they were worn in the same context as Grievant. Grievant wore his in the context of discussions about a racially/ethnically questionable document. The wearing of questionable T-shirts by others may have been misguided, but the evidence in this case shows Grievant's conduct was a deliberate expression of deeply held racist social and political beliefs. The evidence does not show the wearing of the other T-shirts was done in conjunction with other misconduct involving the expression of racist ideology.

So the Grievant's conduct is unlike anyone else, does this mean he should be discharged? This is just one of many challenging questions raised by this case. After all, the expressions of some of the other employee resource groups were found to be offensive to some employees. Isn't some tension inevitable as people work through their differences? And isn't there a natural potential for tension when groups are allowed to form along racial, ethnic or sexual lines? To some extent isn't tension and friction part of the process of diversification and diversity education? And, if undesirable employee attitudes are going to change, shouldn't

people in the context of the diversity program be free to speak their minds on the theory it is easier to change attitudes when they are out in the open and "on the table"? And in the United States generally isn't there "freedom of speech"?

What is protected free speech away from work is not necessarily protected free speech at work. The law requires that employers regulate speech and conduct at work that contributes to a racially or sexually hostile work environment. Such conduct constitutes prohibited discrimination if the employer allows it to exist. The employer has a duty to eradicate such employee behavior from the workplace. The employer also has the right to regulate political and social speech when that speech interferes with the operation of the business. For example, if the discussion of political or social issues creates distractions and tensions between employees where it significantly affects productivity, the employer would be allowed to address it in a reasonable manner. The employer can also expect its workers to treat each other with civility, respect and dignity.

The Grievant can carry around in his head whatever thoughts about race and ethnicity he wants to at work. He could stand on the street corner away from work and scream at the top of his lungs about his related views on race, religion, ethnicity, government oppression, gun control and armed revolution. However, he can't do the same at work.

24

The Union also claimed there was no notice that his conduct was prohibited and subject to discharge. This is not accurate. In general, the policy against harassment and discrimination is known to be a "zero tolerance" policy. More specifically, the Grievant had been put on notice in the context of displaying symbols of racial hatred by two different supervisors that such symbols and expression of political views would not be tolerated. It cannot be said that he did not know that such expressions might result in discharge.

Not only did management put Grievant on notice that controversial political and social views at work would not be tolerated, not only was he told that symbols would not be tolerated, he was warned by friends not to come to the April 20 meeting. Evidently, he was also warned by someone within the "movement" not to wear the "Turner Diaries" shirt to the meeting. It doesn't bode well for him that his first error in judgment (writing a racially inappropriate flyer) was compounded by going to the meeting and wearing the shirt. These multiple errors in judgment strongly suggest that if reinstated, he could not or would not control himself or keep his racial and ethnic hatred from oozing once again from its ugly depths.

It is true that Grievant's writing could be taken two ways. It is true the wearing of the T-shirt could be taken two ways. However, the Employer has provided much evidence to which the Grievant failed to respond. Given this, it

25

was reasonable for them to interpret his actions in the worst possible light. His message was subtle but, in clearly resonant tones, rang true only to the sad song of racial superiority. Clever equivocation and veiled threats are part and parcel of the Grievant's ilk and he can't hide behind this cleverness at the expense of the security, dignity and respect of other workers who do not share his race or ethnicity or his attitudes of racial nobility. His expressions went well beyond the normal learning process involved in corporate diversity. His conduct is incompatible with the Employer's right to have a diverse workforce free from racial and ethnic hostility.

Much is debated in this record. However, in the final analysis, something must be said in plain and simple terms. At the root of Grievant's conduct was hate. At the root of his conduct was a philosophy based on hate for blacks, jews and other minorities. This philosophy has no place being expressed in the workplace. This is especially true where the Employer has engaged in so many efforts to establish a work environment free from racial hostility and harassment. Under these circumstances, discharge was appropriate.

26

## AWARD

The final advisory was for just cause and the grievance is denied.

_____
Gil Vernon, Arbitrator

_____
Mary Tinsman

_____
J. C. Brown

Dated this ____ day of March, 2000.

27



DEFENDANT'S DEPOSITION
EXHIBIT

14

PENGAD 800-631-6989

Page 3

```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE
 2           NORTHERN DISTRICT OF OKLAHOMA
 3
 4
 5    DANIEL W. MAHON,
           Plaintiff,
 6
 7    vs.                    NO. 00-CV-1008-E
      AMERICAN AIRLINES, INC.,
 8    A Delaware Corporation,
 9         Defendant.
10    - - - - - - - - - - - - - - - - - - - - - - -
11              THE VIDEOTAPED DEPOSITION OF
12    DANIEL W. MAHON, produced as a witness on behalf
13    of the Defendant in the above styled and numbered
14    cause, taken on the 29th day of October, 2003, in
15    the City of Tulsa, County of Tulsa, State of
16    Oklahoma, before me, Lisa A. Steinmeyer, a Certified
17    Shorthand Reporter, duly certified under and by
18    virtue of the laws of the State of Oklahoma.
19
20
21
22
23
24
25
```

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 2

```
 1    A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:        Mr. Robert Frazier
                                Attorney at Law
 4                              4150 South 100th East
                                Ave
 5                              Suite 200-B
                                Tulsa, OK 74146
 6
 7    FOR THE DEFENDANT:        Mr. David Cordell
                                Attorney at Law
 8                              15 East 5th Street
                                Suite 3700
 9                              Tulsa, OK 74103
                                -and-
10                              Mr. Robert Taylor
                                Attorney at Law
11                              P.O. Box 619616
                                MD-56765
12                              Dallas/Fort Worth
                                Airport, TX7 5261
13
14    ALSO PRESENT:            Ms. Pamela Terrazas
15
16
17
18
19
20
21
22
23
24
25
```

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 3

```
 1                    I N D E X
 2
 3
 4    W I T N E S S                            P A G E
 5    DANIEL W. MAHON
 6
        Examination by Mr. Cordell              4
 7      Examination by Mr. Frazier            230
        Cont. Examination by Mr. Cordell     245
 8      Cont. Examination by Mr. Frazier     250
        Cont. Examination by Mr. Cordell     251
 9
10    Signature Page                         252
      Reporter's Certificate                 253
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 4

```
 1              (Whereupon, the deposition began at
 2    9:15 a.m.)
 3                  DANIEL W. MAHON,
 4    having first been duly sworn to testify the truth,
 5    the whole truth and nothing but the truth, testified
 6    as follows:
 7                     EXAMINATION
 8    BY MR. CORDELL:
 9    Q     What is your full legal name, please?
10    A     Full legal name is Daniel Wallace Mahon.
11    Q     Is that still your legal name?
12    A     Yes, it is.
13    Q     Have you been known by any other names?
14    A     No other name.
15    Q     My name is David Cordell. We've met once
16    before I believe. I represent American Airlines in
17    this case where you have sued the company here in
18    federal court claiming certain violations of your
19    civil rights resulting from the termination of your
20    employment at American. Are you represented by
21    counsel today?
22    A     Yes, I am.
23    Q     The court reporter has administered you an
24    oath. Do you understand that you're sworn to tell
25    the truth?
```

TULSA FREELANCE REPORTERS
918-587-2878

**TULSA FREELANCE REPORTERS 918-587-2878**

Page 5

1  A  Yes.
2  Q  Do you understand there are consequences or
3  possible consequences if you do not tell the truth?
4  A  Yes.
5  Q  The oath that was given to you asked you to
6  swear under God that you would tell the truth. Is
7  that of any significance of you? Some people have
8  different ideas of God and things like that. So I
9  need to ask whether you believe that is binding on
10 you.
11 A  Yes, I do, yeah.
12 Q  Let me do a little bit of housekeeping here.
13 This deposition, while certainly very serious and
14 very formal, is intended to allow me to understand,
15 whether I agree with it or not, the basis of your
16 claims against my client. So as you know, I'm going
17 to ask you several questions today. I'm going to do
18 my best to ask you straightforward and fair
19 questions but in any evont, at any time you believe
20 you don't understand one of my questions, feel free
21 to point that out and tell me. Okay?
22 A  Okay.
23 Q  Answer out loud. The court reporter can't
24 take down head shakes, and we'll need to remind one
25 another if we start talking non-verbally. Okay?

Page 7

1  A  Not anything that would affect my ability to
2  answer a question, no.
3  Q  Are you on any kind of medication, whether
4  it's over-the-counter or prescription?
5  A  Yeah, I'm on some medication, yeah. I'm on
6  high cholesterol medication and some psoriasis
7  medications.
8  Q  Do you remember the names of them? I never
9  can.
10 A  I'm not a madical person so --
11 Q  Are these medications that were prescribed to
12 you by Dr. Karen Baten?
13 A  Bader, B-A-D-E-R.
14 Q  And she is your physician; is that right?
15 A  Right. She's my personal physician.
16 Q  How long has she been your personal physician?
17 A  Oh, three years.
18 Q  Since you left Tulsa and moved to Arizona; is
19 that correct?
20 A  My HMO, yes.
21 Q  And the problems regarding psoriasis and high
22 cholesterol, those started when?
23 A  About a month after I was terminated.
24 Q  Is it your testimony that prior to that time,
25 you never had any health problems whatsoever?

Page 6

1  A  Yes.
2  Q  Is it fair to me to presume that if I ask a
3  question and you answer it without telling me you
4  didn't understand it, that at least at the time I
5  asked the question, you believed you understood the
6  question?
7  A  I understand what you mean. In other words,
8  if you ask a question and if I don't understand what
9  the question is --
10 Q  Yes.
11 A  -- I have a right to ask you to repeat the
12 question?
13 Q  Yes.
14 A  Yeah.
15 Q  But if you go ahead and answer it, it's fair
16 to me to assume at the time you did understand it?
17 A  If I answer it, I definitely will understand
18 the question if I answer it.
19 Q  Are you feeling well today?
20 A  Not bad. How are you?
21 Q  Other than being nervous, are you feeling
22 physically okay?
23 A  Pretty good, yeah.
24 Q  Are you on any kind of medication that would
25 affect your ability to recall events in the past?

Page 8

1  A  No health problems at all.
2  Q  You're 53; is that right?
3  A  That's correct, 53.
4  Q  Birthday is August 29th, 1950?
5  A  That is correct.
6  Q  Where were you born, air?
7  A  I was born in Rockford, R-O-C-K-F-O-R-D,
8  Rockford, Illinois.
9  Q  Are either of your parents still alive?
10 A  Both parents are still alive and well.
11 Q  Where do they live?
12 A  They live in Davis Junction, Illinois.
13 Q  How far away from Rockford is that?
14 A  Approximately ten miles.
15 Q  I understand that after a stint working for
16 White Beret Enterprises, you moved to Illinois and
17 went to work for Rockford Aero Taxi?
18 A  Rockford Aero Taxi. It's an air cargo
19 operator.
20 Q  Where was that particular business located?
21 A  Rockford Airport.
22 Q  In Rockford, Illinois?
23 A  Yeah, Rockford Airport right there outside of
24 town.
25 Q  In essence, you moved back to your home town

Page 11

1   for a job after leaving American?
2   A   Yes.  I moved there -- well, not after.  I
3   worked in the appliance repair business for about
4   nine months first.
5   Q   And when you moved back to Rockford, did you
6   move in with your parents?
7   A   I resided on the property, not in their house,
8   no.
9   Q   Do they have another building on the property
10  or something?
11  A   Yeah, several.
12  Q   Family farm?  I'm trying to get a picture.
13  A   Yeah, six acres.
14  Q   Do you know your Social Security number by
15  memory?
16  A   Yes, I do.  It's 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.
17  Q   And I understand you're an FAA licensed
18  aircraft and power plant mechanic; is that right?
19  A   Well, I don't actually work as that.  I work
20  as an avionics, FCC license, but I do have all the
21  ratings.
22  Q   What is your A & P license number, if you
23  know?
24  A   1943502.
25  Q   Do you know what your FCC license is?

TULSA FREELANCE REPORTERS
918-587-2878

Page 12

1   Q   You're identical twins; right?
2   A   Yes, sir.
3   Q   I believe your twin brother also is Dennis W.
4   Mahon; is that correct?
5   A   That's correct.
6   Q   Do you know what his middle name is?
7   A   William.
8   Q   Other than Dennis, do you have any other
9   siblings, brothers or sisters?
10  A   I have two siblings, older sister and a
11  younger brother.
12  Q   Please tell me their names and where they
13  live,
14  A   Gary is my younger brother and he lives in
15  Seattle, Washington.
16  Q   Does he go by Gary Mahon?
17  A   Yeah, uh-huh.
18  Q   Am I pronouncing your name correctly?
19  A   You mean --
20  Q   Mahon?
21  A   Yeah, that's correct, exactly.
22  Q   Seattle, do you know what he does for a
23  living?
24  A   He's in the window washing business.

TULSA FREELANCE REPORTERS
918-587-2878

Page 10

1   A   I can get it.
2   Q   Mind checking real quick for me?
3   A   Okay.
4   Q   Do you need to borrow these?
5   A   Yeah.  I forgot my reading glasses.  It's kind
6   of hard.  Okay.  PG, as in papa golf, dash, GB, as
7   golf bravo, dash, 079703.  You don't need the
8   issuance or anything like that; right?
9   Q   No, sir.  I need my glasses back.
10  A   I'm sorry.  I'm used to wearing mine all the
11  time.
12  Q   As we know, this is a case about you and not
13  about your brother, Dennis.  Certainly because of
14  the history of this matter, there will be questions
15  that have to do either directly or indirectly with
16  him.  At this point my question is, are you and your
17  brother, Dennis', Social Security numbers different
18  by only one digit?
19  A   One digit, right.
20  Q   Do you happen to know whose number is higher
21  or lower?
22  A   His number is one digit higher.
23  Q   So you're the older brother?  What's the birth
24  sequence?
25  A   He was born first.  I was born five minutes

TULSA FREELANCE REPORTERS
918-587-2878

Page 12

1   Q   And your older sister, what is her name and
2   where does she live?
3   A   Her name is Margie and she lives in Milwaukee,
4   Wisconsin.
5   Q   Is she married?
6   A   No.  She's single.
7   Q   Does she still use the last name Mahon?
8   A   That's correct.
9   Q   I understand at one point in time -- I'm
10  sorry, I asked about your parents.  I didn't get
11  their names.  What are their names?
12  A   Barbara and William Mahon.
13  Q   I understand at one point in time you were
14  married to a woman named Myrna?
15  A   Right.
16  Q   What was her full name or is her full name?
17  A   Right now it's -- she's twice married again,
18  so her last name is Faracion, and I don't know how
19  to spell that, just Myrna.  F-A-R-A-C-I-O-N, that's
20  as close as I can get it.
21  Q   When she married you, was that her first
22  marriage?
23  A   Yeah, first marriage.
24  Q   You say she's been twice married, so she's on
25  her third marriage?

TULSA FREELANCE REPORTERS
918-587-2878

1  A    Yeah, third marriage.
2  Q    Of your marriage, there was one child born,
3  Willie or William; is that right?
4  A    William R., yeah.
5  Q    What does the R stand for?
6  A    Ricardo.
7  Q    Now, some people use the term married in
8  different contexts. When you were married to Myrna,
9  were you legally married?
10  A    ·Yeah. We had a license, yeah.
11  Q    License, wedding the whole deal?
12  A    We went to a church wedding, yeah.
13  Q    When were you married, and I understand you
14  were divorced. When were you divorced?
15  A    You want to know when I was married first?
16  Q    Sure.
17  A    Okay. We were married in Coupeville,
18  Washington in 1979 in October.
19  Q    Were you still in the Service at the time?
20  A    U. S. Navy, right.
21  Q    And when were you divorced?
22  A    1984. It was in the fall. I forget exactly
23  when.
24  Q    Were you living in Tulsa at the time of your
25  divorce?

TULSA FREELANCE REPORTERS
918-587-2878

Page 14

1  A    No. We were living in Floride, Hollywood,
2  Florida.
3  Q    And you hadn't gone to work for American
4  Airlines by then?
5  A    I was still with Eastern. Eastern Airlines
6  when it was still in business.
7  Q    How old is your son now?
8  A    He's 23.
9  Q    We'll review a little bit of your employment
10  background leading up to going to work for American.
11  At the time you were working for Eastern down in
12  Florida, what was the reason that you left that
13  employment?
14  A    They were going belly up. They were in an
15  extremely bad way financially, and I wanted to leave
16  before they quit, before they went under, which they
17  did.
18  Q    Did you go to work directly for American
19  Airlines at that point?
20  A    No. I went to an operator in Michigan called
21  Activaero. I worked up there for -- before I went
22  with American.
23  Q    I'm going to hand you what's been marked as
24  Defendant's Exhibit 5. This exhibit, while we're
25  marking it, I believe is an application for

TULSA FREELANCE REPORTERS
918-587-2878

Page 15

1  employment with American Airlines, a copy of which
2  was also in the papers that you produced yesterday.
3  Sir, will you identify that as being the case; is
4  that your complete employment application to
5  American Airlines as far as you can tell?
6  A    As far as I can tell, it looks like it is.
7  Q    Sir, at the time you applied for American, as
8  is customary, there's a provision, a portion on Page
9  3 of this application that outlines your employment
10  history. Do you see that?
11  A    Uh-huh.
12  Q    This is a shortcut so you don't have to tell
13  me from memory everything that you did after leaving
14  Eastern. Reviewing that now, do you recall or can
15  you tell me that the employment history that you
16  gave American at the time you went -- applied to
17  work there is accurate?
18  A    Accurate as far as I can see.
19  Q    Are any jobs missing?
20  A    No jobs missing.
21  Q    Now, I note on the one that pertains to
22  Eastern Airlines that your reason given for leaving
23  there was for, quote, various reasons, closed quote.
24  A    Uh-huh.
25  Q    Were there any reasons besides the spectre of

TULSA FREELANCE REPORTERS
918-587-2878

Page 16

1  bankruptcy?
2  A    Well, basically just they were going bankrupt
3  and that was it. I got divorced. That was all.
4  Just felt like leaving the situation.
5  Q    No other reasons?
6  A    No other reasons I know of.
7  Q    Is it your testimony you were not fired from
8  Eastern?
9  A    No, I was not fired from Eastern. They begged
10  me to stay.
11  Q    Directing your attention to Defendant's
12  Exhibit 5 still, does that bear your signature on
13  the last page?
14  A    That's my signature.
15  Q    Above your signature there are some paragraphs
16  that relate to the terms and conditions of your
17  employment by American. At the time that you signe
18  your application, did you agree to abide by those
19  terms and conditions if, in fact, you took a job at
20  American?
21  A    I signed it, so I must have agreed to it.
22  Q    But for any limiting provisions of the
23  collective bargaining agreement between the union
24  and the company, the contract, did you understand
25  that you were an at-will employee, that is to say,

TULSA FREELANCE REPORTERS
918-587-2878

Page 19

1  Q    And did she move away from Tulsa about that
2  time?
3  A    Right.  She remarried a gentleman that had a
4  lot of family in the southwest and she moved to
5  Phoenix.
6  Q    Do you have any family in Arizona other than
7  perhaps your brother?
8  A    Just my son and the ex-wife lives there and my
9  brother.  That's it.
10 Q    Do you live -- I'm not that familiar with
11 Arizona.  Do you live close by where your ex-wife
12 and your son live?
13 A    Yeah, within a fifteen-minute drive, yeah.
14 Q    Do you have any grandchildren?
15 A    One.
16 Q    What is that grandchild's name?
17 A    Clayton.
18 Q    Is your son, Willie, still married?
19 A    No.  It was out of wedlock type of situation.
20 Q    And what is Clayton's last name?
21 A    It's his girlfriend's.  I forget her last name
22 now.  I just can't remember.
23 Q    Does Clayton live in Arizona?
24 A    Yeah.  He lives with my son.  They share joint
25 custody.  He stays at each place.

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 18

1  the company could fire you at any time for any
2  reason, good or bad?
3  A    During the probationary period of six months,
4  right.
5  Q    After the probationary period, except for
6  limitations caused by the union contract, i.e., that
7  there had to be just-cause to fire you, but for that
8  restriction, did you understand you were an at-will
9  employee of American Airlines?
10 A    Yes, yes, I did.
11 Q    Other than the union contract, do you believe
12 that you had any contract of employment with
13 American Airlines?
14 A    Excuse me.  I'm sorry, I didn't --
15 Q    Other than the union contract, did you believe
16 you had any other contract of employment with
17 American Airlines?
18 A    Any other contract?
19 Q    Yes, sir.
20 A    In other words, another job that conflicted
21 with American?
22 Q    No.  Let me clear it up.  Was there any signed
23 contract between you and American Airlines?
24 A    No, there wasn't.
25 Q    Were there any agreements between you and

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 18

1  American Airlines regarding continued employment
2  other than the contract that the company had with
3  the union?
4  A    There was no other contract.
5  Q    Since your divorce from Myrna in roughly 1984,
6  have you been married?
7  A    Not remarried, no.
8  Q    Did you ever get back with Myrna?
9  A    Yeah, we did get back.
10 Q    When did you two get back together?
11 A    She lost her job in Florida and I told her of
12 some job openings in Tulsa, and I would have my son
13 close by to help him grow up, and she came back.  I
14 got her a house in late '89.
15 Q    Purchased a house for her?
16 A    Helped, yeah, helped her purchase a house.
17 Q    But I take it, you all never remarried?
18 A    No, we didn't.
19 Q    Did you live together as husband and wife
20 under common law?
21 A    Yeah, for a certain time.
22 Q    I take it you've split up again; right?
23 A    Right.  It didn't work out.
24 Q    When did you all split up again?
25 A    Oh, about 1990.

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 20

1  Q    I realize that your son is now an adult, but
2  at the time of your divorce from Myrna, who receive
3  custody of Willie?
4  A    She did, although he spent a lot of time with
5  me.
6  Q    If I were looking for your divorce papers,
7  should I look in Florida for them?
8  A    Yeah.  That's where it was filed.
9  Q    Other than your divorce, have you ever been
10 involved in any other kind of litigation besides
11 this case?
12 A    No other litigation at all, nothing.
13 Q    Never been sued by a creditor, for example?
14 A    Never been sued for any reason.
15 Q    Never evicted from an apartment?
16 A    Never evicted from any place of residence.
17 Q    Other than documents that we're going to look
18 at later today, do you recall ever giving a sworn
19 statement, and let me give some examples.  Sometim
20 -- obviously when you applied for employment at
21 American, you made a sworn statement.  Often times
22 when people between jobs apply for unemployment
23 insurance, they fill out affidavits and things of
24 that nature.  Have you ever given any other kind o
25 sworn statements ever in your life?

TULSA FREELANCE REPORTERS
918-587-2878

Page 23

1  A    Not that I know of.
2  Q    I understand that before you left Tulsa after
3  your termination from American, that you lived with
4  a neighbor for awhile.  Back up one place behind
5  that.  In terms of where your home was in Tulsa,
6  where was it located?
7  A    Okay.  Talking about just before I left or
8  after I got fired?
9  Q    At the time you got fired, where were you
10 living?
11 A    I was 1448 North College.
12 Q    How long had you lived at that address?
13 A    1990.  That was the house I bought for the
14 ex-wife, and I just took over payments, quit claim.
15 Q    And is that the location where from time to
16 time your brother, Dennis, would live with you?
17 A    Yeah.  He rented a room.
18 Q    Was the house on North College in your name
19 and only your name?
20 A    Yes, it was in my name.  I finally sold it.
21 Q    Did you have a phone number at that house?
22 A    Yes, I did.
23 Q    Do you recall the number?
24 A    My phone number was 834 --
25 Q    1042?

TULSA FREELANCE REPORTERS
918-587-2878

Page 22

1  A    Yeah, 1042.
2  Q    All right.  As it respects your employment at
3  American, when you were fired, you exercised your
4  rights under the collective bargaining agreement and
5  filed a grievance?
6  A    Right, I did.
7  Q    And at the arbitration that was finally held
8  in this matter, you were represented by your union;
9  correct?
10 A    Correct.  I was represented by TWU.
11 Q    And at that hearing the union also had a
12 lawyer present; is that right?
13 A    They had a lawyer present, Frasier, Frasier
14 Law Firm, Steve --
15 Q    Steve Hickman; right?
16 A    Steve Hickman.
17 Q    Was Steve Hickman your lawyer at that matter
18 or a combination of your lawyer and the union's
19 lawyer; what was he there?
20 A    As far as my understanding goes, he was
21 strictly the union's contracted lawyer.
22 Q    But there to help with the arbitration; is
23 that right?
24 A    He was there supposed to be helping with the
25 arbitration.

TULSA FREELANCE REPORTERS
918-587-2878

Page 23

1  Q    I take it you don't think he helped very much?
2  A    I didn't hear him talk very much.  Let's put
3  it that way.
4  Q    Whether you agree with the decision or not,
5  assuming -- and I assume you don't, but whether you
6  agree with it or not, you understand that your
7  grievance and arbitration was heard and went against
8  you, i.e., it was determined that the company had
9  just cause under its rules to terminate your
10 employment?
11 A    Right.  I read that decision, yeah.
12 Q    How long did that hearing go on?
13 A    That hearing was a record-setting three-day
14 hearing.  The arbitration hearing was three days.
15 Q    I'm going to hand you what's been marked as
16 Defendant's Exhibit 9.  While she is doing that, did
17 you attend all the arbitration?
18 A    Yes, I did, all four or three days.
19 Q    Were you present when all witnesses were
20 testifying?
21 A    Yes, I was.
22 Q    Would you please identify Defendant's Exhibit
23 9 as a copy of the decision of the three member area
24 board adjustment upholding American's termination of
25 your employment?

TULSA FREELANCE REPORTERS
918-587-2878

Page 24

1  A    Yeah.  This is a copy of that decision.
2  Q    Prior to today, have you actually reviewed
3  that decision?
4  A    I've gone through it.
5  Q    Have you looked at it closely?
6  A    As close as I wanted to.
7  Q    Now, at the arbitration you chose -- or strike
8  that.  At the arbitration you did not testify; is
9  that right?
10 A    I was informed not to testify by the union.
11 Q    Who at the union told you not to testify?
12 A    The committee men in charge, Mike Rial,
13 requested that we didn't have time, enough time, and
14 we had plenty of witnesses that testified, so --
15 Q    It was a decision made during the course of
16 the arbitration?
17 A    Yeah, the union decision not to let me
18 testify.
19 Q    Is it fair to assume from the way you answered
20 that question, that you wanted to testify?
21 A    Yeah.  I was looking forward to it, but the
22 union basically ran the show, so I let their
23 judgment stand.
24 Q    Let's begin at the beginning in terms of the
25 case here.  I'm going to direct your attention to

TULSA FREELANCE REPORTERS
918-587-2878

Page 27

1   So I asked him to explain in particular what was
2   wrong with the literature, and then that's how the
3   discussion proceeded after that.
4   Q    At that time, though, did you admit you wrote
5   the pamphlet?
6   A    It was -- absolutely. I was directed by the
7   head of the group on four different occasions that
8   they would like to have some literature made up.
9   Q    The head of the group is Linda Dill?
10  A    Linda Dill and Mr. -- oh, wow.
11  Q    Craig Nichols?
12  A    Craig Nichols, right.
13  Q    Once again, what I'm doing is tracking the
14  language of the advisory here as an overview and
15  we'll give you the chance to give us details of your
16  opinions on it later, okay, but as reflected in the
17  final advisory, on April 20, 1999 at that meeting
18  did you wear a T-shirt with the words and a picture
19  on the front saying The Turner Diaries?
20  A    Yes, I did.
21  Q    And the front side of the shirt had a
22  depiction of the cover of the book; is that right?
23  A    It was, right.
24  Q    Now, you have a copy of that book; is that
25  right? I'm handing to you and I'd like for you to

---

Page 25

1   Defendant's Exhibit 1. At some point in time you
2   were notified in writing that your employment had
3   been terminated; is that correct?
4   A    That's correct.
5   Q    Did you receive that notification by virtue of
6   Defendant's Exhibit 1, the May 10, 1999 final
7   advisory?
8   A    Final advisory, yeah.
9   Q    You did receive this?
10  A    I did receive this copy, yeah.
11  Q    Once you received the copy, did you read it?
12  A    Yes, I read that.
13  Q    Did you read it closely for accuracy?
14  A    Oh, I went through it. I didn't put a
15  magnifying glass on it but I did go through it.
16  Q    Skipping any conclusions that are reached in
17  this and focusing on the facts only, is it true that
18  on April 20, 1999 you attended a meeting of what was
19  then known as the Caucasian employee resource group?
20  A    Yes. I was notified by a crew member that a
21  flyer was on the bulletin board. At the time I
22  received permission to go to the meeting, so I did
23  go that meeting, a little late but --
24  Q    Did you understand going into that, and we'll
25  discuss this in more detail. Right now I'm looking

Page 28

1   look at it and hold it up for the camera. It
2   appears to be a copy of a book called The Turner
3   Diaries that was produced to us from your files
4   yesterday afternoon.
5   A    Yes.
6   Q    Is that your book?
7   A    That's not my book but it's a copy of the
8   book.
9   Q    Did you have a copy of the book?
10  A    For a little while.
11  Q    What happened to your copy?
12  A    It was borrowed. I read the first chapter and
13  it was the last I saw of it.
14  Q    Who borrowed it?
15  A    I'm not sure. I think a neighbor.
16  Q    Who do you think it was?
17  A    Dennis said he let someone else see it or he
18  mailed it off to somebody and that was it. It was
19  very busy household there. I was involved in a lot
20  of repair work on people's TV's and a car outside,
21  an overhaul; my engine was torn down on my own car.
22  I didn't have a chance to get past the first
23  chapter. Plus a lot of overtime, so it was a very
24  busy time.
25  Q    How did you originally obtain a copy of The

---

Page 26

1   for overview, sir, okay? Did you understand going
2   into that meeting on April 20, 1999 that the purpose
3   of the meeting was to discuss the role of American
4   Airlines employee resource groups in supporting
5   diversity in the workplace?
6   A    Yes. There were some other issues that were
7   going to be raised, that were raised at the meeting.
8   Q    Among those issues, did you understand one of
9   the purposes of the meeting was to discuss the
10  recent six-month suspension of the Caucasian
11  employee resource group as a result of the flyer
12  that you authored and was handed out at the
13  diversity fair?
14  A    Actually I didn't know of the meeting at all
15  until I was notified by a crewman in my shop, but I
16  wanted to attend the meeting because there was
17  several issues that were going to be talked about,
18  among those, that particular issue.
19  Q    Okay. During the April 20 meeting did you
20  speak up and admit that you wrote the flyer and
21  supplied it to the CERG for distribution?
22  A    Well, an individual, Greg Hall, started
23  calling me another name. He called me Dennis, and
24  he said, Dennis, we're not going to have this type
25  of radical extremist literature in the workplace.

Appellate Case: 04-5143   Document: 23   Date Filed: 02/25/2005   Page: 39

Page 31

1  A     I thought it was anti-government, pro-gun type
2  book, a novel.
3  Q     Did you understand that part of the infamy of
4  it was that Timothy McVeigh had a copy of it or a
5  portion of it in his car when he was arrested?
6  A     That was part of the reason it piqued an
7  interest.
8  Q     Did you understand at the time you bought the
9  book that it was believed that Timothy McVeigh
10 followed the scenario in the book in terms of making
11 a fertilizer bomb, parking it in a rent truck in
12 front of a federal government building and
13 detonating it?
14 A     All I understood about the McVeigh situation
15 at the trial news reports was that his motivation
16 behind what he did was what he witnessed firsthand
17 at Waco, Texas and also the massacre up in Idaho
18 with the Weaver family. That was the biggest
19 motivation he had for his retaliatory act. As far
20 as I know, The Turner Diaries, the guy I bought it
21 from said over 300,000 copies were sold in the last
22 several years. So McVey may have had it and never
23 even read it. Who knows?
24 Q     Before you bought the book, did you understand
25 that a least a portion of it deals with the

Page 31

1  Turner Diaries?
2  A     Gun show, one of the big gun shows here in
3  Tulsa.
4  Q     The Wanamaker Gun Show?
5  A     I'm not really sure if it was the Wanamaker or
6  the other one. It was about a month or two before
7  the problem we had, talking about at the time I
8  bought the T-shirt and the book, and the T-shirt was
9  on sale, so it was a package deal on it, so --
10 Q     Since we're talking about that, I've lived in
11 Tulsa for awhile and have also gone to the gun
12 shows. If I represent to you that in the first
13 quarter of 1999, prior to the time of your
14 termination, there was a gun show held in Tulsa
15 sponsored by a company or the people named Wanamaker
16 during the weekend of April 10 through 11, assuming
17 for the time being that my information is correct,
18 which I believe it to be, is that the gun show that
19 you attended where you bought a copy of The Turner
20 Diaries and a Turner Diaries T-shirt?
21 A     That probably would have been the one.
22 Q     Returning to the final advisory, turning to
23 the allegations covered in that, The Turner Diaries
24 T-shirt that you bought, as you just testified, did
25 you wear it to the management meeting?

Page 32

1  systematic murder of non-whites?
2  A     No, I didn't know it until I read the first
3  chapter that dealt with a big gun confiscation
4  program that the federal government initiated. I
5  got through the first chapter and I got involved in
6  other activities around the house and that's as far
7  as I got.
8  Q     When you bought the book at the April 10 or 11
9  gun show, were you alone; in other words, gun show
10 by yourself; were you there with your brother; what
11 was the situation?
12 A     I don't think he was with me that day. I
13 think he was out of town. I think he was up in
14 Illinois. I'm pretty sure he was out of town.
15 Q     Do you know who you bought the book from?
16 A     No.
17 Q     Was it a fellow in a booth or something?
18 A     Numerous vendors had the book. I just don't
19 remember. That's a pretty good-sized gun show.
20 Q     Did you buy it at some booth advertising it or
21 was it randomly at some gun seller?
22 A     It was a large area, had T-shirts, books,
23 everything, all kinds of stuff.
24 Q     Do you remember the name on the display?
25 A     No.

Page 30

1  A     What management meeting are we discussing now?
2  Q     The Caucasian employee resource group, at
3  which members of management were present.
4  A     Well, management was present at all meetings.
5  This was an open meeting on a flyer. It described
6  an open meeting to all members and guests. So it
7  was not exactly a membership meeting because they
8  were always represented at those meetings.
9  Q     Did you understand that members of management
10 were likely to be at that meeting?
11 A     Well, there's always some at every meeting, so
12 I didn't know if there would be or not.
13 Q     Now, prior to your purchasing of The Turner
14 Diaries book at the April 10 or 11 Wanamaker Gun
15 Show in 1999, had you previously read The Turner
16 Diaries or any portion of it?
17 A     No, I never read the book before then.
18 Q     What caused you to purchase the book?
19 A     I've heard about it. In the McVeigh trial
20 they mentioned it and USA Today in many articles,
21 and I decided to see what people were talking about,
22 better buy a copy of it and check it out and see
23 what it has to say.
24 Q     Prior to buying it and checking it out, what
25 did you understand The Turner Diaries was about?

Page 35

1  Q    Were you familiar with any people that were
2  working at what I'm calling the booth at the time
3  you bought this book?
4  A    No. I have no idea who I bought it from.
5  Q    My question was, did you know any of the
6  people that were running the booth?
7  A    No, no knowledge of any people that ran the
8  booth.
9  Q    At the time -- I'm referring to Exhibit 1
10  still in terms of the allegations that were made
11  supporting your termination. At the time you went
12  in to the April 20, 1999 meeting, were you aware
13  that American Airlines had received a number of
14  complaints by other employees concerning the flyer
15  or the pamphlet you had written?
16  A    I heard rumors to that effect, just a few
17  people.
18  Q    Had any of the members of the Caucasian
19  employee resource group told you that people were
20  upset about your pamphlet?
21  A    I received one phone call.
22  Q    From who?
23  A    Linda.
24  Q    What did she tell you?
25  A    She said there's just an issue about it with

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 36

1  arbitration.
2  A    Yeah. It's dark; it should be lighter. It
3  looks like it's gray. That is the T-shirt right
4  there.
5  Q    Let me hand this to you and have you hold it
6  up to the camera so we've got a better picture of
7  it.
8  A    You want the front first?
9  Q    Front first, please, and then flip the back
10  around.
11  A    (Witness complied).
12  Q    Sir, there's some confusion in my mind based
13  upon statements you've made to various people at
14  various times, so let me ask a couple of questions
15  about that. Is that the actual T-shirt you wore to
16  the April 20, 1999 meeting of the Caucasian employee
17  resource group?
18  A    No, this is not it.
19  Q    What happened to thet T-shirt?
20  A    I don't know. I think it just got thrown
21  away.
22  Q    At some point I've seen some reference that a
23  lady friend threw it away.
24  A    Yeah.
25  Q    Does my recall bring a recollection to you?

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 34

1  high management and so she didn't say anybody else,
2  just that the management was having an issue with
3  it. That's all she told me.
4  Q    Was that a matter of concern at the time going
5  into the meeting on April 20?
6  A    Not really because I didn't have anything in
7  that literature that was derogatory to any culture
8  or race or anything.
9  Q    Did she, Linda Dill, tell you what it was that
10  management found offensive about your --
11  A    No. She just said that it -- they said it was
12  improper and it showed a hint of white supremacy to
13  certain high management people.
14  Q    For the purposes of the chronology, was the
15  last day of your employment at American Airlines May
16  10, 1999?
17  A    Right. May 10th was it.
18  Q    Sir, I'm going to direct your attention to
19  what's been rarked as Defendant's Exhibit 15, which
20  I'll represent to you is a copy of the exhibit
21  showing a picture of The Turner Diaries T-shirt or
22  the exhibit that was used at your arbitration.
23  Starting with a copy of a picture of it, look at
24  that and tell re if that happens to be a copy of the
25  T-shirt as it was shown and used in your

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 36

1  A    Yeah, a girlfriend. She got kind of irate
2  about it and she took it and last I saw of it.
3  Q    Who is that person?
4  A    Lisa.
5  Q    Lisa what?
6  A    She's a married lady, and I don't feel
7  comfortable about giving that information out.
8  Q    Well, were you having an affair with her at
9  the time she was married; is that the point?
10  A    Yeah.
11  Q    Does Lisa still live here in town?
12  A    No. She's not in the state anymore.
13  Q    Subject to an agreement that I could make with
14  your counsel on a protective order and about how I
15  approach this person, would you agree on a break
16  here to consult with your lawyer and give me that
17  person's last name?
18  A    I don't think it's appropriate. Does it have
19  anything to do with the case? I admit I wore the
20  T-shirt to the meeting, not that exact T-shirt but
21  T-shirt of that exact make and style. This T-shirt
22  has some unusual marks on it. I don't know what
23  those marks are of some type, but that's not the
24  T-shirt I wore.
25  Q    Obviously that's a T-shirt that's been worn a

TULSA FREELANCE REPORTERS
918-587-2878

Page 39

1 fair amount. It's yellow and stained?
2 A   Yeah, it's stained. Actually is this an extra
3 large. That may be my brother's T-shirt. I think
4 he had one, too. Looks like an extra large.
5 Probably too big for me. I wear a medium.
6 Q   Let me get the timing of it this and I'll let
7 you and Mr. Frazier consult on the break about the
8 issue I've raised. Was the original -- I'll call it
9 the original -- the original T-shirt that you wore
10 to the April 20 meeting destroyed by your lady
11 friend between that meeting and the time of the
12 arbitration?
13 A   It was destroyed just after I was put out of
14 work, before the arbitration.
15 Q   Sometime shortly after May 10, 1999?
16 A   Yeah, before the arbitration.
17 Q   And what was the nature, as you recall, of her
18 being upset about it to the extent she trashed your
19 shirt?
20 A   I just told her to go ahead -- it cost me my
21 job, go ahead and destroy it. So I directed her to
22 just go ahead and dispose of it.
23 Q   The T-shirt you produced that we've been
24 looking at here today, do you know where you got
25 that one?

TULSA FREELANCE REPORTERS
918-587-2878

**Top-right column (Page 39):**

1 taken and then made as an exhibit, Exhibit 15, was
2 done?
3 A   You know, I can't recall really what T-shirt,
4 how they got that T-shirt. I'm trying to think back
5 that far. My memory is not good. I know when I got
6 the attorney, my attorney, we went and got that
7 T-shirt from Steve. That's where this T-shirt came
8 from. The T-shirt at the arbitration, I'm not sure
9 I just can't recall where that T-shirt came from,
10 whether they ordered one from the Internet or
11 whatever.
12 Q   Do you happen to know where the T-shirt that
13 they took a picture of that's in Exhibit 15 is
14 located now?
15 A   That's probably the one at the arbitration.
16 Q   So it was borrowed from Waddel, a picture was
17 taken and returned to Waddel; is that what you thin
18 happened?
19 A   That's probably what happened, yeah, because
20 when I got the attorney, we went back to his house
21 and got that T-shirt.
22 Q   When the three of us were in Denver arguing
23 the appeal of this case, your counsel showed the
24 panel members a Turner Diaries T-shirt. Is the one
25 he showed them the one that's on the table in front

TULSA FREELANCE REPORTERS
918-587-2878

Page 38

1 A   The T-shirt, this T-shirt here?
2 Q   The one here on the table.
3 A   I don't know where that shirt came from. Oh,
4 the shirt, I know where it came from. It came from
5 a neighbor, a guy named Steve because I remember we
6 went to his house and got it.
7 Q   Who is Steve; what's his last name?
8 A   Steve Waddel.
9 Q   He's one of the people that you've listed as a
10 witness in this case; right?
11 A   Right. He's a neighbor and a friend. I've
12 done a lot of work for him.
13 Q   So he himself had one of these T-shirts?
14 A   Yeah, he actually had one.
15 Q   You said we went and got it from him. Who is
16 we?
17 A   Me and my attorney.
18 Q   And did that occur after the arbitration?
19 A   Way after the arbitration.
20 Q   So the picture that's in Exhibit 15 that was
21 used at the arbitration is not a picture of the
22 T-shirt that's on the table; is that correct?
23 A   I'm not sure where we got the T-shirt at the
24 arbitration.
25 Q   Were you present at the time that the picture

TULSA FREELANCE REPORTERS
918-587-2878

Page 40

**Bottom-right column:**

1 of us as far as you know?
2 A   As far as I know, that's the one he showed to
3 the judges.
4 Q   When you bought the T-shirt and The Turner
5 Diaries book April 10 or 11, 1999, you've testified
6 that you purchased more than one T-shirt at that
7 time; is that right?
8 A   Yeah. I think I purchased three or four
9 T-shirts around the gun show.
10 Q   From the same vendor, same seller?
11 A   No. Different vendors.
12 Q   Did you buy more than one Turner Diaries
13 T-shirt?
14 A   No. One T-shirt I bought from him and I
15 bought three other T-shirts from three other
16 vendors.
17 Q   Do you recall what the other T-shirts were?
18 A   One was Bill Clinton, something about Bill
19 Clinton, and another one was -- oh, wow. One was
20 pro-gun T-shirt but I forget what it said, and the
21 were two about Clinton, two T-shirts with Clinton'
22 picture on the front, and one said -- it had a
23 target thing on it but I didn't know what it said.
24 It just had a target thing and he was like smiling
25 and one was talking about Clinton in a sexual

TULSA FREELANCE REPORTERS
918-587-2878

Page 43

1  manner. I don't remember what it was; it was a
2  comical T-shirt is all.
3  Q    Do you remember what the third one was?
4  A    I don't remember.
5  Q    Of the total of four T-shirts you bought at
6  the gun show that day --
7  A    I think it was four of them I bought and
8  several other things.
9  Q    Had you worn any of the T-shirts you bought
10 that day besidee the Turner Diaries ones to work?
11 A    I think I wore the Clinton one one time, once
12 or twice.
13 Q    So you wore the Clinton -- let's make sure we
14 understand the chronology. You purchased the shirts
15 on the weekend of April 10 and 11, 1999?
16 A    Uh-huh.
17 Q    And you were terminated May 10, 1999, almost
18 exactly a month leter; is that correct?
19 A    Uh-huh, right.
20 Q    And in the meantime after you bought the
21 shirts and the Turner Diaries book, we know you
22 attended the meeting on April 20, 1999 where you
23 wora a Turner Diaries T-shirt?
24 A    Right.
25 Q    So is it your tastimony that between April 10

TULSA FREELANCE REPORTERS
918-587-2878

1  where did you get that one?
2  A    I don't recall ever getting that book. As a
3  matter of fact, that's a large -- that's a bigger
4  book. The one I bought was small; it was much
5  smaller. That's a much -- I don't know how they go
6  that book.
7  Q    Do you know when this version of the book came
8  into your possession?
9  A    I don't recall ever buying that book unless
10 the union -- I think the union may have gotten it
11 somehow because I don't recall buying -- the one I
12 bought was small; it was a smaller version. It
13 wasn't that large version. That's a larger version
14 Q    Obviously as part of the controversy leading
15 up to your termination and all the testimony at the
16 arbitration, you understand that the beliefs
17 espoused in The Turner Diaries were considered to t
18 inappropriate in the workplace; is that right?
19 A    Yeah. Now that I know the contents, yeah, it
20 probably wouldn't be the right kind of book to be
21 distributing if that's what you mean.
22 Q    Between May 10, 1999, the termination date,
23 and your hearing in the arbitration in November
24 1999, did you read The Turner Diaries?
25 A    Yeah, I went through it after the controversy

TULSA FREELANCE REPORTERS
918-587-2878

Page 42

1  or 11, 1999, that weekend, and the meeting on April
2  20, that you had worn one or more of the other
3  shirts you bought at the gun show?
4  A    Probably one of them anyway on a weekend.
5  More than likely I -- I worked a lot of overtime
6  during that time and I probably wore it once or
7  twice.
8  Q    Do you know for sure?
9  A    Not for sure.
10 Q    What shift were you working at the time you
11 were terminated?
12 A    I was back on second shift.
13 Q    When does that start and when does it end?
14 A    I think it started at 2:30 and went to I think
15 11:15, something around that, the second, what do
16 you call it, night shift.
17 Q    The copy of the Turner Diaries T-shirt that
18 you bought the weekend of April 10th -- I said
19 T-shirt, didn't I. The copy of The Turner Diaries
20 book that you bought during the weekend of April 10,
21 1999, you said you read a chapter of it; your
22 brother or somebody loaned it to somebody else, and
23 you never saw it again?
24 A    It disappeared.
25 Q    The book that's here at the deposition today.

TULSA FREELANCE REPORTERS
918-587-2878

Page 44

1  When the union produced it, I paged through it and
2  it did have some pretty radical stuff, but I didn'
3  see anything about making of a bomb in there, a
4  fertilizer bomb. I never saw the instructions, yo
5  know.
6  Q    Would you agree with me it's a pretty nasty
7  book in terms of expressing hatred and --
8  A    Well, I've read Road Warrior books. I've
9  read books -- the Holy Bible talks about wholesale
10 destruction of entire tribes in the Old Testament.
11 It was just about as nasty as any other book I've
12 read. It has some ugly points in it, some ugly
13 parts, yeah.
14 Q    Would you grab the book there for a second,
15 please. Turn to Page 62.
16 A    (Witness complied.)
17 Q    When you read the book, did you see the
18 reference to an airliner being shot down? Help
19 yourself.
20 A    My Lasix surgery didn't do too good.
21 Q    So you had the surgery?
22 A    Yeah. It failed in my right eye. Okay.
23 Q    I believe it's the second paragraph. See the
24 reference to the airliner being shot down?
25 A    A bazooka to shoot down an airliner which had

TULSA FREELANCE REPORTERS
918-587-2878

Page 47

1  just taken off at Tel Aviv and -- there were no
2  survivors. A bazooka was a portable launcher for
3  small rockets used primarily against tanks in World
4  War II. Okay.
5  Q    As having had a career and I guess a
6  continuing career in the airline industry, you know
7  one of the most serious things or one of the things
8  airlines take most seriously is the safety of their
9  passenger and their aircraft?
10 A    Absolutely.
11 Q    In essence, you, as a licensed mechanic, have
12 taken an oath to do everything in your power to make
13 sure that operating aircraft are safe; is that
14 right?
15 A    Absolutely. I've been doing it for 30 years
16 now.
17 Q    Let's talk a little bit -- before we get too
18 far, I'm handing you what's been marked as
19 Defendant's Exhibit 15A for purposes of the Record.
20 This is a copy of the Turner Diaries. Would you
21 identify it as such, please?
22 A    It appears to be a complete copy of it. How
23 many pages is this?
24 Q    It's a copy of a different version of it, I'll
25 represent to you.

Page 46

1  A    The page numbers don't agree.
2  Q    For the purpose of the Record, the reference
3  to Page 62 was from your copy of the book that you
4  brought; right?
5  A    Uh-huh, right.
6  Q    Let me hand you what's been marked as
7  Defendant's Exhibit 2. This is a copy of the
8  complaint that you filed in this case on November
9  27, 2000 by your lawyer that's here today. Do you
10 recognize that as a copy of the pleading that your
11 lawyer filed on your behalf?
12 A    Yep. That's a copy of the initial pleading,
13 brief.
14 Q    That was some six months or so after the
15 arbitration board made the decision upholding the
16 termination; is that correct?
17 A    That's correct.
18 Q    For the purpose of determining when an
19 applicable privilege might apply, when did you first
20 hire Mr. Frazier as your attorney?
21 A    About a year after I got fired, which would
22 have been probably three months after the
23 arbitration decision came down. I can't give you an
24 exact date.
25 Q    Other than to the extent that Mr. Hickman

Page 47

1  might be perceived as being your attorney in that
2  arbitration, other than Mr. Frazier, have you had
3  any other attorneys represent you in connection with
4  your claims against American Airlines?
5  A    No other attorneys. Just Mr. Frazier, Bob
6  Frazier.
7  Q    Whether you hired them or not, did you consult
8  with any other attorneys besides Mr. Frazier
9  regarding your claims against American?
10 A    I had interviews with other attorneys, yes.
11 Q    One of the people that's on your witness list
12 and who we're going to talk about a little later
13 today is a men by the name of Eugene Hough?
14 A    Gene Hough.
15 Q    Hough?
16 A    Yeah.
17 Q    I apologize. Did you consult with Mr. Hough
18 in his capacity as an attorney or merely as you
19 listed as a witness, as a friend?
20 A    Basically casual talk, not -- I didn't
21 consider him to take the case because he's not
22 specialized in this type of litigation.
23 Q    How did you come to find out about Mr. Frazier
24 and ask him to represent you?
25 A    Initial meeting, Mr. Frazier answered an ad in

Page 48

1  the paper concerning my boat. I sold him my 1957
2  Crestliner, and it came up that he was an attorney
3  and I asked him what he specialized in and he said
4  basic accident type, insurance claims, this type of
5  thing, and about a month later came back to have me
6  sign some paperwork for the boat and at that time h-
7  asked me some questions about my termination and
8  concerning the conditions of it, and he asked me to
9  come to his office the next day, which I did.
10 Q    And that's where your official attorney-client
11 relationship started?
12 A    That's where we officially signed the
13 paperwork and he became my attorney.
14 Q    There are seven what lawyers call causes of
15 action in your complaint; do you see that?
16 A    Uh-huh.
17 Q    One was -- the first one was for breach of
18 express or implied contractual obligations. Do you
19 understand that that claim was ruled against you an
20 that the Tenth Circuit Court of Appeals says that
21 claim is no longer viable?
22 A    Right. They said it was no longer viable,
23 that claim.
24 Q    And as a matter of e shortcut, since it
25 appears you understand what questions I'm asking, d

**Page 49**

1  you understand that the only claim that you have
2  left as a matter of law to pursue against American
3  Airlines is your claim that your rights of equal
4  protection were violated?
5  A   Right. That's our claim, yeah.
6  Q   Do you understand that the underlying
7  discharge, your firing from American Airlines has
8  been upheld by the Tenth Circuit?
9  A   Right, the firing itself. . .
10 Q   In your own words, tell me how you think
11 American Airlines denied you equal protection of
12 law.
13 A   Okay. To put it very simply, the people in
14 charge of this group put heavy pressure on me to
15 make up some literature, custom made for this
16 particular group. On several occasions before I
17 manufactured this piece of literature, I asked for a
18 list of guidelines for this piece of literature,
19 which they could not produce. So I went to the
20 library and got several books on aviation, and I
21 contacted her again and I said I still don't know
22 what to put on here, and she said put down something
23 that concerns the history of aviation and the
24 Caucasian people. I said there's plenty of books at
25 the library and made this up. I did put down -- at

**Page 50**

1  the diversity fair I put down on the literature,
2  please proofread before distribution, which I don't
3  know if they did or not, but they distributed the
4  literature.
5     When this issue came up about this literature
6  being fit for distribution, none of these other
7  people were in any way disciplined, either
8  termination or other type of disciplinary action. I
9  was the only one that was, shall we say, targeted
10 for dismissal. I feel that many other people wore
11 T-shirts at this facility, including one that showed
12 an Adolph Hitler face. Numerous T-shirts showed
13 female body parts, pro-homosexual T-shirts and some
14 T-shirts -- Malcolm X showing a violent act against
15 a police officer, which I didn't complain about but
16 some people did, and they were not disciplined for
17 any of these types of T-shirts. I was the only one
18 in the history of American Airlines who was
19 terminated for wearing a T-shirt.
20    Also they did not -- they did not follow
21 established policies, called a peak performance
22 program, which before a person can be terminated has
23 to go a three-step program. First step is a
24 counseling. Second step that if the person still
25 violates a certain rule, then they're put out of

**Page 51**

1  service for one day, called a career day, and the
2  third time, if they still violate the same rule,
3  then they're terminated. American Airlines did not
4  follow that procedure, established agreement with
5  the union. So that's my claim of unequal
6  protection.
7  Q   Let's start with number three and go
8  backwards. Number three in terms of application of
9  what is known as the peak performance or commitment
10 policy, that was an issue regarding company policy
11 that was raised, litigated and decided against you
12 in the arbitration; correct?
13 A   Correct.
14 Q   Do you understand that that is no longer fair
15 game in this lawsuit?
16 A   Right. You asked me my opinion why.
17 Q   I appreciate that. I'm just trying to keep us
18 focused so we use our time adequately.
19 A   Okay.
20 Q   Number two, I have characterized it as other
21 people wearing T-shirts who were not terminated.
22 Okay?
23 A   Right.
24 Q   There was evidence, and we will look at
25 exhibits that were introduced at the arbitration, t

**Page 52**

1  the effect of other T-shirts that were worn and the
2  person that wore them was not terminated.
3  A   Right.
4  Q   Okay. I don't expect you to remember them but
5  -- all of them. My question is, do you have any
6  examples of any other T-shirts from your personal
7  knowledge that have been worn by other employees at
8  American Airlines other than those that were
9  introduced in your arbitration?
10 A   I did not make it a personal hobby of
11 observing people's T-shirts; however, I had receive
12 many complaints of fellow workers of other people
13 wearing T-shirts, in particular some that were --
14 well, I'll say this. I didn't make it an issue to
15 go to management about things that offended me ther
16 where some people may do it but I did not ever do
17 that. I never went to HR with complaints, although
18 some things did bother me occasionally.
19 Q   Let's try it this way. We're skipping around
20 a little bit. Is the answer to my question, other
21 than what the union introduced on your behalf at t
22 arbitration, you don't have any current evidence o
23 other T-shirts that other employees wore and whom
24 were not terminated?
25 A   Yeah, just at the arbitration, the ones that

Page 55

1  were brought up as far as I know.

2  Q    Then skipping back to the first item, nobody

3  else in the Caucasian employee resource group was

4  disciplined for the flyer, let me ask the first

5  question. Were all members of the Caucasian

6  employee resource group white?

7  A    I don't really know because I had no list.  I

8  was only a member one month.

9  Q    Do you ever recall a non-white attending any

10  meeting of the Caucasian employee resource group?

11  A    Absolutely, many times, the two meetings I

12  went to.

13  Q    Do you recall, or strike that. Do you know

14  whether that person was there as a member or as

15  you've testified earlier, a management

16  representative from the diversity action council?

17  A    Diversity action council, as far as I know I

18  don't know whether they were management or not

19  because there was so many people attended those

20  meetings but there were people of different ethnic

21  people there.

22  Q    Let me approach it a little differently. Were

23  all the people that you dealt with at the Caucasian

24  employee resource group white?

25  A    For the most part, yeah, they were white.

TULSA FREELANCE REPORTERS

918-587-2878

Page 54

1  Q    Let's go down the list of people you know.

2  Linda Dill, is she white?

3  A    Yes.

4  Q    Craig Nichols, is she (sic) white?

5  A    He's white.

6  Q    Give me the names of the people you know by

7  name that were in the Caucasian employee resource

8  group.

9  A    I don't know if the people were actually

10  members or not because I don't really know. It was

11  people that were there. As I said, I only joined

12  six weeks before the thing went wrong, and the group

13  was in operation for six months before I went and

14  attended some of the meetings. There were several

15  people on the list of potential witnesses that

16  attended those meetings. They're all there.

17  Q    Were all those people white?

18  A    White or part Indian. There were some people

19  that had some Indian heritage but they were for the

20  most part I would say white. I don't know what the

21  total definition of white really is, but they're all

22  employees, union people for the most part. I don't

23  know of any management people that were in the group

24  at all.

25  Q    Were all the officers or the leaders of the

TULSA FREELANCE REPORTERS

918-587-2878

Page 55

1  group that you dealt with white people?

2  A    The two I knew, yeah.

3  Q    Focusing on your first subject area of the

4  complaint about nobody else from the CERG being

5  disciplined, did you believe that the treatment you

6  received as opposed to the consequences to the othe

7  leaders of the group was unfair?

8  A    Yes, I believe it was unfair.

9  Q    What do you believe the company should have

10  done to discipline the leaders of the Caucasian

11  employee resource group as a result of the pamphlet

12  A    Well, first thing, I believe they should all

13  be treated equal, all people involved. I think a

14  letter in the file, a letter, disciplinary letter i

15  the file, in their files would have been

16  appropriate. Possibly counseling at the very most,

17  maybe some time off without pay, possibly, but

18  nothing approaching termination.

19  Q    And had the company administered any

20  combination of that discipline to you and the other

21  leaders of the -- or to you and the leaders of the

22  Caucasian employee resource group, would you have

23  any complaint at this point in time?

24  A    Well, personally I think that the infraction

25  or whatever was presented at the meeting, the gist

TULSA FREELANCE REPORTERS

918-587-2878

Page 56

1  was that there was no guidelines given, which didn'

2  warrant any real disciplinary action. If there

3  would have been actual guidelines of this literatur

4  and if guidelines were violated, then I could see a

5  problem. The reason I think they had the meeting

6  was to describe what went wrong with this

7  literature, what was wrong with it that people --

8  certainly a few people got upset about, but I don't

9  think the fact that I was the only one targeted for

10  this situation was not right. It violated all sens

11  of fairness.

12  Q    By the time of the April 20, 1999 meeting of

13  the Caucasian employee resource group where you wor

14  The Turner Diaries T-shirt, by that point in time

15  the group had already been suspended; is that

16  correct?

17  A    I wasn't sure if the group was because when I

18  was notified of a meeting on a flyer on a wall, it

19  said the meeting was that day, all members invited

20  So -- and all non-members. It was basically an op

21  meeting, and it was established on the same day the

22  ever had a meeting. It was on Tuesday, so --

23  Q    So is it your testimony you didn't know that

24  group had been suspended prior to going to the Apr

25  20 meeting?

TULSA FREELANCE REPORTERS

918-587-2878

Page 59

1   A      I thought that's what the meeting was about,
2   that they were going to suspend it, but I didn't
3   know it was suspended at that time. I thought the
4   meeting would be about that situation, but I didn't
5   know if it was actually suspended at that time.
6   Q      You testified earlier today that you found out
7   about the April 20 meeting from another crew member;
8   is that correct?
9   A      Yeah, Eric Hanson.
10  Q      Describe that to me.
11  A      Well, I got to work and punched in and went
12  into the shop.
13  Q      That would be around 2:30; correct?
14  A      Probably around a quarter until 3:00. We were
15  already in the area, awaiting what we call the
16  tie-in, the work orders.
17  Q      Tell us which area. I'm sorry.
18  A      Hanger 2B where I worked 727 light, C check.
19  We had a small, reel small little shop we met in
20  around a small table, and Eric said I see on the
21  bulletin board there's a flyer, a green flyer
22  talking about the resource group has a meeting
23  today, and I said, well, let me see if I can go to
24  it, I would like to see what's going on. I went to
25  Tom Snyder, the supervisor, and asked if I could --

Page 58

1   the work load wasn't too bad, so I said can I be
2   dismissed for an hour to attend this meeting and he
3   said go ahead.
4   Q      Was Eric Hanson involved in the group.
5   A      No, I don't think he was. He just notified me
6   the bulletin board had it on there.
7   Q      He was a co-worker?
8   A      Yeah, he was my avionics co-worker. I worked
9   with him quite a bit, did.
10  Q      To your personal knowledge, were there any
11  leaders or members of the Caucasian employee
12  resource group that were non-white and were
13  disciplined in a fashion other than yourself?
14  A      Not to my knowledge.
15  Q      Now, Mr. Mahon, when you attended the April 20
16  meeting wearing The Turner Diaries T-shirt, did you
17  recognize that those who had an appreciation for
18  what that book was about might be offended?
19  A      Well, first of all, the book is not well
20  publicized. Most people -- I wore the T-shirt all
21  day and nobody mentioned it, nobody looked at it,
22  and most people -- one guy said is that Ted Turner,
23  and I said, well, not quite Ted Turner, but most
24  people had no idea what it was about. As a matter
25  of fact, nobody in the meeting -- I was sitting

Page 60

1   about 25 feet away from anybody from management, way
2   in the corner so they would have had to have pretty
3   good eyesight to read the T-shirt from 25 feet away.
4   It took them basically, what, ten days from the time
5   I was put out of service until the time they called
6   me in to terminate me to determine that that T-shirt
7   was inappropriate during the investigation. So
8   nobody told me at the meeting at all that there was
9   a problem with the T-shirt.
10  Q      Did you understand at the time you wore the
11  T-shirt if in fact somebody did know what it was
12  about, you were running a risk by wearing that
13  T-shirt to work?
14  A      Well, it was the only T-shirt I had that was
15  clean enough to wear and I wore it. I didn't think
16  it would cause a problem. As a matter of fact, I
17  didn't think anybody would be at the meeting to tell
18  you the truth, but I was sitting at the far end of
19  the table. I didn't get up there and put it in
20  anybody's face so to speak, but I didn't notice
21  anybody staring at me or giving me any kind of a
22  look at all. I saw no unusual facial expressions
23  upon wearing the T-shirt.
24  Q      Well, I asked you a slightly different
25  question. My question was, if somebody knew what

Page 60

1   the Turner Diaries T-shirt were about at work, would
2   you understand you were running a risk by wearing
3   that T-shirt to work?
4   A      If they read the book from cover to cover,
5   they would be, but the initial statement on the
6   T-shirt is a pro-gun, what would the government
7   do -- what will you do when the government comes to
8   take away your guns. It also admonishes not to read
9   the book. It says the FBI considers the book
10  dangerous. So the admonishment on the T-shirt is
11  actually not to read the book.
12  Q      Which, of course, is all the more reason to
13  read it; right?
14  A      Well, I don't know about that, but most people
15  that read the T-shirt thought it was a pro-gun type
16  T-shirt.
17  Q      Before we take a little break, is it your
18  testimony that prior to the start of your shift on
19  April 20, 1999, you were not aware that there was
20  going to be a meeting of the Caucasian employee
21  resource group?
22  A      I wasn't really sure. I knew there was a
23  meeting that could happen at any time but I wasn't
24  sure what day. It could have been any time. Until
25  the flyer was actually found and I was notified of

1  the flyer, I didn't know exactly about that meeting.
2  Q    You've confused me now.
3  A    Until I was notified of the flyer, I didn't
4  know the meeting was going to take place.
5  Q    Okay, and when were you notified of the flyer?
6  A    About a quarter until 3:00 before the shift
7  started in my shop.
8  Q    How did you become aware of that?
9  A    When Eric Hanson came and said hey, go check
10  out the flyer on the bulletin board in the hallway;
11  there's a green flyer about your group; they're
12  having a meeting. That's when I asked my supervisor
13  to take some time off to go to the meeting.
14  Q    So your reference to the flyer that you just
15  talked about wasn't the offending flyer that caused
16  the start of this problem?
17  A    Oh, no. This is the flyer announcing the
18  meeting, the CERG meeting, the last CERG meeting.
19  Q    Just for the purpose of the Record, I direct
20  your attention to what's been marked as Defendant's
21  Exhibit 17. Sir, is this the flyer you made
22  reference to in your last series of testimony that
23  was -- I think you said was it green that gave you
24  notice --
25  A    Yeah. This was green. Yeah, this was green.

1  explain what is wrong with the literature.
2  Q    Now, do you believe that you have a right to
3  express your own personal political beliefs in the
4  workplace?
5  A    Insofar as it affects current events I think.
6  That's what most people -- especially during
7  election year, that's all you hear about.
8  Q    Do you believe that the message that is sent
9  by The Turner Diaries is a political message?
10  A    Well, it's a novel. It has some strange
11  belief systems that were presented later in the
12  book. The first chapter, like I said, I thought it
13  was strictly a book about a bunch of people that
14  were being hunted down because they had weapons and
15  guns, and I thought it was strictly a deal about a
16  guy resisting government authority when they had the
17  big gun raids. It wasn't until much later that I
18  found out what the rest of the book was about.
19  I know McVeigh was really, real heavy Second
20  Amendment advocate. I never met the man at a gun
21  show, but that's the only thing I know as far as
22  that goes. The people around the base would talk
23  politics all the time. Especially Clinton was a bi
24  topic.
25  Q    Do you believe that in connection with the

1  This is on the bulletin board outside the hangar.
2  Q    I can't read it very well. Do you happen to
3  know beside the exhibit sticker what that round
4  circle thing in the bottom right-hand corner is?
5  A    I haven't the foggiest idea. Looks like a
6  soccer ball.
7  MR. CORDELL: Is this a good time to take a
8  break?
9  MR. FRAZIER: Sure.
10  (Following a short recess at 10:37
11  a.m., proceedings continued on the Record at 11:00
12  a.m.)
13  Q    Mr. Mahon, at the April 20, 1999 meeting, from
14  notes you produced to me, I've seen where you say
15  that Mr. Greg Hall made statements in that meeting
16  to the effect that political statements were
17  recruiting; do you know what I'm talking about?
18  A    Yeah.
19  Q    What did he say?
20  A    I'll quote verbatim. He said, Dennis, I'm not
21  going to allow white supremacist, neo-Nazi or
22  skinhead material to be distributed on this base,
23  and I said, sir, first of all, my name is not
24  Dennis; I resent you saying that, but I said you
25  know, please explain -- at that time I said please

1  pamphlet and wearing The Turner Diaries T-shirt to
2  the April 20 meeting that you were singled out
3  because of your political views?
4  A    It became very apparent even at the meeting
5  that the whole subject concerned my twin brother,
6  Dennis, especially when the vice-president of
7  maintenance addressed me twice as Dennis. He made
8  mean-spirited remark by not calling me by my proper
9  name. There were several issues brought up at their
10  meeting, not just this material. Also was a
11  statement made by a Robert Hosier that was extremely
12  inflammatory that I think everybody in that meeting
13  would testify to.
14  Q    I'm not sure either you understood or answered
15  my question. Do you believe that you were singled
16  out by American Airlines based on your political
17  views?
18  A    Yes, I think they singled me out for sure
19  because they assumed I had these political beliefs
20  They assumed things and they targeted me,
21  unwarranted.
22  Q    Is it your testimony that you don't have any
23  political beliefs whatsoever?
24  A    Everybody does. I'm a right wing
25  conservative, Rush Limbaugh type, but I'm not a

Page 65

1  hater or a blatant racist.

2  Q    You've testified or written in various places

3  that we'll talk about in more detail later that you

4  are not a card-carrying member of any white

5  supremacist group?

6  A    Never been.

7  Q    Since those are words you've used, what do you

8  mean by card-carrying?

9  A    A card-carrying member of any organization

10  would be a person that's been sworn in, a membership

11  number, an active part of a group.

12  Q    You've testified there that there was a period of

13  time in which you were associated with the Caucasian

14  employees resource group but before you actually

15  joined; is that right?

16  A    I went to one meeting before I actually joined

17  up.

18  Q    Have there been groups, sir, that you have

19  been associated with that you have not been

20  card-carrying member of?

21  A    Associated? That's a big term. Other than

22  the people that my brother associated with, I knew

23  people by names, not personal friends or personal

24  acquaintances, just name familiarization. That was

25  all.

TULSA FREELANCE REPORTERS
918-587-2878

Page 66

1  Q    And what type of groups are you talking about

2  your brother associating with?

3  A    The people he associated with, anti-government

4  militias, tax protests, some racist type people, but

5  they weren't associated with me.

6  Q    So is that the distinction that you've drawn;

7  you've been around and perhaps participated in

8  meetings of those but you've never been a

9  card-carrying member?

10  A    Participation, another big term. I

11  volunteered upon request to videotape certain

12  mayoral forums, certain rallies and provide a

13  rebuilt PA system, and that's as far as it went. As

14  much as my twin brother is my brother, I didn't

15  approve of all of his beliefs but I still love him

16  as my brother and I was protective of him, somewhat

17  protective.

18  Q    I've seen that statement before, that you

19  didn't approve of all of his beliefs. Which beliefs

20  do you and your brother share in common?

21  A    Basically taxation and gun control. That's

22  basically what it is. He's a very complicated

23  person, very complicated personality, and I really

24  don't know what his really total belief system is.

25  He's unique to himself.

TULSA FREELANCE REPORTERS
918-587-2878

Page 67

1  Q    Well, certainly it's fair to say that he's

2  been a controversial figure; wouldn't you agree?

3  A    Anybody that runs for mayor and has alternate

4  viewpoints I guess would be considered

5  controversial, sure.

6  Q    Let's go back a little farther in time. I'm

7  generally speaking. If I'm not saying it

8  accurately, point it out, but generally speaking

9  your brother, Dennis, has been associated, if in

10  fact not the leader of, a section of the Ku Klux

11  Klan; is that right?

12  A    Yes, he was. He was a leader in Missouri

13  until 1990, right around October. I gave him three

14  months to vacate that position or go find another

15  place to live, and he did. So I'm responsible for

16  getting him out of that organization. I said you've

17  got three months to get rid of that thing or you

18  have to find another place to reside, which he did.

19  Q    And your brother, Dennis, has also received

20  attention for being detained in Caneda as a result

21  of pro-Nazi speeches that he made in Germany;

22  correct?

23  A    Canada, he was deported for a book on

24  immigration. There are -- certain publications are

25  illegal up there, about 20 different publications.

TULSA FREELANCE REPORTERS
918-587-2878

Page 68

1  If you get caught, you'll be deported, and that's

2  what happened to him. He was caught with a book by

3  a British author, so he was deported.

4  Q    Other than the KKK, what organizations do you

5  know that your brother has been associated with the

6  would be considered anti-government, racist,

7  supremacist, things of that nature?

8  A    As far as being a membership of anything; is

9  that what you are saying?

10  Q    I'm not trying to be that limiting.

11  A    The only person I know that he was involved

12  with is Thomas Metzger in Fallbrook, California.

13  That's the only person I know he ever really had or

14  correspondence with actually.

15  Q    Known as Terrible Tommy; right?

16  A    Yeah, Terrible Tommy.

17  Q    Have you ever met Terrible Tommy?

18  A    One time I met him. He was a television

19  repairman, and as I do television repair work, I ha

20  to ask his advice a few times but other than that,

21  we're not really considered friends. I don't

22  consider him really an acquaintance really. I

23  haven't spoken to him in, gosh, ten -- since

24  Dennis -- Dennis doesn't operate with WAR anymore.

25  He's not active. Since he left Tulsa, he's not eve

TULSA FREELANCE REPORTERS
918-587-2878

Appellate Case: 04-5143   Document: 13   Date Filed: 02/25/2005   Page: 49

Page 71

1  an active member of anything.

2  Q   When did he leave Tulsa; after your

3  termination?

4  A   Yeah.  That was 19 -- late -- no.  It was

5  about June of 1999.

6  Q   You've made reference to WAR and that stands

7  for White Aryan Resistance; correct?

8  A   Right.

9  Q   Were you involved in any fashion, whether you

10 were a card-carrying member or not, with WAR?

11 A   Well, as far as what I heard from my brother,

12 WAR isn't a membership organization.  They don't

13 have memberships; they have associations and they

14 sponsor concerts for these kids, little bald-headed

15 kids, but he really isn't -- it's not really an

16 organization per se.  He just puts out a little

17 newsletter and that's it.

18 Q   Do you believe that in addition to your own

19 political views, you were singled out by management

20 because of the views of your brother?

21 A   Absolutely.  The notes in the arbitration will

22 bring that out.  It brought my twin brother's name

23 in almost ever issue involved in the arbitration, so

24 I would say absolutely yes.

25 Q   I'm going to hand you what I'm going to

Page 70

1  mark --

2       MR. FRAZIER:  I don't need a copy, David.

3  I've got the transcript.

4  Q   What I'm labeling as Exhibit 9A, which I'll

5  represent to you is a copy that I have of the entire

6  transcript from the arbitration, three-day

7  arbitration of your discharge.  I will tell you for

8  some reason the copy that I got, there's a page here

9  or there missing, not of anything of consequence

10 that I know of, and when I get the missing pages,

11 I'll supplement, but have you seen a copy of the

12 transcript of your arbitration before today?

13 A   I've seen most of it, yeah.  I've gone through

14 periodically.  I didn't read all of them.  I just

15 don't have the time, but I pretty much went through

16 the arbitration.  I witnessed the whole proceeding

17 and know what transpired in those proceedings.

18 Q   So you do have copy of it, you and/or your

19 lawyer?

20 A   Yeah, we have copies.

21 Q   As you've read through it, have you written on

22 it, annotated it, whatever word you want to use, for

23 things you agree or disagree with?

24 A   Not really.  Like I said, I've been witness to

25 all the things that went on.  I have a pretty good

Page 71

1  memory of what was said, and I don't have time to

2  read every single page but --

3  Q   Well, not really, does that mean no, you have

4  not annotated or written --

5  A   No, I've not annotated any notations on the

6  transcripts.

7  Q   Does anything specifically come to mind that's

8  in that transcript through the testimony on the

9  arbitration that you believe to be untrue?

10 A   I don't understand the question.  Anything

11 that was in these transcripts that I think is

12 untrue?

13 Q   Yes.

14 A   That American brought up?

15 Q   Anybody brought up.

16 A   Absolutely.  A lot of things are untrue.

17 Q   What ones do you recall?  I realize it's a

18 thick thing, but you're living this firsthand; you

19 attended the arbitration; you have the transcript.

20 What things are not true that were testified about

21 in the arbitration?

22 A   The innuendos that I'm a member or support

23 heavily white supremacist groups, that I support

24 them monetarily, that I support my brother

25 monetarily.

Page 72

1  Q   Is that untrue, completely untrue?

2  A   Absolutely untrue.

3  Q   Never gave any of these groups any money

4  through your brother or directly?

5  A   Never gave any money.  I don't give my brother

6  any money.  He makes it on his own.  The innuendo

7  that I had a so-called white supremacist agenda on

8  the literature was totally untrue.  That's just the

9  major big ones.  There are probably some other ones

10 I'd have to have time to look at.

11 Q   You've talked about innuendos, conclusions that

12 were reached as a result of the testimony; right?

13 A   (Witness nods head up and down).

14 Q   Do you recall any particular witness

15 testifying under oath and lying in that arbitration

16 A   Oh, yes.  The woman at the drugstore, that had

17 to have been an out and out lie.  The statement she

18 made about a bomb threat.  That was absolutely --

19 Q   Well, is there anything else you remember

20 before I ask you about that?

21 A   Oh, I wish it happened just last year.  It's

22 hard to remember back that far.  I don't remember

23 anything else.  Just the whole general spirit of th

24 arbitration was based on a false premise that I wor

25 a T-shirt in there just to offend a bunch of people

1 They assumed that I went on my own to make this
2 literature up, which I was bothered at least six
3 times to be sure to put out this literature. That's
4 basically the two big things that I can recall that
5 were totally false.
6 Q    Let's talk about the testimony about the bomb
7 threat. Is that the same story about you and your
8 brother going to Walgreen's to drop some film off?
9 A    Yeah, to drop some film off.
10 Q    Is it true you and your brother went to
11 Walgreen's to drop some film off?
12 A    All the time.
13 Q    Which Walgreen's?
14 A    We went to the one on Pine and Sheridan. I
15 was doing a lot of buying and selling of collectable
16 modal airplanes at the time and, of course, people
17 want pictures so we always had pictures to develop
18 and send out. That was before the age of computer
19 scanners and things. So we went there quite often,
20 but I don't ever believe my brother screaming out
21 loud that -- I don't even know what she said,
22 something about a threat against American.
23 Q    Something to the effect of, if my brother
24 doesn't get his job back at American, that they're
25 going to see the biggest bomb they ever had?

TULSA FREELANCE REPORTERS
918-587-2878

Page 76

1 A    He did most of his drinking on weekends. He
2 never did publicly drink. He didn't appear to be
3 drunk any time we went to stores. I wouldn't be
4 with him if he was snockered, I never would be with
5 him, but he was for the most part sober most of the
6 time. Sometimes on the weekend he would imbibe a
7 little bit.
8 Q    When did the incident at Walgrean's occur; on
9 a weekend?
10 A    No. I think it was -- we usually went during
11 the week. That's when he did all of his business.
12 I don't know exactly what day it was, but I know he
13 wasn't drunk and I know he didn't say it.
14 Q    Did he say anything that has a ring of truth
15 from what this witness testified about?
16 A    I don't recall him ever saying anything about
17 my situation at American at all. He certainly
18 didn't say anything about a bomb going off. That's
19 one thing he wouldn't have said, but I didn't hear
20 him say anything at all.
21 Q    So it's possible he said it and you didn't
22 hear it; is that true?
23 A    Well, if she was in the area -- I don't know
24 where she was standing at the time, but if he barke
25 that out, I'm sure the person he was talking to at

TULSA FREELANCE REPORTERS
918-587-2878

Page 74

1 A    Yeah. This woman has obviously a big, big
2 imagination. Plus, if she took that really
3 seriously, if she did take it seriously, she's in
4 violation of law by not reporting that to the
5 authorities. If you hear a conspiracy to do an act
6 of violence like that, you are required by law to
7 report that to authorities. She did not do that.
8    This woman at her job, I know she has a lot of
9 the people that work for her at the restaurant that
10 she manages have a lot of complaints, and she has a
11 poor track record of management policies. So -- but
12 anyway, I think this woman has some problems.
13 Q    Do you think she was out to get you?
14 A    I think she didn't like my brother's politics
15 for sure, and she appeared to be extremely upset at
16 the arbitration, more upset than anybody who had
17 heard something six months before that. She
18 appeared to be emotionally disturbed to me.
19 Q    Possible she was scared of you and your
20 brother?
21 A    No. I think she is on some kind of
22 medication. I've heard she has had some surgeries
23 and some health and mental problems.
24 Q    At the time of the incident at Walgreen's, was
25 your brother drunk?

TULSA FREELANCE REPORTERS
918-587-2878

Page 76

1 the counter would have heard it, and I have no
2 inclination of anything like that. It's a big
3 store. Anything is possible. I don't know, but I
4 know I don't think he would have said that. I neve
5 heard him say it.
6 Q    You worked at American roughly fourteen years;
7 is that right?
8 A    Just shy of fourteen years, uh-huh.
9 Q    Limiting it to your work group, in other
10 words, the people that work out at the base here in
11 Tulsa, generally speaking is the majority of the
12 people that work out there white?
13 A    In my department?
14 Q    Yes.
15 A    Yeah. My whole crew -- well, the crew I last
16 worked with were all Caucasians. The crews I worke
17 with before that were mixed. Even at my
18 arbitration, I had two mixed members on my crew,
19 Hispanic American and Asian, Barney, and we had
20 another guy, yeah. We had mixed. The entire dock
21 worked with was mixed.
22 Q    From your -- what you see when you drive into
23 work and go into the parking lot and you walk
24 through the buildings, go to your work station,
25 isn't it true that the vast majority of the people

TULSA FREELANCE REPORTERS
918-587-2878

Page 77

1  that worked in Tulsa for American Airlines are
2  Caucasian?
3  A    That applies to any corporation. Majority of
4  people usually are Caucasian, yeah. We've had some
5  mighty fine people out there.
6  Q    Despite the fact that the majority of the
7  people that work for American Airlines are
8  Caucasian, do you recognize that American also hires
9  people of all nationalities and colors?
10 A    Absolutely. Some of the best people I've
11 worked with are of other cultures and races.
12 Q    Do you agree from your time at American
13 Airlines, that American has policies to encourage
14 diversity and respect for all groups of people?
15 A    Sure. It's been a policy for most companies.
16 Q    Did you understand at the time you worked
17 there that American had an anti-discrimination
18 policy prohibiting discrimination based on anybody's
19 race?
20 A    For hiring purposes, yeah, they do.
21 Q    Any kind of practices. Did you understand
22 that discrimination was not tolerated at American?
23 A    Right. That's the policy for a long time.
24 Q    And that was true of any race, discrimination
25 against whites, for example?

TULSA FREELANCE REPORTERS
918-587-2878

Page 78

1  A    Right. For any people at all, yeah.
2  Q    Now, there were more employee resource groups
3  than just the Caucasian one; correct?
4  A    As far as I know, there was like 20 of them.
5  Q    Do you remember the names of any of them?
6  A    African American, gay and lesbian, GLEAN.
7  There was Muslim American, people over 40 group.
8  There was female and women, and different occupation
9  group. There were a lot of different groups, just
10 probably around 20 or 30 in all.
11 Q    Mr. Mahon, did you join or participate in any
12 of those groups besides the Caucasian employees
13 resource group?
14 A    No, I didn't. I wasn't that -- for one thing,
15 I wasn't concerned that much about it. I didn't
16 even know it was a Caucasian resource group for a
17 long time. It had been in operation for six months.
18 I had no idea it was in operation even.
19 Q    Why did you decide to join the Caucasian
20 resource group?
21 A    One of the guys at work said there's a
22 Caucasian resource group. I said I don't believe
23 they would allow it, and so he said they have
24 meetings once a month, and I started to go to one of
25 their meetings just as a curious observer.

TULSA FREELANCE REPORTERS
918-587-2878

Page 79

1  Q    Why did you think that the company wouldn't
2  allow Caucasians to have a resource group?
3  A    I didn't think that it would be somewhat, oh,
4  not really encouraged.
5  Q    Because?
6  A    Just my gut feeling. It was a gut feeling.
7  Q    Because?
8  A    Because I got a gut feeling.
9  Q    Is that the best you can do to answer that
10 question?
11 A    I think they would consider that racist. The
12 company would consider that a racist group to have
13 that form up.
14 Q    What was your purpose in joining the group?
15 A    I joined after the first meeting just to see
16 what they had to say and to warn them about not
17 getting too far in certain areas. I wanted them to
18 be very watchful on what they do because they're
19 under a watchful eye.
20 Q    Because you were experienced with the company;
21 right?
22 A    Management was heavily represented in all
23 these meetings. So I said you are being watched an
24 be very careful of what you do.
25 Q    Generally speaking, from your observation in

TULSA FREELANCE REPORTERS
918-587-2878

Page 80

1  terms of the work group that you're in and on the
2  base, are the majority of management positions at
3  American held by white people?
4  A    First of all, I'm not in a WAR group. I want
5  to make that perfectly certain.
6  Q    I apologize. Work group.
7  A    I'm sorry, work group. Let's get back to the
8  question again so I understand what you're asking
9  here.
10 Q    From your observations, both in your work
11 group and knowledge of the base in Tulsa in general
12 isn't it true that the vast majority of people in
13 management positions are white people?
14 A    Oh, absolutely, absolutely. They tried very
15 desperately to get more people of different races i
16 come into management, but a lot of people don't lik
17 to get in management there. That's a common thing.
18 They have a hard time filling management, getting
19 anybody in there. They have a bad reputation.
20 Q    Have any of your supervisors during your time
21 out at American been non-white?
22 A    I'm trying to think. We've had a lot of
23 supervisors.
24 Q    Any that you recall being non-white?
25 A    Not that I can recall. We had a handicapped

TULSA FREELANCE REPORTERS
918-587-2878

1   supervisor, my last one.

2   Q    Of the managers you've had over the years,

3   were any of them non-white?

4   A    At American?

5   Q    Yes, sir.

6   A    Not that I know of, not that I can remember.

7   Q    Were any of your crew chiefs at American other

8   than Caucasian?

9   A    Let me think.  Is that considered acting crew

10  chiefs or people at temporary crew chiefs?

11  Q    Let's not get down into the temporery.  That's

12  a little bit --

13  A    I'd say no.

14  Q    You're clearly a white male; right?

15  A    Yeah.

16  Q    Did anybody else help you prepare the flyer

17  that was handed out at the diversity fair?

18  A    No.  Just me.  I went to the library and hit

19  the books in four hours.

20  Q    Are you aware of any non-Caucasians who have

21  distributed a pamphlet or flyer suggesting racial

22  superiority of their race?

23  A    It was brought to my attention that the

24  African Americans had one on football and sports.

25  That wasn't considered hateful, but it was their own

TULSA FREELANCE REPORTERS
918-587-2878

Page 82

1   developed literature.

2   Q    Other than that, are you aware of anybody ever

3   distributing a flyer that was considered to be

4   hateful and supremacist to a particular race?

5   A    I've never seen any out there.

6   Q    Generally speaking, do you believe that

7   American Airlines discriminates against white

8   people?

9   A    Generally I'd say no, generally no.

10  Q    Okay.  In this particular instance, do you

11  believe you were discriminated against because of

12  your race or your political beliefs?

13  A    Either or both.  Probably both.

14  Q    There was testimony to the effect, as I

15  recall, that somebody named Tim Vinson --

16  A    Right, Tim Vinson.

17  Q    -- also wore a Turner Diaries T-shirt to work;

18  is that right?

19  A    That's correct.  At the arbitration he said he

20  wore it for four or five days, I forget, one of the

21  two.  He wore it to work.

22  Q    Do you know when he wore it to work?

23  A    I don't recall exactly when.

24  Q    Do you remember if it was the same year as

25  your termination, or do you even know?

TULSA FREELANCE REPORTERS
918-587-2876

Page 83

1   A    Same year I'm sure.

2   Q    How do you know that?

3   A    Because he said he wore it recently.  He said

4   he recently wore one.  I'll have to check the notes

5   in the arbitration but --

6   Q    Are you and Tim friends?

7   A    I think I met him one time because their

8   hangar was right next to our hangar, and he had a

9   big Harley Davidson motorcycle we talked about, but

10  we weren't like buddies.

11  Q    Did you ever discuss your political views and

12  find you shared common views?

13  A    Not to speak of.

14  Q    At all?

15  A    We just talked about the job at hand and his

16  motorcycle situation.  Oh, I did fix a VCR for him

17  one time.

18  Q    What race is Mr. Vinson?

19  A    He's Caucasian, possibly some Indian mixture,

20  but he's from the area, from Oklahoma.  Like most

21  Oklahomans, they have a little bit of something in

22  them, you know.

23  Q    Are you aware of snybody other than Mr. Vinson

24  and yourself ever wearing a Turner Diaries T-shirt

25  to the workplace at American Airlines?

TULSA FREELANCE REPORTERS
918-587-2878

Page 84

1   A    Any other people wearing Turner Diaries,

2   that's the only one I have knowledge of.

3   Q    Are you aware of any non-white, non-Caucasian

4   person who has worn a T-shirt depicting a book that

5   promotes white supremacy?

6   A    No, I have not.

7   Q    Are you aware of any non-Caucasians or

8   whites -- excuse me or non-whites that have worn

9   T-shirts depicting a book that promotes anti-Semiti

10  views?

11  A    Just the one that Linda Dill made reference

12  to, the Malcolm X T-shirt, and that was not a book.

13  It was just depicting a scene that she was offended

14  by is the only one I know of.

15  Q    Who was Malcolm X or is he?

16  A    He was a black leader in the '50's and '60's.

17  He was a separatist, actually a very articulate mar

18  but he promoted racial separation and very

19  anti-government.

20  Q    To your knowledge did Malcolm X promote racia

21  violence?

22  A    He had a statement as necessary, but I don't

23  know what that would mean, but that could mean

24  anything.  Some of the people objected to that

25  T-shirt, but I saw some Louis Farrakhan out there,

TULSA FREELANCE REPORTERS
918-587-2878

**Page 85**

1    too.  A lot of Christian was distributed out of my
2    toolbox.
3    Q    A lot of what?
4    A    Christian material.
5    Q    The person that wore the Malcolm X T-shirt,
6    did you see it with your own eyes or did you just
7    hear it?
8    A    No.  This was testimony at arbitration when
9    the subject got on T-shirts.
10   Q    So in terms -- you don't know who wore it,
11   when it was worn, anything other than what was
12   testified to in the arbitration; is that right?
13   A    Well, I did see at -- one time I did see a
14   T-shirt.  One of the stock clerks -- some black
15   Muslims wore T-shirts and the hats, but I didn't
16   find it really -- it didn't bother me.  The Malcolm
17   X T-shirt did not bother me at all.  I never
18   complained about it.
19   Q    Let me ask you to look at a series of
20   documents which are copies of exhibits from the
21   arbitration that depict various T-shirts that
22   witnesses testified they have worn to work that were
23   offered in support of your case in the arbitration.
24   I hand you what's been marked as Defendant's Exhibit
25   23.  Here's Defendant's Exhibit 23.  Do you

TULSA FREELANCE REPORTERS
918-587-2878

**Page 86**

1    recognize that exhibit, sir?
2    A    Yes, I do.  It's one of the T-shirts that were
3    presented at the arbitration.
4    Q    Were you present when the testimony was given
5    about this T-shirt?
6    A    I was present when this was shown.
7    Q    Does this T-shirt in your mind have anything
8    to do with white supremacy or racial cleansing?
9    A    Well, it shows obnoxious, very obnoxious
10   wording in it that would probably be very, very
11   offensive to a lot of people, especially the
12   Christian people and the Muslims.
13   Q    You're an intellectual man.  You wouldn't
14   disagree with me, would you, that this is by no
15   means on par with The Turner Diaries T-shirt?
16   A    It doesn't show any racist or supremacist
17   meaning.  Its just kind of a bar-type T-shirt I
18   guess.
19   Q    Might be crude but it doesn't talk about
20   killing people, does it?
21   A    No, it doesn't say anything about that.  It's
22   just very crude, obnoxious.
23   Q    I hand you what's marked as Defendant's
24   Exhibit 24.  I apologize.  Once these exhibits get
25   copied so many times, sometimes they're hard to

TULSA FREELANCE REPORTERS
918-587-2878

**Page 87**

1    read, but I believe it shows some mice in a
2    mousetrap and one of them's neck is stuck in the
3    trap and says when you're down and out, everyone
4    wants to screw you.  Were you present when the
5    testimony was given regarding this T-shirt?
6    A    Yes, I was.
7    Q    And the person that wore that T-shirt
8    admitted, did he not, that it had nothing to do with
9    racial violence or cleansing?
10   A    No.  It's just very uncouth.  I mean it's not
11   a very -- it would be very offensive to a Christian
12   or somebody that had a lot of ethics, morals.
13   Q    Because of the word screw?
14   A    Yeah, the meaning of it, yeah.
15   Q    And as before, this isn't anywhere near on par
16   with the message that The Turner Diaries book sends
17   is it?
18   A    The Turner Diaries book, right, but the
19   T-shirt is just strictly anti-gun as far as I can
20   see.
21   Q    But, you know, as you testified earlier today,
22   if somebody knows --
23   A    If they had read the book, right, right, if
24   they read the book, yeah.
25   Q    Defendant's Exhibit 25, there's a series of

TULSA FREELANCE REPORTERS
918-587-2878

**Page 88**

1    these T-shirts that were introduced and I'll call
2    them the big Johnson T-shirts.  Do you recall who
3    had this collection of T-shirts?
4    A    Who wore this T-shirt?  I don't know who wore
5    these T-shirts, what individuals.  It was just
6    presented, people that had been told to go home and
7    change or take the T-shirt off or whatever.
8    Q    This has sexual connotation to it; right?
9    A    Yeah.  I would say if you were familiar with
10   this term, right, it would have a sexual context.
11   Q    But it doesn't have anything to do with murder
12   or racial violence, does it?
13   A    No.  Just a sexual type T-shirt thing.
14   Q    As before, it's certainly not on par with The
15   Turner Diaries T-shirt, is it?
16   A    Not quite.  As a matter of fact, it's very
17   small.  You would have to be right up front to see
18   this.  That's a very small writing on that T-shirt
19   Q    Defendant's Exhibit 26, do you recall that
20   T-shirt being offered in evidence at your
21   arbitration?
22   A    That's another sexual, very sexist type
23   T-shirt.  It could be offensive to certain people.
24   Q    Certainly not on par with The Turner Diaries
25   and systematic killing of Jews and non-whites, is

TULSA FREELANCE REPORTERS
918-587-2878

Page 89

1 it?
2 A    Not quite, but it's still offensive.
3 Q    Defendant's Exhibit 27, same question.  Is
4 there any basis that you can give me that this is
5 anywhere of the same caliber in offensiveness with
6 regard to racial violence and intimidation as The
7 Turner Diaries?
8 A    It's the same.  It's obnoxious and very
9 sexist, but it's not quite the same as Turner, not
10 the same type of T-shirt.
11 Q    Not the same message, is it?
12 A    Well, like I said, the message in the T-shirt
13 is different than the book, but that's my opinion.
14 Q    Same series of questions to Exhibit 28.  Would
15 you admit, sir, that while this may have a sexual
16 context to it, it doesn't send a message of racial
17 violence and intimidation?
18 A    Right.  It's strictly a sexual type message.
19 Q    Defendant's Exhibit 29, would you also agree
20 that that T-shirt isn't in any way close to the
21 message that's given by The Turner Diaries?
22 A    This is a biker-type T-shirt, yeah.
23 Q    Not even in the same league, is it?
24 A    It's a different T-shirt, right.
25 Q    Finally, Defendant's Exhibit 30, a T-shirt

Page 91

1 mixed Mediterranean and French.  She was not what
2 you would call Aryan or a totally white person.
3 Q    Other than that, are they all Aryan or totally
4 white?
5 A    Yeah.
6 Q    Do you recognize that several of the persons
7 depicted in this flyer are believed to have white
8 supremacist or anti-Semitic views?
9 A    I don't think Amalia Earhart is.  I don't know
10 of anybody -- I don't think the Wright Brothers
11 were.  The Semitic people are also Arab people.  The
12 Semitic people are also Arabs, so when you say
13 anti-Semitic, I assume you're talking about Arabs
14 and Israelis and Hebrews.  I don't know of anybody
15 here that's -- that has those ideologies at all.
16 Q    Let me talk about the mechanics of the
17 preparation of this.  You said you went to the
18 library and looked some things up and made some
19 copies.  Is the first page of Defendant's Exhibit 12
20 a copy of a page of an existing book?
21 A    It's a copy of a book called Who's Who of
22 Aviation at the Central Library in Tulsa, a very,
23 very complete compilation of history of aviation
24 from its inception all the way to the present day.
25 Basically I went to the older areas of the pioneers

Page 90

1 from what's purported to be a gentleman's club in
2 Tulsa, Oklahoma.  That doesn't send any message of
3 racial violence, does it?
4 A    No.  It's a sexual type of advertisement
5 there.
6 Q    From the point in time that you authored and
7 had the pamphlet distributed that began this series
8 of events, have you ever apologized for doing that?
9 A    Are we referring to T-shirt or the literature?
10 Q    Starting with the literature.
11 A    No.  I never apologized for actually producing
12 it because I saw nothing wrong with the content of
13 the literature.
14 Q    I hand you the pamphlet, Defendant's Exhibit
15 12.  Mr. Mahon, is this in fact a copy of the
16 pamphlet that you authored and gave to the Caucasian
17 employee resource group to be handed out at the
18 diversity fair?
19 A    That it is.  That's a copy of it.
20 Q    I know you've been questioned at length or
21 questioned about it in various contexts at length,
22 so let me just see if I can summarize some of that
23 testimony.  Each of the aviators shown in this
24 pamphlet are Caucasian; correct?
25 A    Actually not.  This Helene Dutrieu, she was

Page 92

1 and just basically took pictures and stories of who
2 these people were.  That's about it.
3 Q    I'm trying to understand how it was put
4 together.  The first page, is that a page taken
5 directly from a book or is it a collection of thing
6 that you got from various places in the book and
7 assembled all on one page?
8 A    It's a collection of pictures in the first
9 area of the book from 1900 to approximately 1930.
10 Q    With respect to the second page, are those
11 pictures that you selected from different places in
12 the book and assembled on this one page?
13 A    Right.
14 Q    The typing on it, did you do the typing?
15 A    I typed -- I did the, yeah, subtitles, right.
16 All this is my typing.
17 Q    So you are personally responsible for
18 capitalizing one of the areas deemed to be
19 offensive, quote, they are all members of the
20 capital W white and capital R race, closed quote; i
21 that true?
22 A    The entire last -- entire last sentence is all
23 capitalized.
24 Q    Second sentence.
25 A    Well, that's the proper pronoun.  That's a

1 noun. It's a proper pronoun, so that would be
2 normally capitalized because that's considered --
3 white race is a connotation of a people. So if
4 there's any kind of message, there was no message
5 there. It was just the proper pronoun, the way I
6 was taught in school to write letters.
7 Q    Immediately following sentence, the second
8 word of it is race, is it not?
9 A    Yeah.
10 Q    It's not capitalized, is it?
11 A    Looks like it is.
12 Q    Check again.
13 A    I can't read it that well. Yes, it is, you're
14 right. It's capitalized.
15 Q    So you typed it. Were you alone when you
16 typed it?
17 A    Yeah. As bad of a typist I am, I did type it.
18 Q    Were you at your house?
19 A    I have an old typewriter that still works.
20 Q    And once you had assembled the pictures, did
21 you make those copies of the --
22 A    The copies of the --
23 Q    Of the pictures at the library and then bring
24 them home and type on it?
25 A    Right. That's what I did. I got the pictures

Page 94

1 at the library. I cut the pictures out and then I
2 basically -- when I got done with it, laid them out
3 and went to Kinko's and I Kinko'd it and made about
4 25 copies each.
5 Q    I find this interesting because it was news to
6 me. You testified that you were pressured into
7 doing this?
8 A    Right. She --
9 Q    She being Linda Dill?
10 A    Yeah, Linda mainly. She called me on a
11 Tuesday and said I've got to have this stuff by
12 Thursday, and I told her, I said that's going to be
13 awful hard to do. I said, number one, no
14 guidelines; number two, I'll have to take a vacation
15 day to do it because I'm so busy. As I said, I ran
16 an appliance repair business at the time and I was
17 hard pressed. I said I'll try to do it, and I went
18 to the library early and got it done, but I packaged
19 them up and put down please proofread because I had
20 to give it to the people at the fair.
21 Q    Who did you give these packages -- you said
22 there were two packages of these?
23 A    Yeah. Because they were going to be set up at
24 the -- let's see. Two different buildings on the
25 compound. Linda Dill had one area and Craig Nichols

Page 95

1 had the other area, so I gave one for her and she
2 said to give one to Nichols. So there's just two,
3 and both the manila envelopes did -- I put down with
4 a heavy black grease pencil please proofread.
5 Q    Do those envelopes still exist as far as you
6 know?
7 A    No. Because I gave them -- I gave the
8 envelopes to them. I said please proofread because
9 I'm not sure about this literature, so --
10 Q    You testified Linda Dill pressured you. Did
11 she do that in person; did she call you on the
12 phone; how did that come about?
13 A    She did that at the last meeting before the
14 fair. She said are you going to have this
15 literature done, and that's when she told me to do
16 some literature based on aviation because I told her
17 I'm an aviation nut; I'm a tremendous aviation
18 historian and I like looking into the early days of
19 aviation, and then she called me again Tuesday and
20 then she called me Wednesday to see if I was going
21 to have the stuff done. So I got two other calls
22 between the time she initially charged me with doing
23 this job for her.
24 Q    From the time you were charged to do it until
25 the time you produced it, was it roughly a week or

Page 96

1 how long was it?
2 A    The last meeting was -- well, the meeting
3 before the last meeting, it was about approximately
4 three or four weeks I think. At first I didn't take
5 her seriously. She's -- you know how people talk
6 and not mean anything, but when she started calling
7 me up and asking me about this, I realized she is
8 pretty serious about it, and both times I said I
9 have no guidelines; I have no idea what you want,
10 and she said just do something as pertains to
11 aviation as it pertains to white people. That's all
12 she said. I said, well --
13 Q    Do you believe she had some discriminatorial,
14 supremacist motive in asking you to do it that way?
15 A    I don't really know. I know her supervisor.
16 The manager of her area was totally against them
17 starting this group. Linda Dill and Craig are from
18 the same work area.
19 Q    APU shop?
20 A    APU shop.
21 Q    And were they trying to say told you so or --
22 A    No, I have no idea. I just know later on I
23 found out this gentleman was really against anythin
24 they were doing.
25 Q    At the first meeting that you've described

1  where you were asked to prepare this, there's been
2  testimony that -- it was given by Mr. Kelly and
3  written down at the time of the events to the effect
4  that you told the members there that were
5  participating in the conversation that your brother,
6  Dennis, was good at doing this kind of stuff and did
7  you want it wild or mild. You've heard that before,
8  haven't you?
9  A    I never said that at all.
10  Q    What did you say?
11  A    I think I may have said I may have to borrow
12  my brother's typewriter to get this done. He was
13  actually out of town those two days.
14  Q    The two days that it was prepared; right?
15  A    Yeah, two days I prepared it, and he didn't
16  come back until after this whole thing went down.
17  He was gone.
18  Q    Did you say or use the phrase do you want it
19  wild or mild?
20  A    No, I never said anything like that. That has
21  to be fabrication. No.
22  Q    In the meeting -- strike that. When you first
23  attended a Caucasian employee resource meeting and
24  you've testified that you expressed to those persons
25  whether they thought it would be a problem with you

1  Q    -- is not the truth of that. I'm trying to
2  establish what the exchange was.
3  A    I never mentioned that because it was past
4  history. This is 1999.
5  Q    In the context of the propriety of you joining
6  and whether that would cause problems for the group,
7  did you give any information about your brother and
8  his views or your concerns that the company would
9  scrutinize that group as a result of you being a
10  member?
11  A    Yeah, I did say that. I said because of my
12  brother's politics and he's run for mayor and he's
13  quite controversial, I said I really shouldn't join
14  your group, but she said come to a meeting, no
15  problem.
16  Q    And was the next meeting where they asked you
17  to prepare the pamphlet?
18  A    Next meeting they brought up the diversity
19  fair and -- the first meeting I didn't join. The
20  next meeting is when I joined, and that's when she
21  asked me about making some literature for the
22  upcoming diversity fair, and that's when she starte
23  putting the pressure on me to do this literature.
24  Q    When she asked you to do this and started
25  putting pressure on you to do it, did you understan

1  joining the group, tell me in as exact detail as you
2  can exactly what that conversation was.
3  A    Okay. I went to the APU shop and I talked to
4  Linda and Craig, and I said, well, what you guys are
5  doing you are going to be watched very closely and
6  you need to watch every step you do, and he said,
7  well, we've got a real good group of people who
8  joined, and I said, well, I probably shouldn't
9  really join, and she said absolutely no problem, we
10  would love to have you, come to a meeting, and I was
11  invited to a meeting, and I said I'll try to make
12  the next meeting, which I did. That's exactly what
13  she said, no problem at all. I did mention about my
14  brother's politics, that he ran for mayor and he is
15  kind of controversial, and she said no problem.
16  Q    Did you ever tell Linda or whoever you were
17  talking to at the time that your family had been
18  investigated in the Oklahoma City bombing?
19  A    I wasn't ever investigated. Dennis was. He
20  went to two Oklahoma City grand jury investigations.
21  He was found absolutely no involvement by the FBI
22  and ATF. All the investigative agencies, after a
23  thorough investigation, found no involvement.
24  Q    What I'm trying to establish --
25  A    I never did tell her that.

1  this literature was going to be distributed in the
2  workplace?
3  A    At the diversity fair, yes. She mentioned
4  many other groups have their own individual
5  literature, too.
6  Q    Let me direct your attention to Defendant's
7  Exhibit 10, and while she is doing that, let me ask
8  you this question: Did Linda Dill, Craig Nichols c
9  any of the other leaders of the group ever tell you
10  their views on what the purpose of the group was
11  for?
12  A    At the minutes of the meetings, all they woul
13  talk about is what their concerns were concerning
14  different things. They never did say -- other than
15  the piece of literature that they first had for
16  diversity group functions, they never harped on it
17  too much. Basically they got into the meat of the
18  meetings, the latest controversies that were going
19  on in the shops and just the usual stuff people ta
20  about. There wasn't anything heavy that I could
21  detect. There was some controversy about the
22  homosexual group getting $75,000 from the company
23  when nobody else did. That was a big, big issue a
24  the last meeting but that's the only thing I
25  remember getting a lot of information on or

Page 101

1  controversy about.
2  Q    And these meetings would last what, 40, 50
3  minutes?
4  A    Oh, 45 minutes to an hour seems like.
5  Q    In the course of that meeting, those meetings
6  that you attended, were there issues discussed about
7  people's perceptions that the company's efforts at
8  diversity had gone too far?
9  A    I don't really recall.  It's been so long, but
10 they basically said what the other diversity groups
11 are up to and what they're allowed to do and things
12 that were happening in the diversity council.  For
13 instance, they talked about picnics that people were
14 having, and they talked about the Muslims being
15 allowed to having their meetings at the library, one
16 of the libraries downtown for extra room, just
17 general type things that were going on within the
18 diversity council and the other groups, nothing
19 hatred or condescending or in any way you could call
20 supremacist that I could detect.
21 Q    I apologize if I've asked you this.  I don't
22 think I have.  What caused you to join the Caucasian
23 employee resource group?
24 A    I was talked into it.  Linda is a very
25 charming and very persuasive lady, and I said I do

TULSA FREELANCE REPORTERS
918-587-2878

Page 103

1  anyway, and then she persuaded me, just come to one
2  of our meetings and find out what we were all about,
3  and I said, well, I wouldn't mind doing that, just
4  to check you out but, like I said, this group was in
5  operation six months before I even had any ideas of
6  even checking into it at all.
7  Q    Defendant's Exhibit 10, is this the initial
8  flyer that you saw that caused you to start checking
9  into the Caucasian employee resource group?
10 A    Yeah.  This is probably one I found up on the
11 bulletin board.  This is probably it.
12 Q    The back side of the bottom right-hand corner
13 states that employee resource groups must show
14 consistency with AMR goals and the diversity action
15 council's visions, goals and objectives; do you see
16 that?
17 A    Right, I see that.
18 Q    And that the group must support company
19 policies on a harassment-free workplace and
20 non-discrimination?
21 A    Yeah, that's there.
22 Q    Did you agree that as a condition of joining
23 one of these groups to support those two issues?
24 A    Sure.  It's part of the deal, to be proud of
25 who you are and not put anybody else down; just to

TULSA FREELANCE REPORTERS
918-587-2878

Page 102

1  have a lot of videos on aviation, a lot of
2  documentaries on some of the aviation greats of the
3  country, documentary on Wright brothers, all these
4  different things I could have brought in and shown
5  to people, just things concerning the aviation
6  industry, a lot of models I could show and pictures
7  and frames, just general aviation stuff, plane talk.
8  Q    As I understand your testimony, though, the
9  first contact with that group with Linda Dill was
10 made by you; is that right?
11 A    What happened is -- I don't know how I found
12 out where they were located.  I have no idea how --
13 I don't really know how because I went to the APU
14 shop and I didn't know that was where they were -- I
15 had no idea that's where they were at, but somebody
16 must have found a piece of literature someplace.
17 That's what it must have been.  I must have found
18 her flyer, initial flyer, and I did contact them,
19 and I wanted to give some warning about the
20 possibility of management watching them.  I said you
21 are being very watched by -- look at all the
22 management who show up at your meetings.  So you
23 need to be really kind of careful of where you tread
24 and be advised that you're being monitored very
25 closely, which I think was pretty good advice

TULSA FREELANCE REPORTERS
918-587-2878

Page 104

1  be aware and have some pride of being.  That's abou
2  it.
3  Q    I hand you what's been marked as Defendant's
4  Exhibit 7.  While she's doing that, the company's
5  efforts at eradicating discrimination and promoting
6  a diverse and harassment-free environment had been
7  going on for a number of years; right?
8  A    It's been a policy a long time.
9  Q    There had been training done by the company;
10 right?
11 A    Training, I don't know about training.  We
12 never saw videos or anything like that, nothing you
13 would call formal training, no.
14 Q    You're aware the company had a written policy
15 against unlawful harassment?
16 A    Yeah.  We were forced to sign that.
17 Q    I hand you what's marked as Defendant's
18 Exhibit 7.  Is that one example of a written policy
19 against unlawful harassment?
20 A    Right.  We were all basically forced to sign
21 it, required signature.
22 Q    Did you object to signing it?
23 A    Well, some of the supervisors -- some of the
24 union guys said you didn't have to, but I saw
25 nothing in there that would hurt me or hurt anybody

TULSA FREELANCE REPORTERS
918-587-2878

TULSA FREELANCE REPORTERS 918-587-2878

1  else, so I signed it. Everybody else signed it.

2  Q    Look at the second page of Exhibit 7. My

3  understanding is that you refused to sign this; is

4  that correct?

5  A    Chose not to sign. Why did I sign it then?

6  My signature is on here?

7  Q    That's just your name handwritten.

8  A    No. That's where we had to sign it. That was

9  a signature.

10 Q    Do we need to go back and look at a signature?

11 Is that your signature or just your name printed

12 out?

13 A    Probably my name. It look -- it's not my

14 signature, but why would something be on there?

15 Q    Do you recall refusing to sign this document

16 for fear that it might come back to haunt you later.

17 A    What date was it here?

18 Q    This document is a 1995 document.

19 A    '95.

20 Q    February 6th, 1995.

21 A    Well, I remember reading it, but I might have

22 refused to sign it because a lot of people said it's

23 a lot of vague statements in here.

24 Q    Did you understand that the anti-harassment

25 policy included not harassing somebody because of

Page 107

1  A    Well, it has to be a direct implied threat,

2  yeah. If you get in somebody's face and say I'm

3  going to hurt you, a threatening phone call to a

4  house, yeah, absolutely, that's threatening. It's a

5  criminal offense actually.

6  Q    I hand you what's been marked as Defendant's

7  Exhibit No. 8. Defendant's 8, sir, do you recognize

8  that as a written policy of American Airlines

9  involving work environment in general and

10 specifically on policies against discrimination and

11 harassment?

12 A    I don't recall ever seeing this before, but

13 when did this come out? What date did this

14 publication come out? There it is. 11 --

15 Q    -- 1-1999.

16 A    That's way after I was terminated.

17 Q    L otmetask it differently. You're aware that

18 for quite sometime the company had a written policy

19 against harassment and intimidation?

20 A    It's in there in the procedural manual, the

21 rules of conduct, yeah, but this came out after the

22 fact.

23 Q    Some kind of clean-up questions. As it

24 respects the April 20, 1999 meeting where you wore

25 The Turner Diaries T-shirt, did anybody call you an

Page 106

1  their race or religion, national origin, ancestry,

2  et cetera?

3  A    Yeah. Well, I think I chose not to sign it

4  because we already signed previous documents

5  concerning this. Plus this is a company regulation,

6  too. It's part of the company, the employee

7  handbook, and it's also in the company procedural

8  manual. So I think the reason I refused to sign it,

9  basically because it's already part of the company's

10 policy.

11 Q    Did you understand that if you unlawfully

12 harassed somebody because of their race, national

13 origin and et cetera, that your employment could be

14 terminated?

15BA   Oh, absolutely. If I went on my way and

16 threatened anybody or caused a threat of any kind,

17 physical, absolutely, and there's been many people

18 fired recently since I've been fired Pof that

19 reason, threatening notes on people's toolboxes, and

20 I understand they all got their jobs back because

21 they didn't really receive counseling but,

22 absolutely, if there's a threat made, vandalism,

23 anything like that, sure, you should be fired.

24 Q    In your opinion does the threat have to be

25 verbal?

Page 108

1  either warn you or ask you not to come to that

2  meeting?

3  A    I didn't receive any calls about it on my

4  phone. I didn't have a cell phone at the time. I

5  don't recall ever getting a phone call saying the

6  meeting was even taking place. I got a phone call

7  about the problem with the literature twice on that

8  Q    From whom?

9  A    Linda.

10 Q    Both times from Linda?

11 A    I think once from Linda one day and the next

12 was from Craig; I'm pretty sure it was Craig. He

13 said we've got a problem with the literature and

14 we're thinking about disbanding the group. I said,

15 well, shouldn't be anything with it; I said anybody

16 going to get fired. He said no, and I said don't

17 worry about it because I thought it was a passing

18 fluke.

19 Q    Were the two phone calls fairly close in time

20 to the actual diversity fair?

21 A    They were -- it was -- actually one was at the

22 diversity fair.

23 Q    It caused quite a stir that very day?

24 A    Yeah. Actually that afternoon is when I

25 started getting the calls, late afternoon before I

1  went to work, but then the next day I got a call,
2  too.
3  Q    Did either of the two calls from Dill or
4  Nichols you've just described warn you or ask you
5  not to attend any more meetings because of the
6  problems it might make?
7  A    No. They just said they were going to have a
8  meeting with Greg Hall, and I asked if I should come
9  to that meeting that afternoon or that next day, the
10 next morning, and I said, well, do you think I ought
11 to come and she said no, no, no, just let this thing
12 die; I said okay, I won't come. That's the meeting
13 I thought they were referring to when they said the
14 meeting with him, with him, Greg Hall, HR and a lot
15 of other people in management.
16 Q    I understand now. That clears that up. After
17 the meeting with Greg Hall, did anybody report to
18 you what had happened, what he said, things of that
19 nature?
20 A    Well, she called back and said they're
21 thinking about canceling the group and the big
22 concern about the literature and that's about it.
23 She said -- I said is anybody getting threatened
24 with being fired and she said no; they just want to
25 stop the group from functioning for awhile.

TULSA FREELANCE REPORTERS
918-587-2878

Page 110

1  Q    Did either Linda Dill, Craig Nichols or any of
2  the other leaders of the group ever advise you that
3  they felt like the pamphlet you had made, what is
4  Exhibit 12, had gone too far?
5  A    No. Even Linda said, she said we find nothing
6  wrong with it, with the literature. Even Flora
7  Washington at the arbitration, she heads up the
8  diversity action -- activity council in Dallas, said
9  she found nothing inherently hatred about the
10 literature. So the group, Linda Dill and Craig said
11 they didn't find anything wrong with it because they
12 both read it and they said they put it out and they
13 could see nothing wrong distributed in the
14 literature.
15 Q    These gun shows that you go to from time to
16 time, do you actually work at the gun shows?
17 A    You mean work for Wanamaker or just set up and
18 show?
19 Q    Set up.
20 A    Yeah. I set up until about '92 or '91 is the
21 last time I set up.
22 Q    What type of booth did you set up?
23 A    I used to have a diversified table, everything
24 from old holsters to World War II memorabilia.
25 Q    Nazi stuff?

TULSA FREELANCE REPORTERS
918-587-2878

Page 111

1  A    Well, there's no Nazi -- if you call it German
2  collectable knives, yeah, daggers. Luftwaffe, some
3  of that early Luftwaffe, SS, were extremely
4  valuable. Original condition could run up to a
5  thousand dollars. I did have a few ones that were
6  in bad conditions that I had that I was collecting,
7  but it was mainly everything. You name it. I had a
8  lot of stuff.
9  Q    Was there a business name that you went under?
10 A    No. Just personal name, a table. You have a
11 table and reserve a table and you just pay it and
12 use it for a weekend. I think my last time was 1990
13 is the last time I set up at a gun show.
14 Q    Regardless of whether you agree with it or
15 not, whether it's factually accurate, would you
16 admit that prior to your termination and before
17 actually the whole events about the pamphlets
18 started, that over a period of time you had been
19 suspected by American and talked to about bringing
20 white supremacist ideas into the workplace?
21 A    Nobody ever actually talked to me about
22 anything like that. Of course, you know, there was
23 absolutely no evidence of any recruiting information
24 ever been taken in to American. Like I said, most
25 of the guys in my crew, I've had people all races

TULSA FREELANCE REPORTERS
918-587-2878

Page 112

1  I've worked with and they've all enjoyed my company
2  I've gone the extra mile for these people. I never
3  had an altercation or argument based on race,
4  basically politics, talked a lot about Clinton and
5  the election things.
6        I was a pretty busy body. When I got to work,
7  there was plenty of work to keep me busy. I did do
8  a lot of TV and VCR work on slow days, but there wa
9  absolutely no inclination to even think about doing
10 anything like that on the job.
11 Q    But the company asked you about it; right; you
12 had been taken to HR, interviewed, questioned about
13 wearing various paraphernalia to work?
14 A    What I remember in HR is when a lady's car was
15 vandalized and I was brought in there, and there wa
16 an FBI agent that talked to me about some things,
17 and that's the only thing I really remember of any
18 importance.
19 Q    Do you remember the testimony at the
20 arbitration by one of your co-workers that he had
21 observed you wearing a KKK hat and belt buckle?
22 A    I never wore anything at work that had KKK or
23 Swastika or anything written on it, never, never
24 anything that said KKK on it.
25 Q    Is that witness mistaken then in his

TULSA FREELANCE REPORTERS
918-587-2878

1  testimony?

2  A    Well, he may have saw something but I had

3  nothing that actually said KKK or Ku Klux Klan

4  written on it.

5  Q    Let's not mince words.  Did you have anything

6  that to a person educated in those particular areas

7  would recognize as a symbol of the KKK?

8  A    I wore a hat with a rebel flag and if you want

9  -- people may construe that and there are still

10  people who think that that and KKK are one and the

11  same.

12  Q    What about the belt buckle; what did it have

13  on it?

14  A    No belt buckles.  I had one with an NRA and I

15  had one with a gun, a 45 automatic that would clip

16  on, and I had one, a Scottish cross, and that had

17  all I remember wearing.  I had one that had my name

18  on it I wore for a long time; it had Dan on it, but

19  I don't know too many people that pay attention to

20  belt buckles.  I don't know too many people walking

21  around looking down.

22  Q    Before we take our lunch break, I need to

23  satisfy some curiosity.  Between the day of your

24  discharge and the date that you left town to go to

25  work for Aero Taxi in Rockford, you've listed in

Page 116

1  of cool.

2  Q    How long had you and your brother done

3  business from time to time as White Beret

4  Enterprises?

5  A    Actually when I got fired, that's when we

6  really went big on it.

7  Q    How about before then?

8  A    Before then it was just stuff at American,

9  repair work.  I was just too busy to do that.

10  Q    I'm talking about the use of the term White

11  Beret Enterprises.  How long had that been going on?

12  A    Well, I guess since about 1990, about 1997 I

13  guess, around there, '96, '97.  I used to do a lot

14  of work for people at the company.

15  Q    Is there any significance to the term White

16  Beret?

17  A    No.  Just cliche.

18  Q    Didn't stand for anything?

19  A    White Hat Cleaners, same thing, just White

20  Beret.

21  Q    I'll hand you an exhibit that was marked and

22  introduced in your arbitration, which is now

23  Defendant's Exhibit 32.  I take it you recognize

24  that document, don't you, sir?

25  A    My brother put that out back in the '80's.

Page 114

1  your answers to our interrogatories, and feel free

2  to refer to them if you want; they are Exhibit 3.

3  You indicated that your employment was White Beret;

4  is that correct?

5  A    Yeah, White Beret Enterprises.  We did car

6  repair, electronics repair, household repair,

7  general type repair work.

8  Q    I hand you Defendant's Exhibit 13 if you need

9  to refresh your recollection.  When you say we did

10  repair, who are you referring to?

11  A    Excuse me.  I'm sorry.  I was looking.

12  Q    When you were saying that we did repair work

13  in the context of White Beret, who are you referring

14  to?

15  A    My brother and I both worked together on

16  things.

17  Q    And is White Beret Enterprises an actual

18  company; is it just a name you do business under?

19  A    It's just a name that we just did business

20  under because it was a unique name.  There's a White

21  Hat Cleaners in town.  It's a nation-wide franchise

22  that they also call themselves the White Hat

23  Cleaners.  I mean White Beret is -- the Army used a

24  beret for many years as an intelligence, elite

25  intelligence unit, and we thought it would be kind

Page 116

1  Approximately a year after that, yeah, October of

2  1990, he gave it up.

3  Q    And it's a publication called the White Beret;

4  correct?

5  A    Yeah.  That wasn't White Beret Enterprises.

6  We just called it that.

7  Q    Is that the same usage you had when you worked

8  under that company or that trade name after you got

9  terminated?

10  A    No, I don't think so.  I think it was just a

11  coincidence more than anything.  It had no racial

12  connotation at all because I did a lot of repair

13  work for -- I lived in a mixed neighborhood in nort

14  Tulsa and most of my clients were African American

15  or Mexican American, so they had no problem with it

16  Q    Second page of Exhibit 32 under white patriot

17  of the month, you're familiar with that paragraph,

18  are you not?

19  A    Uh-huh.

20  Q    Do you deny -- strike that.  Before we go, whc

21  wrote this pamphlet?

22  A    At that time I think it was a guy by the name

23  of Jim Moran.  Is this Oklahoma or Missouri?  It

24  doesn't say, does it?  Kansas City.  It's all from

25  Kansas City, these clippings here.

Page 119

1 Q    Was your brother involved in writing this at
2 tha time?
3 A    No, I don't think so because he was -- in 1990
4 he quit putting these out a long time before then,
5 Q    Look at the second page, bottom right-hand
6 corner and see if you don't recognize the signature
7 D. W. Mahon.        .
8 A    Okay. Maybe he did, okay. Must have been the
9 last one because he quit putting this out very
10 shortly after that.
11 Q    This particular version of publication
12 attributes to a Daniel M; is that you, Daniel M, top
13 right, excuse me, top second page, white patriot of
14 the month?
15 A    Yeah, that's me.
16 Q    That's you?
17 A    Yeah.
18 Q    It claims there that you've given tremendous
19 efforts in the financial support of the struggle; is
20 that true?
21 A    Well, not really. It was basically the
22 equipment. The camcorder was a $1,500 camcorder,
23 but I did weddings and parties and everything else,
24 and PA system was about 50 bucks. I rebuilt it,
25 but --

1 collections of those things.
2 Q    Do you have a large collection of Klan
3 material?
4 A    I had some antique Klan -- back in the '20's
5 they got various collectors and I also sold Taylor
6 cutlery, the little novelty knives for $4, which I
7 made $2 apiece on, and actually made in Japan, but
8 also had a king knife and some Israeli officer
9 knives. I had s lot of collectable things that
10 people -- that I would buy and sell and make money.
11 Q    Is it true that you also supplied many white
12 resistance group with T-shirts?
13 A    No. A lot of people sell on my table at the
14 gun shows and I charged them $2 apiece for the
15 T-shirts I sold for them, so I made a little money
16 on it and they were novelty items, strictly novelty.
17 People would buy them and say, oh, look what I got
18 and they could show it to their friends and say,
19 cool, where did you get that. You know, it's like a
20 novelty. As a matter of fact, the best knife I sold
21 was a black crew chief for another company and I
22 polished it up with black gold and he was real glad
23 to get it, just as a conversation piece.
24 Q    At the time that this article was written and
25 the events that are described in it occurred, you

Page 118

1 Q    Did you supply a portable generator?
2 A    Yeah. I've had that for a long time.
3 Q    Did you supply a large tent for the rally in
4 Oklahoma On September 23rd?
5 A    Again, I've had that for a long time. I do a
6 lot of camping out, so that's, you know --
7 Q    There's a reference in here, quote, Daniel
8 also built the cross, closed that. Is that the KKK
9 cross that was used at that rally?
10 A    Yeah. I may have supplied the hardware for it
11 but that's -- other people built it.
12 Q    It says you built it. Is that an untruth?
13 A    I think that's an untruth because I don't
14 think I'm going to be able to drive it down the road
15 with my little 1990 Buick. A little pickup truck
16 with a huge cross in the back would look a little
17 unusual.
18 Q    It also says you have a large collection of
19 Klan and national socialist white power merchandise;
20 is that true?
21 A    Basically all collectable stuff, yeah. It's
22 national socialist World War II paraphernalia, yeah,
23 the old German bayonets and things, rifles, because
24 I am kind of into that historical context. All that
25 stuff is pretty valuable. So I did have some

Page 120

1 were employed by American Airlines; true?
2 A    Yeah, I was still with American Airlines.
3 Q    Did you ever make any effort to retract or
4 tell the readers of this publication that your
5 brother had said untrue things about you in this
6 document?
7 A    Well, nobody at American got this document.
8 This is a very small coverage. I think only 100
9 people in the whole country got this, if that. So
10 it's not something you would buy at a local tabloid
11 distributorship. So nobody at American would have
12 ever seen this. To my knowledge nobody would ever
13 know it.
14 Q    My question was different. Did you ever make
15 an attempt to reach the audience of this letter and
16 tell them what your brother had said about you was
17 not true?
18 A    Not really because I didn't think it was any
19 big issue. It doesn't say I'm a white patriot. It
20 doesn't say I'm a member or activist, just talked
21 about it a little bit and that was it.
22        MR. CORDELL:  Let's go ahead and take our
23 lunch break.
24        (Following a lunch recess at 12:26
25 p.m., proceedings continued on the Record at 2:11

Page 121

1    p.m.)

2    Q    Mr. Mahon, I direct your attention, if you

3    would, to Exhibit 5, your answers to our discovery,

4    the next one. I said 5. I meant Exhibit 3. I have

5    a few follow-up questions. Earlier in the

6    deposition I asked you about a doctor, Karen Bader.

7    Is that again the only doctor you've seen over the

8    last seven years?

9    A    Last one I've seen basically in the last seven

10   years.

11   Q    Would she be the only source of medical

12   evidence or testimony that you somehow suffered

13   physically or emotionally from your termination at

14   American?

15   A    She's the only one I've actually had any time

16   in the last seven years. She's the only doctor I've

17   ever had since I was terminated.

18   Q    Has part of her treatment of you had anything

19   to do with psychological counseling, treatment for

20   depression, chemical dependency, anything like that?

21   A    No. It's strictly a chronic condition that

22   maybe it's just that desert atmosphere or may be

23   anything. Who knows. It's just that it's gotten

24   worse since I was terminated.

25   Q    And how do you describe the psoriasis; is it a

TULSA FREELANCE REPORTERS
918-587-2878

Page 122

1    scaling of your hands?

2    A    It's mainly on my hands. This is starting to

3    heal a little bit, but I've got scars on my knuckles

4    and sometimes in the middle of the summer it

5    actually gets in my palms. I can't grab tools very

6    good.

7    Q    Cracking, dryness?

8    A    Cracking and sores that won't heal very easy.

9    It's painful, but I'm under medication now and it

10   seems to help.

11   Q    Good. Interrogatory No. 5, you were answering

12   questions about what you've done and how much you've

13   made since you left American. Do you know what your

14   current rate of pay and expected annual gross

15   earnings at Alaska Airlines?

16   A    It's going to be the same as last year, about

17   42,000 before taxes.

18   Q    Is that without bonuses, including overtime?

19   A    We don't get overtime there. Don't get

20   overtime at all.

21   Q    Does it factor in any bonuses you might get?

22   A    No. We don't get bonuses. No profit sharing

23   as of yet.

24   Q    What kind of health plans, if any, or benefit

25   plans do you get at Alaska Airlines?

TULSA FREELANCE REPORTERS
918-587-2878

Page 123

1    A    Standard HMO and dental, 80 percent. The

2    dental I think is -- I think it's a deductible,

3    standard dental plan, Aetna, Aetna group.

4    Q    And do you have flight privileges at Alaska?

5    A    Yeah. Very good flight privileges, yes, I do.

6    Q    Do you also have what is known in the industry

7    as OAL privileges, other airline?

8    A    Yes, I do.

9    Q    All right. So other than the difference in

10   what you were making at American as opposed to what

11   you're now making at Alaska, are the benefit

12   packages roughly the same?

13   A    They're pretty similar. I was PacifiCare at

14   American and I'm with PacifiCare here for my regular

15   health and Aetna is dental, but PacifiCare. I'm

16   with the same type of program, same price.

17   Q    Is your take-home pay or your gross earnings

18   governed by a contract; is it a union position?

19   A    It's a union. We have AMFA. That's our

20   union. We're contractual.

21   Q    Are you considered an AMT or what

22   classification do they use at that airline?

23   A    I'm actually classified as an AV, avionics

24   tech, line mechanics, line avionics man.

25   Q    So you work at a line station?

TULSA FREELANCE REPORTERS
918-587-2878

Page 124

1    A    Yeah. I work up at Sky Harbor Airport,

2    midnight maintenance. We have three overnight

3    airplanes, and sometimes I'm there by myself, and

4    they go out mornings between 6:30 and 9:00.

5    Q    Is that Phoenix?

6    A    Sky Harbor Phoenix, Sky Harbor Airport, Sky

7    Harbor International Airport in Phoenix. We're at

8    Terminal 2.

9    Q    And roughly how far from your home or how far

10   do you have to drive to get to your job?

11   A    It's approximately eight and a half miles

12   total.

13   Q    Eight and a half?

14   A    Yeah.

15   Q    So very close?

16   A    Absolutely.

17   Q    So basically you live in Phoenix?

18   A    Well, Tempe is actually Tempe. It's actually

19   considered Tempe.

20   Q    When you go over that one street, I can't

21   remember what it's called, you go into Tempe; right

22   A    Yeah. You do from Phoenix and Tempe and then

23   Tempe into Mesa on the same street. Street just

24   changes names. It gets confusing down there because

25   everything kind of runs into each other.

TULSA FREELANCE REPORTERS
918-587-2878

Page 127

1 **Q**   You've indicated here from September of 2000
2 to February 2001, as we discussed, you worked for
3 Aero Taxi of Rockford.  How much were you making
4 there?
5 **A**   I was making 14.50 an hour.
6 **Q**   Do the math for me.  What does that work out
7 on an annual gross?  .
8 **A**   I don't have a computer.
9 **Q**   Do you remember approximately how much it was?
10 **A**   I'd say 36,000 a year, something like that.
11 **Q**   And that company shut down; right?
12 **A**   Yeah.  They went bankrupt for a pilot mistake.
13 **Q**   Cause an air crash or something?
14 **A**   No.  They lost a contract with UPS and it
15 caused them some financial pain.
16 **Q**   For the period of February 2001 until you went
17 to work at Alaska Airlines April 9, 2001, did you
18 stay in Rockford, Illinois?
19 **A**   Right.  They sent me a relocation check and I
20 left approximately last part of March of 2001, yeah,
21 March.  I started working April 9th is my first day
22 I started.
23 **Q**   So with the relocation check, et cetera,
24 basically did you have uninterrupted income during
25 that transaction?

Page 126

1 **A**   Yeah, uninterrupted income.
2 **Q**   Then we talked a little bit earlier about
3 working with White Beret Enterprises June '99 to
4 September 2000.  How much did you make there?
5 **A**   Oh, it was kind of an ad hoc business.  I
6 would say maybe 15,000 at the time we were just
7 doing it.  It was a short time.
8 **Q**   Would that be actual cash money?
9 **A**   Yeah.
10 **Q**   Did you work for trade or --
11 **A**   Yeah, I did a lot of barter work mainly.  It's
12 hard to determine.  I would say mainly 20,000.  20
13 would be pretty accurate.
14 **Q**   The next page, 4, you have given us a list of
15 the various places you sought employment.  In each
16 case you've indicated what you did to make contact
17 but you don't show here what the result was.  UPS
18 Air, did you ever hear back from them?
19 **A**   No, no response from them.
20 **Q**   From any of these did you hear a response?
21 **A**   Just United and Southwest, and Air Wisconsin
22 did an interview with.  I got a card back from
23 Northwest, a card said that I was on their records
24 for six months.  Midwest Express, I did an interview
25 with them.  Horizon Air, no response.  Airborne

Page 128

1 Express, no response.
2 **Q**   Is it your contention in this case that
3 American Airlines in any way interfered with your
4 ability to get a job with another air carrier after
5 your termination?
6 **A**   I don't believe there was any interference at
7 all in that situation.
8 **Q**   Let's talk a little bit about your witness
9 list beginning at Page 6.  You've identified Larry
10 Poffen, P-O-F-F-E-N, as a former crew chief.  What
11 do you expect Mr. Poffen to testify about?
12 **A**   He was my crew chief for about eight years.
13 He taught me how to work on TV's.  I spent a lot of
14 time with him learning TV repair.  He would be a
15 very good character witness about my performance and
16 behavior on the job.
17 **Q**   Does he have any to your knowledge from what
18 he's told you or you know, have any knowledge about
19 any comparable employees wearing a comparable
20 T-shirt and not getting fired for it?
21 **A**   He retired back in '96 I believe, so he wasn't
22 even an active employee at the time I had this
23 problem with American; however, he was my crew chief
24 for many, many years.  He wouldn't probably know
25 anything about that.

Page 128

1 **Q**   So he would fall in the category of a
2 character witness?
3 **A**   Probably a character witness would be the best
4 thing, yes.
5 **Q**   What about Woody Ribbe?
6 **A**   Woody Ribbe, yeah, he's my T-shirt man.  He's
7 the one I bought T-shirts from all the time.
8 **Q**   T-shirt man?
9 **A**   Yes.  I bought at least 20 T-shirts from him,
10 airline type T-shirts, nostalgic airline T-shirts,
11 advertising T-shirts, and --
12 **Q**   But you didn't buy The Turner Diaries T-shirt
13 from him?
14 **A**   No.  He just came by during lunchtime with two
15 big bags of T-shirts and I bought several of them
16 because I'm an air aviation type person and he had
17 lot of antique-looking things, so I bought them.
18 He's a real good character witness.  His Chinese
19 wife, I'm very familiar with.  I've been to her
20 house numerous times and did some repair work for
21 them.  He's still an active inspector out there,
22 been there for 32 years, and I think he would be an
23 excellent -- both character and verify my work
24 habits because he inspected a lot of my work.
25 **Q**   From your perception of the arbitration and

1  your understanding of what rules and regulations you
2  were accused of violating, did anybody ever take
3  issue with your work ability or quality?
4  A    No one that I recall ever took issue with my
5  work.  As a matter of fact, most of the people
6  praised my work.  I helped make a training film out
7  there on my own time.  Nothing but a lot of -- I'm
8  not saying I walk on water but most people didn't
9  have a problem with my work.  They seemed to believe
10 I was a very good avionics man and I usually did a
11 good eight hour day for them.
12 Q    For people who aren't familiar with the
13 industry, what is avionics; what did you do?
14 A    Okay.  Avionics is a real broad term.  It's
15 basically aircraft electronics, and it involves
16 repair, servicing, maintaining and modifying
17 aircraft systems, basically anything on an airplane
18 that has a wire going to it, including the
19 navigation system, computers, lighting, hydraulic
20 control, flight control, pressurization,
21 instrumentation.  Anything that's got to do with
22 instrumentation or any wiring at all in the airplane
23 is an avionicsman job.  That's what I do today at
24 Alaska.  The airplanes come in.  I talk to the
25 pilots about any problem the aircraft may have, and

1  sure it's done right, so that when a plane goes, I'm
2  very satisfied it's going to make a safe flight.
3  Q    Don Anderson, how does he fit into this?
4  A    Don was my -- he was the other half of the
5  double D team.
6  Q    The what?
7  A    Double D team.  His name is Don and, of
8  course, my name is Daniel.  It goes back a long
9  time.  Nobody would work with him on a crew for a
10 long time.  Nobody -- he was the kind of guy that
11 was kind of hard to get along with, but once I got a
12 chance to work with Don, I realized he was highly
13 intelligent, highly motivated person, and we got to
14 the point where we worked together all the time, and
15 we got to be called the double D team and whenever
16 an airplane came in, what they call a drop-in, which
17 was an airplane that came -- in the fleet that would
18 come in with a serious problem that needed to have
19 fixed at that time, which is overtime, and sometimes
20 we would get it done in an hour, hour and a half.
21 So we had a reputation in the 727 product line, and
22 I remember Don well.  He's is a wonderful person to
23 work with.  I wish I was still working with him.
24 Q    Does he have any personal knowledge as far as
25 you know about a similarly situated person to

1  we look at what we call the pie ripped off, and then
2  we have scheduled maintenance that we do every
3  night.  So it's a very fulfilling job.  There's a
4  lot of challenges and a lot of fun sometimes.
5  Q    While I fully understand that you disagree
6  with the innuendo that you would ever have any
7  intention of causing an aircraft to crash, as a
8  technical matter would you have that ability?
9  A    Well, any man, mechanic or otherwise, that
10 works on airplanes, including the people that
11 service the food, the people that fuel the airplane,
12 the people that wash the airplane, the customer
13 service agents, all people have access to everything
14 around an airplane.  So anybody that has access to
15 aircraft has potential, under extreme conditions, to
16 do damage; however, I've done this work for 30
17 years.  My family, my friends -- I have utmost
18 respect for what can go wrong with an airplane.
19      In the Coast Guard I was involved in a rescue
20 effort of an downed Eastern Airlines L1011 in
21 December of '73, and I witnessed firsthand the
22 destruction and the unbelievable pain and injury
23 that can be caused by an airplane that contacts the
24 earth in the wrong way.  So I have utmost respect
25 and am very, very cautious about my work and make

1  yourself offering the flyer and wearing the T-shirt'
2  A    Don was off my dock at the time this event
3  took place.  He became a crew chief on the adjoining
4  maintenance area.  So he wasn't in my immediate
5  working environment for the last, oh, last six
6  months I was there, although we took breaks together
7  and saw each other quite a bit, but he was an avid
8  race car driver and a hunter.  So he never discussed
9  much except for the airplane thing and the work
10 environment, things that were going on on the dock.
11 So he was just a real conscientious hard-working
12 guy.  Sometimes you couldn't stop him.  He would
13 want to work through breaks and lunch.
14 Q    Violate that unwritten --
15 A    Workaholic to the extreme.
16 Q    Violate that unwritten union rule, huh?
17 A    Yeah.  Sometimes -- well, of course, I was the
18 same way.  I wanted to get things done and take it
19 easy the rest of the night.  Get things done pretty
20 quickly.
21 Q    So he would just testify about your work
22 habits and personality?
23 A    Oh, yeah.  He would be a good character
24 witness.
25 Q    We need to make it easier on the court

1  reporter to take turns speaking. Help me and I'll
2  help you. Mark Bass, who he is and how does he fit
3  into this?
4  A    I just saw Mark Bass yesterday. He was my
5  supervisor for five years on the 727 line. He's an
6  ex-Marine, been around the whole world a lot, and he
7  was a real good supervisor, and he was fired a year
8  before I was terminated, and he is here in town. He
9  drives a truck for Schneider now. He just lost his
10 wife recently, and I took him out for dinner night
11 before last. Real nice man.
12 Q    What did he get fired for?
13 A    He never did exactly say why. It was a
14 conflict between him and a higher manager named Glen
15 Brock, and I never really did want to delve into it,
16 but it was a pretty painful thing. They just built
17 a home, but he's really a nice man. He was a good
18 supervisor, one of the best ones I ever had.
19 Q    Category of character witness but without any
20 knowledge of other people wearing T-shirts and the
21 like?
22 A    Well, he was gone the year before I had this
23 problem, so he would have no knowledge of this
24 situation. I would just say he was my boss, my
25 supervisor, and I was responsible to him with the

Page 136

1  Carner, what category does he fall in; a person the
2  has knowledge of the issues in the case or just a
3  character witness?
4  A    He's also -- he retired about the same time at
5  Larry Poffen, and he runs a gun shop here in town,
6  pawn shop, gun shop, and I've known him a long time
7  and see him at the bingo halls a lot and I still se
8  him occasionally.
9  Q    Which gun shop does he run?
10 A    The Bullet Hole. He's part owner, I'm pretty
11 sure he's part owner of it. It's over on Memorial
12 and 11th Street, 9th Street.
13 Q    Is that the one that sells reloading?
14 A    Yeah. He sells a lot of reloading stuff, lot
15 of used stuff.
16 Q    Mr. Cooley?
17 A    Lee Cooley, he was also an avionics man. He
18 retired several years ago. I worked with him quite
19 a bit and as a matter of fact, I sent him a kit of
20 an American Airlines Electra awhile back. I meet
21 with him every time I come in town. He comes to ou
22 little meeting at the restaurant and he's always
23 there. He's a very good man. Right now he is
24 helping some orphans. He never had a family so --
25 but he would be a really good character witness for

Page 134

1  job. He was my direct management over me.
2  Q    Lynn and Roger Bloxham, those are the people
3  you stayed with last night?
4  A    Yeah. Interesting. I stayed with them two
5  nights this week. They're Libertarian party. He's
6  running for a position in Tulsa County next year or
7  this coming election. Very articulate, educated
8  Libertarians. They've done a lot of good in the
9  community. I've known them for at least seven
10 years. Roger is an aviation enthusiast. He's
11 building a home-built airplane. I'm trying to help
12 him do things right, but he's a real good character
13 witness.
14 Q    For those that aren't actively involved in
15 politics, what is a Libertarian as far as you know?
16 A    Libertarian, oh, gosh, it's another broad
17 term. They're people that believe less government
18 is better than big government. They'd like to see
19 some of the drug laws liberalized. They're pro
20 Second Amendment, pro choice basically, basically
21 pro choice. They're even pro homosexual rights,
22 believe it or not.
23 Q    That's an unusual mix, isn't it?
24 A    Yeah. Pro civil rights. They just believe
25 that people should be allowed to do what they want

1  to do as long as it doesn't hurt other people, and
2  they're very much against this thing in Iraq right
3  now, and I think Bush is on the most hated list
4  they've ever had. They're very anti-Republicans
5  right now in the system.
6  Q    Do you belong to any recognized political
7  party?
8  A    I'm an independent, and I do consider myself
9  more Libertarian than either one of the other
10 parties.
11 Q    Mr. Robert Bales, who he is?
12 A    Bob Bales, he was a guy I worked with for a
13 long time and we were friends on the dock. He was
14 present at the arbitration. He showed me some
15 T-shirts that he wore that they didn't have a
16 problem with.
17 Q    Is he the guy that talked about the big
18 Johnson T-shirts?
19 A    Yeah, yesh, I think it was one of them. He
20 and his wife are really good friends. I've done a
21 lot of work for them. I rebuilt his car engine, a
22 Cougar. A lot of these people I've done a lot of
23 work for and work with. He would be a pretty good
24 witness for my character and my technical ability.
25 Q    Let's make it through the list. Mr. Jack

Page 139

1   my performance and work duties.
2   Q    You mentioned the restaurant before lunch
3   today.  Are you talking about the same place and if
4   so, which restaurant?
5   A    We used to meet at Denny's -- I mean Wendy's,
6   I'm sorry, Wendy's, Wendy's near Admiral and
7   Sheridan, Memorial, just right down between Sheridan
8   and Memorial, Wendy's on the north side.  We meet
9   there every single time I come into town, except
10  this time because obviously we've got this stuff
11  going on.
12  Q    When you were talking about the witness at
13  Walgreen's incident as I call it, I think you made
14  some reference to her as managing the restaurant?
15  A    I think she was part owner or manager of the
16  Family Diner because I've seen her.  I used to eat
17  there all the time and I would see her behind there
18  ordering people around, and that's on Harvard and
19  Admiral on the north side of the street.
20  Q    So when she showed up at the arbitration, you
21  even knew who she was?
22  A    It's been a long time since, of course, the
23  arbitration.  I thought she was somebody that worked
24  at the car glass place where I used to get glass for
25  my cars.  They could be identical twins.  I thought

Page 139

1   granddaughter, and he's a BMW man and we like cars
2   and talk mechanics, and he was my crew chief, and he
3   would testify that I never made any derogatory
4   statements or any type of issues in the shop area.
5   Q    Is Ian Caucasian?
6   A    Yeah, he's Caucasian, but he's from -- I think
7   he's from England or New Zealand.  He has a real
8   heavy British type accent.  Real nice guy.  One of
9   the best people to work for out there.  He's a good
10  guy.
11  Q    Mark Ihnen?
12  A    Mark Ihnen, tractor men.  Yeah, he's a crew
13  chief on the dock that I last worked with on
14  midnights, a midnight crew chief.  He also testifie
15  at the arbitration.  I've been to his place a few
16  times, fixed his TV once or twice.  He's a good man
17  He's volunteer fireman.  As a matter of fact, he
18  teaches fire science at one of the universities her
19  in Oklahoma.  I forgot which one.  He goes once a
20  week and teaches fire training.  I don't know if he
21  still does but he did then.  He would be a good
22  character reference, witness.  He's been a crew
23  chief for about five years out there.
24  Q    Does he, to your understanding, have any
25  knowledge about other persons doing the same things

Page 138

1   it was her, and she bolted past me with this
2   surprised look.  I didn't think -- because I was
3   walking out when she was walking in.  It was during
4   an intermission of the arbitration, but she did look
5   kind of upset, and she showed a lot of emotional,
6   very, very emotional during this arbitration, more
7   than I would think a person that heard something six
8   months ago or a year ago.  Very disturbed lady.
9   Q    J. C. Brown was the union board member on the
10  panel; right?
11  A    Yeah, J. C., I believe he's still a committee
12  member of the union.
13  Q    What's his role in this case?
14  A    He witnessed a company representative at the
15  arbitration say verbatim that no matter what the
16  arbitrator decides, we will not put Mr. Mahon back
17  to work and that was kind of -- I would say that was
18  undermining the arbitration process by saying that
19  in front of the arbitrator.
20  Q    And that was part of the case you filed that
21  the Tenth Circuit threw out?
22  A    Exactly.
23  Q    Ian Fenwick?
24  A    Ian, he was my last crew chief before I was
25  terminated.  He has a biracial daughter or

Page 140

1   that you did and not getting fired for it?
2   A    I don't really know.  He never received
3   questions on that at the arbitration.  He just is a
4   person I worked for and worked with and been to his
5   house.  That's about all I can say about Mark.
6   Q    There's some overlap between these witnesses
7   and the ones that appeared at the arbitration.  Wit
8   respect to that overlap, are you aware of any
9   information that you expect that witness or
10  witnesses could testify now that they did not at th
11  arbitration?
12  A    You mean the witnesses that were pointed out?
13  I don't know really.  It's hard to say.  I don't
14  know.  I couldn't answer that question.
15  Q    For example --
16  A    I wouldn't know what --
17  Q    Before lunch we talked about the exhibit of
18  the White Beret publication and the article on you
19  as the white patriot.  That was brought in the
20  arbitration and there was never any evidence
21  introduced from your testimony or anybody else abo
22  that subject.
23  A    Yeah.
24  Q    For example, using that just as an example,
25  are there any witnesses that appeared at that

Page 141

1 arbitration that could have addressed any of these
2 issues to your knowledge that didn't?
3 A    As far as that White Beret publication here?
4 Q    Any of the issues.
5 A    They had no knowledge of any of that stuff.
6 Most people would never have seen that stuff. They
7 never would have had the opportunity to see it.
8 Q    Mr. Charles Kountze?
9 A    Kountze, Charles Kountze, well, he's been a
10 friend of ours for several years. He's up in Ann
11 Arbor, Michigan. He gave my brother a car last
12 month, a 1999 Malibu, and he's a very wealthy
13 person, and he's been kind of a friend of ours off
14 and on for the last seven or eight years. He's
15 trying -- he wants to write a book on Dennis.
16 Q    On Dennis?
17 A    He wants to write a book on Dennis, his
18 experience in life, and he comes down and he is kind
19 of a buddy, professional college student most of his
20 life. He hasn't done a lot of work in his life but
21 he's had a lot of money to spend and he's very
22 wealthy, and it's kind of nice to have wealthy
23 friends occasionally who can help you out.
24 Q    Where did you say he lives?
25 A    Ann Arbor, Michigan, but he comes down and

TULSA FREELANCE REPORTERS
918-587-2878

Page 142

1 visits quite a bit. He does a lot of traveling, a
2 traveling man.
3 Q    Speaking of writing a book, Dr. William Pierce
4 who wrote The Turner Diaries, had you ever met him?
5 A    William Pierce, I've never met him. I've seen
6 him in video. My brother I think went up and saw
7 him et someplace back in the mid '80's I think it
8 was, but I don't recall meeting him. He's deceased,
9 I understand now, because they had a big article in
10 the paper about him. He died a couple of years ago.
11 Q    Did you understand that he espoused certain
12 white separatist ideas?
13 A    Like I said, I just heard his name mentioned a
14 few times. Somebody said he was a professor of
15 physics. Like I said, Dennis mentioned his name a
16 couple of times but I never talked to the man or met
17 him. A lot of names got thrown around. They're
18 just names to me. He knows so many people.
19 Probably thousands.
20 Q    Dale Lance, who is he?
21 A    Oh, Dale, he sat next to me in the
22 arbitration. He took notes. He was kind of my -- I
23 don't know. I guess you would call it escort me
24 around, took me to lunch. Didn't really know him
25 that well, but he's a good mechanic and he knows a

TULSA FREELANCE REPORTERS
918-587-2878

Page 143

1 lot of people out there. I talked to him basically
2 at the arbitration, talked to him quite a bit. He
3 took me to restaurants and stuff during lunchtime
4 and breaks.
5 Q    Did the union appoint him as your caretaker
6 or --
7 A    Well, he was there every day at the
8 arbitration, every single day all three days, and he
9 just sat next to me, next to Kevin Creaser, and he
10 took notes. He was there to observe more than
11 anything.
12 Q    Is he a union officer?
13 A    I think he was a steward. I think he was
14 going to run for a union position, a high position
15 at that time, but at the time of the arbitration, I
16 think he was just a steward, union steward there to
17 observe and take notes and stuff.
18 Q    Seems odd. Your son, Willie, William Ricardo
19 Mahon?
20 A    Yeah, right.
21 Q    Other than -- don't take this the wrong way,
22 but other than being a good father, what knowledge
23 could your son have about whether or not other
24 people in the workplace did comparable things to you
25 and weren't fired?

TULSA FREELANCE REPORTERS
918-587-2878

Page 144

1 A    Well, he -- when this went down, he was living
2 in Chandler, Arizona, so he had no knowledge of what
3 went down. He didn't really acknowledge the
4 workplace other than the fact I worked overtime all
5 the time. He never had a chance to see me. I'm
6 sending him to mechanic school now, but American
7 made a lot of accusations about me trying to have a
8 conspiracy to kill my son and my ex-wife. They also
9 made statement about me not insuring or my life
10 insurance not authorizing -- authorizing a
11 percentage to go to my son. So I think he would be
12 e good witness to -- as me es a father and me es a
13 working man and how I conducted myself.
14 Q    I've seen or read somewhere that your brother,
15 Dennis, at some point in time disapproved of you
16 being married to a Philippino lady; is that true or
17 not?
18 A    He actually did her way over here from the
19 Philippines. Now, when he was working for Boeing,
20 couldn't have gotten her over here without his help
21 because I was still in the Navy making peanuts, but
22 I think he didn't like her character because when
23 she got here, she seemed to get a little more
24 materialistic than when I was with her in the
25 Philippines. First time we went to a mega mall,

TULSA FREELANCE REPORTERS
918-587-2878

Page 147

1  there was sort of a transformation there that took
2  place, but he gets along with her just fine now.
3  We've been to her house and fixed her car.
4  Q    Did he publicly announce his disapproval of
5  your marriage to her and having a biracial son?
6  A    Publicly? You mean like in print and --
7  Q    Well, within those circles that he operates
8  in.
9  A    No, probably never mentioned it. It was just
10  a personal situation.
11  Q    What would your ex-wife have to add to this
12  particular legal issue?
13  A    Oh, she would add quite a bit. The fact that
14  I'm being labeled as a terrorist, a hater, a devil,
15  a racist, all this stuff, I think she would testify
16  that I've probably been the most model ex-husband a
17  person has ever asked for. I helped her with a down
18  payment for her house in Phoenix. I've been to her
19  house on numerous occasions to fix her appliances
20  and air conditioning and both her cars. So she -- I
21  think she would be a very good -- testify to my
22  character and I behaved myself when you're married
23  and not married.
24  Q    Would she have any knowledge of any alleged
25  involvement with racist groups?

TULSA FREELANCE REPORTERS
918-587-2878

Page 147

1  about belief systems, your brother's as opposed to
2  yours, on some of your political philosophies and
3  where you fall in the spectrum of independent,
4  Libertarian and things like that. Tell me what your
5  belief system is involving racial identity.
6  A    What do you mean racial identity? I don't
7  understand what you mean. What race are you or what
8  race you live with yourself as?
9  Q    Let me try to pick a better example. Do you
10  believe that the races are properly kept separated?
11  A    Well, Louis Farrakhan, when his lieutenants
12  talked to my brother on the phone for a long time,
13  they feel the races generally do better when they
14  have their own determination, self-determination.
15  My brother believes basically, as well as some of
16  the other separatist groups around the country, that
17  people are generally more content when they have
18  their own leaders and their own industries, but he
19  never once wanted to attack a biracial couple or if
20  people wanted to congregate, he had nothing against
21  it. He was all for people having the right to
22  associate if they want to, with who they want to.
23  That's all I know he knows. You would have to ask
24  him.
25  Q    I believe the question was, what do you

TULSA FREELANCE REPORTERS
918-587-2878

Page 146

1  A    Oh, no.
2  Q    KKK?
3  A    No, I don't think -- she has no knowledge of
4  anything. She had a problem with Dennis and some of
5  his belief systems, of course. She was a little
6  nervous about it, but now we've been to her house
7  numerous occasions. She had us over last
8  Thanksgiving and had a good time and had some of her
9  Philippino friends over.
10  See, I don't think my brother is really a
11  hater. I think he was more of a separatist. When
12  he gave that speech to the Blank Panther militia in
13  Dallas in 1993, they gave him a standing ovation.
14  When he ran for mayor, he got I think a standing
15  ovation from the black Christian forum over here in
16  north Tulsa when he ran for mayor. They booed the
17  standing mayor, Miss Savage. My brother goes up
18  there and talks, he says I live in north Tulsa with
19  you people and I actually am trying to get
20  businesses back in this community and fix the roads
21  for you people, and so they enjoyed his speech a
22  lot. I don't think he's being labeled -- I mean
23  he's not as bad as people label him to be.
24  Q    That may be an appropriate place to ask this
25  question. You've talked kind of in bits and pieces

TULSA FREELANCE REPORTERS
918-587-2878

Page 148

1  believe?
2  A    Oh, what do I believe? Okay. I believe total
3  freedom. Libertarianism means total freedom,
4  freedom of association, freedom of using -- being
5  around who you want to, believing what you want to
6  as long as you don't cause personal harm to anyone.
7  That's the way it's always been. If I was a racist
8  I wouldn't be living in the most racially diverse
9  city in America, besides LA; it's Phoenix, and I
10  lived nine years in a multi-racial neighborhood in
11  Tulsa. I've had an African American right across
12  the street, Mexican Americans cattycorner, Indians.
13  Everybody in that area, we got along fine; no
14  problems at all.
15  Q    So then what caused you to want to affiliate
16  yourself with a group that tried to stand out as
17  being only Caucasian?
18  A    Well, I think private being is okay. I
19  thought that would be good to have all the races an
20  cultures represented out there. Like I said, I
21  basically got talked into it. I personally didn't
22  really want to join, but Linda Dill had that kind of
23  a charm, you know. You know, if she would have bee
24  250 pounds with a beard and mustache, I probably
25  wouldn't have joined, but she talked me into it.

TULSA FREELANCE REPORTERS
918-587-2878

Page 151

1 about it on -- at first I didn't know what it was.
2 I just thought somebody threw a pipe bomb into a
3 building, but when they said that many people died,
4 it was very horrific. It was a pretty big shock
5 to everybody.
6 Q   Do you remember the date of the Oklahoma City
7 bombing?
8 A   19th of April of '95, yeah.
9 Q   After you bought The Turner Diaries book,
10 isn't it true that you testified that you were aware
11 of the tie that was made between Timothy McVeigh and
12 The Turner Diaries?
13 A   Well, April 19th is also the anniversary of
14 Waco, which I think maybe played a big significant
15 part of that day they chose, that he or whoever was
16 involved chose to bomb the building. I think it was
17 definitely his retaliatory act against what happened
18 in Waco because it happened on the anniversary of
19 Waco, but there's a lot of conjecture of things that
20 happened and how it led up to it and stuff, so --
21 Q   And when you wore The Turner Diaries T-shirt
22 on April 20, you did admit you thought it was an
23 anti-government or anti-establishment statement;
24 correct?
25 A   The book is anti-government. I don't remember

TULSA FREELANCE REPORTERS
918-587-2878

---

1 Q   You indicated on the same subject matter area
2 that you did recognize the Turner Diaries to be
3 anti-government?
4 A   Well, that's the impression I got in the first
5 chapter. It was mainly anti-government, governments
6 were taking guns from everybody around the country,
7 and this individual was arrested and he escaped and
8 formed his own little group.
9 Q   Are you concerned about the efforts to pass
10 gun control laws?
11 A   I've always been to a certain degree. I'm
12 very scared of the Patriots Act. Search and seizure
13 laws have been apple gated. Sneak and peek, no more
14 federal warrants for wire taps. I'm very concerned
15 about the lack of how we're losing freedoms from
16 this Patriots Act, and I think the government
17 eventually will plan on gun control, confiscation of
18 guns. Some of our freedom of free speech will be
19 taken away, but it's a passing concern. I'm not
20 totally obsessed by it, but the Libertarians, we all
21 have that passing concern.
22 Q   What about the increasing power of the Federal
23 Emergency Management?
24 A   FEMA?
25 Q   FEMA. Some people are pretty concerned about

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 152

1 admitting that I wore that just because of Waco.
2 American Airlines picked that date for that meeting
3 for some reason. I don't know why. Also they also
4 mentioned it was Adolph Hitler's birthday and I
5 didn't even know what birthday Hitler was born on.
6 So American Airlines must have more knowledge of
7 dates and places than I do, but there was no
8 connection.
9 Q   Are you aware that your brother is quoted as
10 he made the comment that the Oklahoma City bombing
11 was a beautiful thing?
12 A   I think what he said, he said -- the only
13 thing I remember him saying about it to Fox News
14 network when they came down for an interview, he
15 said he's glad that someone finally took it to the
16 government but he should have done it at 3:00 in th
17 morning, that's what he said, when there was no lif
18 lost. He never approved of all the people dying
19 there. He said it's just too bad they didn't do it
20 at 3:00 in the morning.
21 Q   Often times a person's religion plays a role
22 in their belief systems. You agree with that I
23 assume?
24 A   Sure. Religion is a great part of people's
25 lives.

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 150

1 that.
2 A   It's a concern. It really is.
3 Q   Why is that?
4 A   Because as Americans, we're used to going
5 where we want to without papers; we're used to
6 saying things we want to say and having the freedom
7 to do hobbies involved, and I think that FEMA is
8 going to put a crunch on our basic freedoms.
9 Q   You mentioned Waco and the Branch Davidians.
10 Do you believe what occurred there was an
11 infringement of somebody's rights?
12 A   I think it was an atrocity, yeah. I think the
13 government killed almost 80 real good innocent
14 people, most of them -- many, many African Americans
15 and Asian Americans and Hispanic Americans in that
16 group were burned alive, and I think it was a ugly
17 blight upon the American history, as well as Ruby
18 Ridge when they killed that woman with her baby, but
19 it's becoming an emotional subject. I don't really
20 want to discuss that.
21 Q   You were living in Oklahoma at the time of the
22 Oklahoma City bombing, were you not?
23 A   I remember the morning very well as a matter
24 of fact, yeah. I was at a restaurant eating
25 breakfast at Tallies when they first said something

TULSA FREELANCE REPORTERS
918-587-2878

Page 155

1  Q    I understand at some point in time, maybe
2  earlier in your life, maybe until today, you were a
3  member of the Seventh Adventist?
4  A    Seventh Day Adventist, yeah.
5  Q    Is that still the case?
6  A    No. I fell away from it. I'm a back slider.
7  They're very legalistic. -You couldn't eat certain
8  things. You couldn't drink any alcoholic beverages
9  at all. You couldn't work from Sabbath, Friday
10 sundown to Saturday sundown, and as I grew into that
11 religion, I realized that although the people were
12 very nice in the church and they treated me great,
13 it just got to be a little bit legalistic and I fell
14 away. When I was in the Service, I was a very
15 strong member of it.
16 Q    In fact, while you were in the Service, you
17 applied to be released from the Service as a
18 conscientious objection; is that correct?
19 A    Exactly. They wanted me to participate in the
20 nuclear bombing problem, a nuclear loading program
21 of loading nuclear weapons, and I said my religion
22 prevents me from loading weapons of mass
23 destruction. So they said you can't do that unless
24 you file for a conscientious object 1A0
25 classification, so I got paperwork to do that. The

TULSA FREELANCE REPORTERS
918-587-2878

Page 154

1  process is pretty involved. I had to see a
2  psychiatrist for an hour or two. Then I had to see
3  the chaplain on board the base, Navy chaplain, the
4  Catholic and Protestant, and they all agreed my
5  beliefs were sincere and they finally approved that
6  category.
7      I still had to work on the airplanes and I
8  still had to go to sea with the squadron. I still
9  did my job as an avionics man but I didn't have to
10 load that nuclear ordnance.
11 Q    If you are no longer with the Seventh Day
12 Adventist church, are you with some other organized
13 religion?
14 A    Pretty much agnostic now. I see all these
15 religions all trying to gain strength in the world,
16 and I've pretty much assumed or come to the
17 conclusion that we need to have a big stadium and
18 put Allah and Jesus and Vishnu, Buddha, Yawway and
19 all these different gods in there and let them
20 hammer it out and we'll worship the one that wins.
21 That's kind of how I feel about it now.
22 Q    Evan Sirois, is that how you pronounce his
23 name?
24 A    Sirois, Sirois. He's a gentleman from -- he's
25 a Vietnam veteran, highly decorated, and been out

TULSA FREELANCE REPORTERS
918-587-2878

Page 155

1  there probably 16 years. I worked with him quite a
2  bit out there. Came to me for a lot of advice.
3  He'd been a mechanic and he got to avionics a little
4  later in his career, so he came to me a lot of times
5  for training, informal training on the airplane.
6  Born-again Christian, very conservative. I've been
7  out to dinner with him on many occasions since I got
8  fired and before. Real good character witness. His
9  son is a doctor now and a real honest, hardy man.
10 He could also testify to my behavior, my psychosis,
11 my performance on the job, my basic psyche, what I
12 believe. Another good man. He's been out there a
13 long time.
14 Q    Why don't we have a break so everybody can get
15 a little refreshed and --
16 A    Can I get some coffee?
17 Q    Yes.
18      (Following a short recess at 2:59 p.m.,
19 proceedings continued on the Record at 3:23 p.m.)
20 Q    Mr. Mahon, following up, after a break, to the
21 list of people that you believe would be witnesses
22 on your behalf in this case, we had made it down
23 your list to Bob Pierce and I assume Debbie Pierce?
24 A    Yeah.
25 Q    Who are they, please?

TULSA FREELANCE REPORTERS
918-587-2878

Page 156

1  A    They're next door neighbors, one house down
2  from me. They have been my neighbors for roughly
3  eight years, a real nice couple, got two kids. We
4  worked on his cars. He works on my stuff. We have
5  garage sales together, and he's a fan of Harley
6  Davidson motorcycles, got two of them, and they're
7  the ones that have been there the longest. I
8  thought they might be nice.
9  Q    Do they have any idea of what went on in the
10 workplace and whether employees similar to you were
11 terminated or not terminated?
12 A    Not really. Him and my brother got to
13 drinking beer a lot. They liked to drink beer.
14 Q    Drank a lot of beer?
15 A    Drinking a lot of beer, dealing with the
16 Harley there, but I used to fix the TV for them and
17 their appliances and stuff. So they were kind of
18 regular kind of people.
19 Q    Steve Waddel, he testified, didn't he, at
20 the --
21 A    No. Steve is another friend of ours. I've
22 had him as a friend a long time. I've worked on hi
23 truck a lot. As a matter of fact, we rebuilt a
24 wreck when he got in a wreck. He works at
25 Whirlpool. Known him about seven or eight years.

TULSA FREELANCE REPORTERS
918-587-2878

Page 157

1  He's just kind of a regular working class guy,
2  middle class, nothing special about him but he's a
3  pretty honest-hearted guy. I just done a lot of
4  work for him, fixed TV's for him, his trucks all the
5  time, put a garage door on his house.
6  Q    Ralph Schubert?
7  A    Ralph, he did testify at the arbitration. He
8  was my crew chief for about two and a half years.
9  He's retired, just racently retired. Been at
10 American for I think 28 years or 30 years, and he
11 used to go a lot of these political forums. He's --
12 what do you call it, the town hall meeting, and we
13 used to see him there a lot, fairly political
14 active, big NRA supporter, conservative person, and
15 he's been my friend a long time.
16 Q    Did he work at American?
17 A    He works at American, right.
18 Q    I'm sorry.
19 A    He was my crew chief for three years, almost
20 three years.
21 Q    Does Mr. Schubert, from what he's told you or
22 you know, have any information about whether a
23 similarly situated employee to you had done the same
24 kind of things you did but didn't get fired?
25 A    I don't think he has any knowledge of anything

TULSA FREELANCE REPORTERS
918-587-2878

Page 159

1  to be written in cursive?
2  A    Which is --
3  Q    As opposed to printing, cursive handwriting.
4  A    Yeah, yeah, it was my handwriting, yeah.
5  Q    Is this how you write in cursive or is this
6  somebody else's handwriting?
7  A    No. It's mine. That's how I write; that is
8  how I write. Of course, now I'm older, I probably
9  write older, but that's how I write.
10 Q    I guess I had never seen other then your
11 signature any writing in cursive. In the left
12 margin of the first page of this exhibit there's an
13 note that says, Gene, should you print Danial Mahon
14 in the place of I?
15 A    There's a big cross thing here. I don't
16 recall doing that. I don't recall putting this
17 scribbling on here.
18 Q    Did anybody ever write a letter for you or
19 draft a letter for you to send out?
20 A    Should you print Danial Mahon in place of I?
21 I have no idea -- this is not my writing here;
22 that's not my writing.
23 Q    The printing in the margin is not your
24 printing?
25 A    That's not my printing, and also this thing

TULSA FREELANCE REPORTERS
918-587-2878

Page 158

1  like that. I don't think so.
2  Q    Eugene Hough?
3  A    Eugene Hough, yeah. He's my attorney friend.
4  He does domestic cases, bankruptcy, divorces, this
5  type of thing. I've known him for about nine years.
6  Done a lot of work on his vehicles. I was his
7  personal mechanic and home repairman. I know him
8  and his wife quite well. Another conservative type
9  person, pro-gun. Real nice guy. He's been in town
10 here a long time.
11 Q    Your interactions with him were on a friend
12 basis as opposed to a formal attorney-client
13 privilege?
14 A    We have a professional attorney-client
15 relationship with my house. When I got the quit
16 claim, he did the paperwork for the transferring the
17 house over.
18 Q    But as it respects this litigation, was he
19 ever your attorney?
20 A    No, no.
21 Q    I hand you what's been marked as Defendant's
22 Deposition Exhibit 41. Can you identify that?
23 A    It was a letter I think I sent to the ACLU
24 that they didn't take the case.
25 Q    On the first page the majority of it appears

TULSA FREELANCE REPORTERS
918-587-2878

Page 160

1  here is also not -- I don't know what is involved
2  here.
3  Q    Turning over to Page 4, which also has Bates
4  stamped 118 on it, you'll see that the handwriting
5  changes from cursive to printing.
6  A    That's my printing; that's definitely my
7  printing, and it's definitely my writing. I don't
8  know if I just probably went to a different day, an
9  sometimes to make things more clear, I do that
10 occasionally. I made a mistake on aircraft
11 paperwork, too. Sometimes I'll start writing and
12 should be printing and vice versa.
13 Q    The reference on the first page to Gene, do
14 you call your friend Mr. Hough Gene as opposed to
15 Eugene?
16 A    What page is this?
17 Q    The very front page in the margin.
18 A    I've always called him Gene and that's his --
19 just Gene.
20 Q    Did Gene ever insist you write a letter?
21 A    No. Only thing I used Gene for was my quit
22 claim on the house, and I did ask him to take this
23 case but he said I'm not interested in it. He
24 wasn't interested in looking into it, so he didn't
25 take it.

TULSA FREELANCE REPORTERS
918-587-2876

Page 161

1  Q  Did he ever offer or help you review anything
2  you had written, such as this letter?
3  A  No, he never looked at anything. I just asked
4  him if he would help out and he said I'm too busy, I
5  can't do it; I'm not interested in that case.
6  Q  Did you in fact send this letter out to the
7  ACLU?          .
8  A  I believe I did. I believe I sent that to
9  Kansas City.
10  Q  Can you tell me by looking at it what the date
11  of this letter is?          .     .
12  A  Not dated. I probably sent that out between
13  the time that the arbitration decision came down and
14  the time I got Bob. I also contacted Gerry Spence
15  and a Prepaid Legal attorney I met with.
16  Q  This letter is entirely written by you; is
17  that what you are telling me?       .
18  A  Sure looks like it. I don't know about this
19  thing in the side here but it definitely is my --
20  this is my letter. That's my writing.
21  Q  It has your name at least in the signature
22  page on Page 10?
23  A  Yeah. This is my letter. ..
24  Q  Do you consider that for this purpose to be
25  your signature to this letter?

TULSA FREELANCE REPORTERS
918-587-287B

Page 162

1  A  Yeah. That's the way I would do it.
2  Q  Was this letter sent to the ACLU written in
3  longhand form or did you have it typed up or do you
4  remember either way?
5  A  I sent this letter as is. I think I put it in
6  a manila envelope and sent it off to the Kansas City
7  chapter of the ACLU.
8  Q  Did you try to be careful and accurate when
9  you wrote this letter?
10  A  As accurate as I could.
11  Q  Did you embellish it; did you take any
12  liberties with the facts in it at all?
13  A  Well, again, I would have to go through it to
14  make sure because it's been a little while ago since
15  I wrote it.
16  Q  Take your time to read it. That will make my
17  questioning go more quickly later.
18  A  One date may be off. I think it was 1990 I'm
19  almost positive that he quit, not '91.
20  Q  Tell me where you're looking.
21  A  Second page, approximately -- yeah, second
22  page about two inches up where it says 1988 and
23  September of 1991. I think it was around October of
24  1990 that they finally let go of him.
25  Q  Have you heard that your brother, Dennis, said

TULSA FREELANCE REPORTERS
918-587-287E

Page 163

1  the Klan wasn't violent enough or progressive enough
2  for his tastes?
3  A  Oh, I don't recall it. He may have said it
4  when he was out. He was gone quite a bit doing
5  interviews with people. He didn't spend a lot of
6  time at the place. He was actually out of town a
7  lot. Dick Kurtenbach, that was his attorney for the
8  ACLU in his case against Kansas City. I did have a
9  F-29 after the showing of the -- airing of the Opra
10  Winfrey Show. Mayoral -- ran for mayor. Okay.
11  Talked about when I was called in with the FBI when
12  the FBI was at American. That's accurate. 1998,
13  that doesn't sound right. No way I was in that
14  group that long.
15  Q  Talking about the Caucasian employee resource
16  group?
17  A  Yeah. That's not right. There's no way I was
18  in there a whole year, no way, no way. I don't ever
19  think they were in operation then. That date is
20  wrong. It has to be spring, early spring of 1999.
21  That's January of 1999. These dates are one year
22  off.
23  Q  You are referring to on or about the first
24  week of January?
25  A  They weren't even in operation then.

TULSA FREELANCE REPORTERS
918-587-2878

Page 164

1  Q  I met privately with Linda Dill and Craig
2  Nichols?
3  A  Yeah. It has to be January of '99, has to be
4  Okay. April 20th, after I checked the bulletin
5  board, I was notified to check bulletin board and
6  found out about the meeting. Other than those
7  dates, it looks fairly accurate.
8  Q  Let me ask you a few follow-up questions. You
9  begin the letter by saying as a member and supporte
10  of the ACLU for many years. Are you a member of ti
11  ACLU?
12  A  Yes, I am.
13  Q  Is that one organization of which you are a
14  card-carrying member?
15  A  Right. I do have an ACLU card.
16  Q  As you recall, does it make you remember any
17  other groups that you're officially a member of?
18  A  I'm a member of PETA. I'm also a member of
19  the National Peace Alliance, National Peace Memori.
20  Fund. I'm a member of several assertive pro-peace
21  organizations, NRA, many organizations.
22  Q  Any others that you can think of?
23  A  Not that I can think of now but they're out
24  there. There's quite e few.
25  Q  Do you keep a list of them; do you keep your

TULSA FREELANCE REPORTERS
918-587-2878

1  cards with you; how do you know?
2  A     Well, I have a pretty thick wallet.  I do have
3  some in any -- I have a lot of things.  That
4  obviously is one of them.
5  Q     Christian Seniors Association, do you mind if
6  I grab it here?
7  A     There's several of them in the -- I wish I had
8  known that because I have a whole bunch of stuff at
9  the place I'm staying, a bunch of my records and
10  things.  I also belong to World Wildlife Fund.
11  That's another one.  Amnesty International.  That's
12  all I can think of right now.
13  Q     Okay.
14  A     My wallet would be two inches thick if I put
15  all those cards in there.
16  Q     How do you afford all those dues?  That's more
17  things than I can imagine belonging to.
18  A     I live in a travel trailer.
19  Q     Bottom of the first page of Exhibit 41 talks
20  about spring of 1999, two years after the separation
21  from your wife, your identical twin brother lost his
22  job after Braniff Airlines went broke in Kansas
23  City, Missouri?
24  A     Yeah.  They went bankrupt for the third time.
25  Q     Do you know whether your brother had ever been

---

1  I'm not Dennis, so I showed him my ID to prove I
2  wasn't Dennis, and he said we have to question him
3  about a possible threat against the United States
4  president, and I said what happened, and he said
5  about six months ago your brother while working in
6  Wichita urinated in the Oval Office of U. S. Air
7  Force One, a 747.  Although the aircraft was still
8  under Boeing's auspices, it wasn't really released
9  to the president's fleet, so the FBI wasn't really
10  involved; it was just the Secret Service, and he got
11  rather threatening, and I said, well, I'll let you
12  know where he is as long as you promise not to do
13  any personal harm.  He basically said unless your
14  brother admits to wanting to kill the president, he
15  will not be arrested.  So I gave him the whereabouts
16  of where my brother was and I said he's at Braniff
17  Airlines, Kansas City International Airport, line
18  crew, he's there right now.
19       And about an hour later I got a call from my
20  brother and he said you're not going to believe what
21  happened; he said this real old graveled experienced
22  Secret Service agent came on the job with Barney
23  Fife, a young rather exuberant sidekick, and they
24  asked me if I urinated on President Bush's airplane
25  and my brother said yes, I did, and the head agent

---

1  fired from another major airline?
2  A     He did get fired from TWA in 1989 after he
3  appeared on the Oprah Winfrey Show.  He took a half
4  an hour off his night shift to catch a flight to
5  Chicago to do the show, and nothing happened until
6  they aired the show and then after that they fired
7  him for missing time off work, which he actually was
8  approved to take.  His job was already finished on
9  the airplane, so he had some downtime anyway.  They
10  were waiting for avionics to get done, and they
11  called him in and said you missed an unauthorized
12  absentee, a half hour off work, and they fired him.
13  Q     Are you aware that he was accused of urinating
14  on the presidential seal of Air Force One?
15  A     All too aware.
16  Q     Is it true?
17  A     Yeah, it is true.  As a matter of fact, I got
18  visitation by the president's Secret Service
19  organization about that, a very disturbing visit.
20  Got a note on my door at the house, a little calling
21  card said that Agent Rafferty of the Secret Service
22  needs to talk to you about a very urgent problem,
23  and later on he made an appearance and he wanted --
24  first he thought I was Dennis and he said, Dennis,
25  you need to come outside, we need to talk.  I said

---

1  started laughing uncontrollable.  He says we laughe
2  so hard when we heard it, we didn't really believe
3  it.  He said do you want to kill President Bush, an
4  my brother said I'd like to kill his policies but I
5  don't want to kill the man.  He said okay, can I
6  take a quick picture and thumbprint and we'll be on
7  our way.  Meanwhile, the younger man was kind of an
8  in-your-face kind of guy.  My brother said can you
9  tell Barney Fife to take a coffee break and I'll go
10  deal with you, and he told -- the older agent told
11  Barney Fife, Barney Fife, take a coffee break.  So
12  they got his thumbprint and a picture and that was
13  the end of it, but they claim they have over 399
14  threats against high officials every day and they
15  have to investigate every single one.  They're
16  pretty much busy people, but it was a no event, a
17  non-event.
18  Q     Well --
19  A     I guess he had to urinate pretty bad.  I don't
20  know what happened there.
21  Q     Did he go on the presidential seal on the
22  outside of the airplane?
23  A     No.  He was actually inside the chair.
24  Q     He peed on the president's chair?
25  A     Yeah, and his table and the carpeting.  He

Page 171

1  policeman next to him died of a heart attack.  He
2  tried to revive him and it didn't work.
3      A week after that he went on -- the Cubans had
4  a problem with Castro.  Mariolitto, Mariolite
5  Botliff, he was a Cuban.  Castro allowed a great
6  deal of his prisoners and criminals to come to this
7  country under the guise of some type of emergency i
8  Cuba and it was -- it caused the National Guerd to
9  be activated for 40 days to guard all these
10 entrants.  Most of them were from mental
11 institutions and hardened criminals; very few of
12 what you would say decent Cubans were brought.
13 Castro basically did a dirty trick, and my brother
14 was involved in that for 40 days in that situation,
15 guarding all of these people.
16     So he -- I think he established some of his
17 belief systems from that experience.  I think it wa
18 different after that time.
19 Q   Was the riot you referred to involving race?
20 A   Yes, it was.  Basically it involved four Cubar
21 police officers beating an African American to deat
22 with the billy clubs, and it was a motorcycle chase
23 that got ugly, and it was on -- close to a weekend
24 and it got out of control, and National Guard got
25 brought in to help quall it, and it was traumatic

Page 171 (left column)

1  baptized it quite well.  Agent said are you glad you
2  did it.  He said I would do it in a heart beat; if I
3  had the chance, I would do it again in a heart beat.
4  Q   What do you think about that?
5  A   Comical.  You know, I mean I know he wouldn't
6  jeopardize any airplane to cause a serious --
7  jeopardize safety, but he saw the people look in his
8  toolbox and he kind of figured his termination was
9  very short coming, so he decided to leave his
10 essence on the Oval Office.  A little bit of
11 disinfectant cleaner took care of it.
12 Q   Page 2 of your letter here in Exhibit 41 where
13 you're talking at the top, let me interject at this
14 point that identical twins more often then not have
15 a markedly different relationship with each other
16 than with other siblings do.  As young children, we
17 played with the same toys, built model airplanes
18 together, went fishing together, et cetera.  My twin
19 and I shared the same interests, hobbies and the
20 same politics.  Most people wouldn't understand it.
21 It's a twin thing I guess.  Is that an accurate
22 statement?
23 A   Well, except for totally the politics aren't
24 always the same.  The hobbies aren't always the
25 same.  He has different hobbies now.  But we did go

Page 170

1  in the military together and we taught each other
2  how to do things, the airplane thing and the
3  fishing, and both had interest in firearms.  I would
4  say quite a bit of things were quite alike.  Of
5  course, when you share your life with someone with
6  the same identical DNA, you're going to be somewhat
7  similar.  I don't see how that could be different,
8  but as we grew older, I think like everyone, we had
9  different ideologies about a lot of things.
10 Q   Then in the next paragraph you talked about
11 his involvement in the KKK, and then you make a
12 statement I thought was curious.  I believe he may
13 have developed these negative beliefs from some
14 experience while on riot duty in Miami, Florida in
15 1980.
16 A   Yeah.
17 Q   What is that all about?
18 A   I think he had a traumatic experience on
19 National Guard duty during May of 1980.  He worked
20 for Eastern three days, on the job three days, and
21 he got called out for National Guard duty.  It was a
22 pretty bloody situation took place May 3rd.
23 Eighteen people died the first night.  He was put
24 right in the thick of it, and he had to use his
25 firearm, military firearm on a person, and the

Page 172

1  for him.
2  Q   You said it was May 3rd, 1980?
3  A   1980, May 3rd or May 13th, one of the two, I'
4  not exactly sure, I think it was May 3rd but it ma
5  have been May 13th.  It was during the month of Ma
6  But anyway, that's his own experience he went
7  through.
8  Q   You say later in that page that you agreed to
9  allow your brother to rent a room at your house fo
10 $125 a month?
11 A   That's right.
12 Q   And he agreed not to engage in any illegal
13 activity?
14 A   He never has -- never at any time had he ever
15 engaged in anything illegal.  All his activities
16 were constitutionally protected, including his bid
17 for mayor twice.  He never advocated wholesale
18 violence against anyone.  I did tell him that he h
19 one year to get out of this KKK business, which he
20 did, or not one year.  I'm sorry.  Within 90 days
21 him coming in, 90 days he resigned.
22 Q   What was the basis of your talking him out of
23 the KKK?
24 A   After seeing a lot of people that are in that
25 I considered them kind of uneducated, low-life typ

Page 173

1 people. He was I think trying to reform it, trying
2 to get people to go -- getting the politics instead
3 of the violent talk, and he did get attacked three
4 times by skinheads for that reason. He got beat up
5 twice.
6 Q   And so your brother went from the Ku Klux Klan
7 to the White Aryan Resistance?
8 A   Yeah. He got rid of that Klen thing ell
9 together, and later on he started talking to Tom
10 Matzger. Used to be White American Political Party
11 and then changed it to WAR, White Aryan Resistence,
12 which that's kind of what ha went with. It was more
13 of a political organization than this Klan thing
14 because the Klan drew a lot of drunks and wife
15 beaters and people of this nature.
16 Q   And his association or involvement with WAR
17 continued until the two of you all left Tulsa; is
18 that right?
19 A   Way before that. He really -- after the
20 bombing, Tom Metzger basically said you're no longer
21 an organizer or an activist with this organization.
22 So after the bombing, that was it. It was no more
23 anything, except just an occasional phone call, you
24 know, how you doing, Tom. He called him
25 occasionally, but there was no other activity
TULSA FREELANCE REPORTERS
918-587-2878

Page 174

1 involved. As a matter of fact, Tom Metzger's son
2 got out of the whole thing a couple of years ago.
3 Q   Did what?
4 A   His own son is no longer associated with his
5 father. He's out of that thing, too, so --
6 Q   We're going to return to this exhibit so you
7 may want to keep your hand there, but in the
8 meantime would you turn to Defendant's Exhibit 31.
9 Do you recognize that, sir?
10 A   I don't recognize this. I don't know these
11 individuals at all.
12 Q   You haven't seen a document like this before
13 in your life?
14 A   Not this. I've never seen this. I don't know
15 where it came from or whether he faxed this to
16 people. I have no idea. I just don't know who
17 these people are. I've never heard of them before.
18 Q   This is the WAR that we're just talking about,
19 isn't it, White Aryan Resistance?
20 A   Yeah, WAR network, that is, yeah.
21 Q   And the telephone number on your first page is
22 your home phone number; correct?
23 A   Yeah. We shared a phone number.
24 Q   And the P. O. Box, is that a shared P. O. Box?
25 A   Yeah. A lot of people share P. O. Boxes for
TULSA FREELANCE REPORTERS
918-587-2878

Page 175

1 ease of expenses and stuff. A lot of businesses do
2 it. I get a lot of parts to my TV service through
3 the P. O. Box and all kinds of mail, junk mail.
4 Q   Clearly, you testified that you were concerned
5 with you being associated with your brother's
6 activities; right?
7 A   I don't see how a post office box really makes
8 you -- he got his mail and I got my mail. It was as
9 simple as that. There was no post office available,
10 so we just got one box and used it, a big one.
11 Q   So did you condone him using your P. O. Box
12 and your home telephone number to conduct his WAR
13 activities?
14 A   He didn't really mail much to that P. O. Box
15 or get much stuff. Most of the stuff was just junk
16 mail and stuff that I ordered through my collecting
17 and my model airplane thing. If he did, I'm sure he
18 got a few things, but I don't necessarily -- the box
19 wasn't addressed to some type of a racial title. It
20 was strictly the box in my name; it was my P. O.
21 Box. It wasn't like White Beret Enterprise box or
22 it wasn't KKK or WAR. It was just Daniel Mahon's
23 box.
24 Q   But you knew he was using your box and your
25 phone number for WAR activities?
TULSA FREELANCE REPORTERS
918-587-2878

Page 176

1 A   Well, he had his own phone line in his room.
2 He had his own hotline that he had set up and he
3 used that to call people and things of this nature,
4 but he had access to the main phone, sure. It's a
5 small house, 985 cubic feet or square feet, it
6 wasn't a big house, but I never heard any seditious
7 talk being talked about. It was just a shared
8 phone. People do it all the time, share phone
9 numbers to save money.
10 Q   My question was, you did know he was using on
11 documents such as this one, Exhibit 31, your
12 telephone number and your P. O. Box; correct?
13 A   Oh, yeah, he used it. No problem about that.
14 Q   And you knew it?
15 A   Absolutely. How am I not going to know it?
16 Q   We talked a little bit about William Pierce.
17 Have you ever met Mr. Metzger, Tommy Metzger?
18 A   I met him one time, yeah. He came back --
19 excuse me -- to Tulsa for a short visit, and I had
20 few words with him about TV's, how's the TV repair
21 business, and I had some TV problems I talked to hi
22 about.
23 Q   Are you aware that Mr. Metzger has for quite
24 some time operated a video -- excuse me, a website
25 and a recorded racist hotline service out of
TULSA FREELANCE REPORTERS
918-587-2878

Page 179

1   California?

2   A    More than that. I think he had cable access

3   in about 25 states I think if I'm not mistaken.

4   Q    Are you aware that in the course of the

5   dispute between you and American Airlines, the

6   arbitration, and for a period of time at least

7   following that, Tommy Metzger was publishing

8   commentary and stating opinions on his publications

9   about you?

10  A    Internet, I think somebody let him know on the

11  Internet what's going on.. I don't have a computer.

12  At that time none of us used a computer, except to

13  look up parts for an airplane, but, yeah, he did put

14  something on there about that and I don't know how

15  he got the information at all.

16  Q    So he didn't interview you to get that

17  information?

18  A    No. I don't talk to Tom Metzger at all.

19  Q    Did your brother, as far as you know, give him

20  that information?

21  A    I don't think he did. He could have got that

22  from any number of sources. I was very disturbed he

23  put that on there because he had no business putting

24  that on there.

25  Q    As are other people. The telephone service

TULSA FREELANCE REPORTERS

918-587-2878

1   His was the top one. The bottom one was Carol

2   Howe. I do remember she had a thing set up, Carol

3   did.

4   Q    This is the same Carol Howe that was

5   implicated in the Oklahoma City bombing?

6   A    Implicated or testified for? She was a

7   witness for other things.

8   Q    And wasn't it through that connection that

9   your brother was suspected of having been involved?

10  A    Yeah. She became an informant, later dropped

11  her for being unreliable, but she did make some

12  trouble for my brother.

13  Q    Now, were you aware that your brother was

14  operating the Dial-A-Racist Hotline out of your

15  house?

16  A    Oh, absolutely. It's a smell house. It's a

17  985 square foot house, so I knew he had a hotline.

18  I said if you do any illegal activity, you got to

19  go.

20  Q    Is the message or messages that are contained

21  on that hotline anything that disturbs you?

22  A    I actually didn't hear much of the messages.

23  That was his domain. I never went into his room fo

24  any reason because I had nothing to go in there for

25  I ran my little repair business out in the garage

TULSA FREELANCE REPORTERS

918-587-2878

Page 178

1   that your brother operated was called the

2   Dial-A-Racist Hotline; right?

3   A    Right. That was his own phone.

4   Q    That went into his room in the house?

5   A    Yeah. That was plumbed into his -- wired into

6   his bedroom, yeah.

7   Q    And he would leave a tape recording on the

8   answering machine in there for people to dial and

9   listen to?

10  A    Yeah. They had to voluntarily dial in. It

11  wasn't a dial-out service.

12  Q    Let me direct your attention to a calling card

13  I believe you've seen before today. Would you

14  identify that for me?

15  A    Yes. My brother's -- I don't know who this is

16  Aryan separatist thing is. Oak Hurst, something I

17  can't recognize. The other I do as Dennis'.

18  Q    It says Oklahoma White Aryan Resistance, P. O.

19  Box 434, Catoosa, Oklahoma. That's your P. O. Box;

20  right?

21  A    Yes, it is.

22  Q    Which of the two numbers on here, I think I

23  know, but of the number for White Aryan Resistance,

24  as opposed to the Oklahoma Aryan Separatist Party,

25  was your brother's phone number?

TULSA FREELANCE REPORTERS

918-587-2878

Page 180

1   and he kept his deal there. It's two separate

2   deals.

3   Q    Did you oppose any of the activities that he

4   was conducting out of your home?

5   A    Well, the deal was anything illegal, he's got

6   to go. As long as you're doing a constitutionally

7   protected activity, you can stay, but as soon as yo

8   do something illegal, you got to go.

9   Q    Did the two of you all talk about the line

10  between what's illegal and what's constitutionally

11  protected activity?

12  A    Basically I said if any police come and arres

13  you for anything, you'll have to find another plac

14  to live.

15  Q    I direct your attention to what's been marked

16  as Defendant's Exhibit 19. It's a transcript of t

17  telephone call recording placed to 918-834-4272

18  August 17th, 1999. This was also an exhibit I

19  believe at your arbitration.

20  A    Right. I remember that.

21  Q    Have you ever taken the opportunity to read

22  that transcript?

23  A    I don't see anything about American Airlines

24  in here but I guess it's his hotline, one of the

25  messages here.

TULSA FREELANCE REPORTERS

918-587-2878

Q This timing-wise was after the date of your termination and before the arbitration; is that correct?
A August -- yeah, I think it was. August 17th sounds about halfway between -- before --
Q It states in part send $3 or more to your host, Dennis Mahon, and that's P. O. Box 434, Catoosa; that's your P. O. Box; right?
A Uh-huh.
Q And he refers to Tom Metzger International Aryan Update as a source for people to go to; correct?
A It's just another -- yeah. He has a hotline, too, several hotlines around the country.
Q And he gives the telephone number for Metzger; correct?
A Yeah. He used to always do that but that's all he did for him.
Q Page 4, quote, now I predict a major earthquake at American in the next few months.
A I'm sorry.
Q I also predict a major airline crash. I'm not going to say which airline but I just feel within the next two months I'm afraid we're going to lose one, period, closed quote. Have you found that?

A That came up at the arbitration, that message.
Q Now, do you think that that kind of statement is appropriate?
A Well, he predicts because of safety violations, that it's very possible. People predict things all the time. If you picked up a National Inquirer, you would see all kinds of predictions that people make about all kinds of things. He doesn't get specific. He doesn't name any major airline, any major flight, any major time or date. He just makes a blanket statement that he thinks that -- he told me because of safety violations of certain airlines, but there's no inference that this is American or any other airline that I can see here.
Q He told you he was going to make this prediction on the Dial-A-Racist Hotline?
A No. I found out about it when the union called and let me know that there's something on the hotline that's not good. So I went and replayed it and verified it and I said, hey, you got to take it off, so he took it off immediately. It was only on for approximately 24 hours.
Q Once you said, hey, you got to take it off and he took it off, was that the end of the

Dial-A-Racist Hotline or?
A That was the end of that message. I said don't be referring to things like that on your hotline; that's not going to work.
Q Was that the end of the Dial-A-Racist Hotline?
A No. It stayed on for another three to four weeks and then he shut it down.
Q As you pointed out here in the transcript from August 17, 1999, it doesn't mention American Airlines, does it?
A What he did here, after he took this off, he redid his message and he explained what he meant by that. He made a retraction.
Q But this first one doesn't even mention American Airlines, does it?
A No, nothing. There's no inference of any carrier or anything.
Q I direct your attention to the transcript of the following day, which I think you've just testified was where he changed the message. This i Defendant's Exhibit 20. Have you read that transcript before today, sir? It states 6:30 at night August 17th. I just changed my message, ladies and gentlemen, because certain small pusillanimous cowards have misinterpreted my messag

of this morning. Do you see that?
A Yes, sir.
Q Do you know what pusillanimous cowards he was referring to?
A I don't know what pusi -- I don't know what that means. I'm sorry, I'm not very good at my vocabulary. I know what a coward is but I don't know what this other name is. Do you have any ide: what that means? I don't know.
Q Were you -- the next paragraph talks about this morning I made a prophecy; I had a dream. I saw an airline crash. I saw buildings collapse. you see that?
A Uh-huh.
Q Did Dennis tell you that he had a dream with that in it?
A Yeah. He says he dreams all the time, maybe after he has a little too much of that vodka or whatever he drinks maybe. I don't know, but he do talk about things he sees in his dreams.
Q Okay. The bottom of the page he says in part quote, I don't know which airline but probably I said American because they have a bad safety recor closed quote. Do you see that?
A Yeah, I do certainly see it.

Page 187

1  Q    We just read the transcript from the day
2  before and it doesn't mention American Airlines,
3  does it?
4  A    I don't know what he -- it must have been one
5  of his heavy inebriation type days.
6  Q    So at that point in time at least you knew he
7  had made what he called a prophecy of a threat
8  against American Airlines; correct?
9  A    Yeah.  Probably he said American, and yet he
10  didn't say American, so I don't know what went on
11  there at all.
12  Q    That's pretty serious, wouldn't you agree?
13  A    If that's what he said, but he didn't --
14  probably said American because they have a bad
15  safety record.  He prophesized that American may
16  have an accident because of a bad safety record.
17  Well, their safety record has been pretty bad the
18  last eight or ten years, but I don't think he meant
19  that he's going to make it happen or anybody else.
20  It's not really a threat.  It's more of just a
21  prediction, a dream of something he dreamed.
22  Q    Is that an example of somebody that's playing
23  it close to the line in terms of constitutionally
24  protected speech as opposed to a direct threat?
25  A    I would say it is getting close; however, like

TULSA FREELANCE REPORTERS
918-587-2878

Page 186

1  I said, legally the FBI was called in to look at
2  this and they said you can predict anything; you can
3  predict the world is going to break in half, and
4  unless you are doing something to make it happen,
5  you really can't be arrested for it.  So he was
6  found -- after an investigation with the FBI, there
7  was no cause for any more investigation on it, so --
8  he also predicted an earthquake.
9  Q    Do you -- as his twin brother working for the
10  airline, that's not something you would want to be
11  associated with, is it?
12  A    Well, I'm not happy he said it.  I don't know
13  why he said it.  My twin brother is a heavy drinker
14  and he gets a little wild, but I think he's
15  basically a harmless person.  He's never hurt
16  anybody or caused any pain to anybody.  He does say
17  things that are somewhat off the cuff, but not too
18  many people called.  This is not like a big hotline
19  thing.  I think maybe five calls a night at most.  I
20  don't know how many calls he got, but I hardly ever
21  heard the telephone go off.
22  Q    Is it true that the union representing you in
23  your grievance asked or told your brother to shut
24  down the Dial-A-Racist Hotline for awhile until the
25  case was over?

TULSA FREELANCE REPORTERS
918-587-2878

Page 188

1  A    Yeah.  They contacted me about it and I said I
2  don't know anything about this.  He said, well, he's
3  talking about airplane situations.  So I confronted
4  my brother and said you need to take it off there,
5  it's really not appropriate, and he said, well, I'll
6  change it and explain what I meant by that.  So like
7  I said, he's not a teenager; he's not my dependent.
8  He's a very stubborn and very -- sometimes hard to
9  deal with, but he is my twin brother and I don't
10  want to see him get hurt, but he does stupid things.
11  I have to admit that.  He does do stupid things.
12  Q    Did the Dial-A-Racist Hotline go off the air
13  for awhile while the arbitration was getting ready?
14  A    I think it went off the air not too long after
15  that because at that point in time I was putting the
16  house up for sale and I started garage sealing and
17  started giving him my property.
18  Q    The arbitration was in November of '99;
19  correct?
20  A    Yeah.
21  Q    And the decision came out in March of 2000?
22  A    Yeah.
23  Q    March 8th of 2000?
24  A    Yeah.
25  Q    Let me give you direction to turn attention

TULSA FREELANCE REPORTERS
918-587-2878

Page 188

1  direction to Defendant's Exhibit 21.  This is
2  another certified copy of a transcript by telephone
3  recording on 834-4274, which has previously been
4  identified as the line going into your brother's
5  room at the house.
6  A    Uh-huh.
7  Q    This is dated April 17th, 2000, so that places
8  it after the date of the arbitration decision;
9  correct?
10  A    Right.
11  Q    Bottom of that page it says in part, Daniel
12  Mahon has been on this message machine.  Do you see
13  that?
14  A    Has been on or he discussed me on this message
15  machine?
16  Q    That was going to be my next question.  Was it
17  literally that you were on it or your name had come
18  up on it?
19  A    I think my name had come up on it, he
20  mentioned my name before, because I never did a
21  message.
22  Q    Then you have -- he says here in part, my twin
23  brother, Daniel Mahon, has never been politically
24  active or an activist of any sort; do you see that?
25  A    Right.

TULSA FREELANCE REPORTERS
918-587-2878

1    Q    And you've testified to that?

2    A    I've not been a spokesman for this situation.

3    Q    Then he goes through kind of talking about his

4    view of your belief system and he concludes but he

5    does support certain things I believe in?

6    A    Yeah.

7    Q    But he does not believe in everything I

8    believe in?

9    A    That's probably correct.

10   Q    What type of things that Dennis believes in do

11   you support?

12   A    Oh, just Second Amendment rights, opposed to

13   uncontrolled immigration. I think that's wrong.

14   High taxation for sure. That's about really all I

15   believe in that he believes in. I believe in

16   freedom of association. That's -- you should have

17   the right to have the friends you want to have.

18   Q    The vice-president involved in your

19   termination was Greg Hall; correct?

20   A    Right. Greg Hall was his name.

21   Q    And you didn't think very highly of him, did

22   you?

23   A    Well, he called me Dennis twice at the

24   meeting. That kind of put everything on a bad

25   footing when he knew who I was. I thought that was

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 190

1    a little bit tacky of him to do that.

2    Q    Are you aware that, as is reflected in this

3    message, that your brother spun a tale about how he

4    had circumvented somebody's $2,500 security system

5    and left his calling card on the person's kitchen

6    table?

7    A    I don't have the slightest idea what we're

8    talking about here.

9    Q    Page 4. I'll read it. Okay, quote, a friend

10   of mine just got a $2,500 security system put into

11   his house he just moved into and we had a little

12   talk and I said look, you took off the day and I

13   will show you how fast I can circumvent your

14   security system and I will put my calling card on

15   your kitchen table. Okay. It took me approximately

16   three and a half minutes to totally neutralize his

17   $2,500 security system, take out video cameras and I

18   was able to jimmy a window, get in and put my

19   calling card on his kitchen table. In less than a

20   minute and a half I was gone. Ha, ha. How do I

21   know how to do this? Because one of my best friends

22   was an installer and he knows. There's basic things

23   that these systems have to have and without these

24   two basic things, you ain't got no security system.

25   So a lot of my enemies are spending a lot of on own

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 191

1    security systems but that don't make you secure,

2    boy. Does that refresh your recollection?

3    A    Well, this is the first time I've seen it but

4    it must be something he put on there. I don't know

5    who he's talking about. He did have some enemies.

6    Congressman Kees was one of the biggest ones and he

7    tried to implicate my brother in that bombing, big

8    time. He actually wrote a book about it. That was

9    one of his big enemies. Maybe talking to somebody

10   like that. I don't know. I don't know who he's

11   talking to. He had a lot of imagined or real

12   enemies that I know of, mostly imagined I'm sure.

13   Q    Do you agree that that could be read to him

14   conveying to somebody that he could come defeat

15   somebody's security system and do harm to them?

16   A    He was referring it to some other person like

17   who?

18   Q    Well, kind of like the prophecy, he's not

19   saying it himself but he's saying I can envision a

20   situation where this could happen to somebody?

21   A    I guess anybody could do that if they knew

22   about electronics and how security systems work. I

23   don't recall him ever working in a security

24   business.

25   Q    Was your brother an avionics mechanic also?

TULSA FREELANCE REPORTERS
918-587-2878

---

Page 192

1    A    No. He was systems, hydraulics and structura.

2    He has no interest at all in electronics at all.

3    Q    Next page, 5, talks about, quote, now American

4    Airlines update. Okay. Because of the publicity

5    that Tom Metzger has -- has mentioned about my

6    brother losing his career, his hotline and my

7    hotline, we have received over $3,000 in cash

8    donations in a little over two weeks from people al

9    over Oklahoma and Tulsa and some from out of state.

10   They are so angry this 37-year old punk, race

11   traitor, the vice-president of maintenance at

12   Tulsa's engineering and maintenance section fired

13   Dan viciously and illegal, closed quote. Is he

14   referring to Greg Hall?

15   A    I don't know how old Greg Hall was.

16   Q    Is that who he is referring to?

17   A    It's possible. I don't know. He's talking

18   about this money. I received a lot of money from a

19   lot of people when I was discharged.

20   Q    Did you keep track of who you got it from and

21   how much?

22   A    Some, but there were some people that felt

23   that I was wrongly treated and I did get some cash

24   from some generous people out there.

25   Q    Do you recall who sent you money?

TULSA FREELANCE REPORTERS
918-587-2878

1  A    Just different people.

2  Q    Don't recall any of their names?

3  A    No. Some of them were just anonymous.

4  Q    Were all of them anonymous?

5  A    No. One of them wasn't from an American

6  person. Most of it came from a guy in another state

7  that heard about it.

8  Q    Tell me who that was.

9  A    He's deceased now.

10 Q    Who was it?

11 A    I'd have to look up -- oh, gosh it was a

12 donation. It's been so long. He's -- I don't

13 remember his name now.

14 Q    What was his connection with you?

15 A    He was a friend of my brother's and heard

16 about my demise and he sent -- he's a millionaire.

17 He's an inventor, and I can't remember the guy's

18 name but --

19 Q    Do you remember where he lived?

20 A    Up in the northeast area. He's from that part

21 of the country.

22 Q    Was it Dr. Pierce?

23 A    No, it wasn't Dr. Pierce. He died way before

24 Pierce.

25 Q    If you think about that name, let me know.

Page 194

1  Okay?

2  A    I didn't get no 6,000, though. I wish.

3  Q    Page 7, bottom of the page, talks about being

4  sold out by politicians for the last 60 or 70 years

5  and states, ladies and gentlemen, it's too late,

6  referring politically. Quote, the only solution for

7  white man now, the white man now is a violent

8  revolution I'm afraid or maybe a depression or

9  something, closed quote. Do you see that?

10 A    Last page it was?

11 Q    Bottom of Page 7.

12 A    Oh, there it is, okay. I see it.

13 Q    Does this reflect your brother's ideas as far

14 as you know?

15 A    Well, it's his hotline, his message. As far

16 as depression, I don't know about that, but a

17 revolution, I don't know if the Arabs are going to

18 start something or not. Looks like they've already

19 started stuff in this country. It's just his

20 opinion. Like I said, I don't know what he means

21 totally by it but I guess there's some kind of an

22 upheaval coming. A lot of Christians have been

23 saying that for years.

24 Q    And you condone such a message like that even

25 after your arbitration decision in March?

Page 196

1  A    I don't condone or approve of anything he

2  does.

3  Q    But you allowed it to happen under your own

4  roof; right?

5  A    Well, like I said, it's his answering machine;

6  it's his bedroom; it's his life; it's his rights as

7  a citizen of this country to say what he wants to

8  say until he presents a clear and present danger to

9  anyone or anything, constitutionally protected righ

10 of free speech. I don't particularly care for what

11 he says, but he's a big boy. So am I, but -- at

12 least he was watching and not getting in any more

13 serious trouble.

14 Q    Let me show you what's been marked as

15 Defendant's Exhibit 22. It's a March 12th, 2000

16 printoff of the Aryan Update from Terrible Tommy

17 Metzger's website. I believe you testified that yo

18 were aware that your name and situation was being

19 discussed publicly on Mr. Metzger's --

20 A    Right. I was aware of that.

21 Q    The second -- beginning that the bottom of

22 Page 1, Terrible Tommy Says speaking of anal

23 orifices, our friend, the Mahon brothers, have bee

24 shafted by American Airlines again in Tulsa

25 Oklahoma. Do you see that one?

1  A    Sure do.

2  Q    Have you read that before today?

3  A    I think he was referring to when Dennis was

4  hired in 1997, and he worked less than one day and

5  he was terminated.

6  Q    Go on to the next page, second paragraph.

7  Dennis lives with his brother, Danny, who is not

8  involved in his brother's operations. Several

9  months ago American Airlines, where Danny worked,

10 conspired to rid themselves of Danny's presence.

11 you see that?

12 A    Right.

13 Q    Do you agree with the characterization of you

14 situation at American Airlines?

15 A    Conspired to rid themselves, there's some

16 truth to it I think, yeah.

17 Q    Were you fired for the most part for having a

18 brother who would not knuckle under to anti-white

19 attacks from the Iron Heel?

20 A    I think I was harassed and basically conspire

21 to be terminated because of my brother's ideaIogy

22 and his political activities, yeah, I think so. I

23 convinced of that.

24 Q    Is there truth in that the arbitrator

25 commented off the Record that if Mahon had been

Page 199

1 black, he would be sitting in a beach in a townhouse
2 with the money a good lawyer would have gotten out
3 of American Airlines?
4 A   Arbitrator? No. I think that was a statement
5 by one of the committeemen.
6 Q   Who?
7 A   I think Mike Rial made that statement to me
8 before the arbitration.
9 Q   Read the rest of that section to yourself and
10 tell me if there's anything about it that you
11 disagree with, please.
12 A   Are we talking about the airline being
13 convicted of a felony?
14 Q   That whole article.
15 A   Just this page here?
16 Q   Well, as you can see, it's kind of an article,
17 if you will. It goes on to the next break with
18 stars.
19 A   Well, looks like one man's opinion of what is
20 going on with the airline industry. I don't know if
21 all this stuff is factual or not. I know American
22 has been sued by a lot of black and Hispanic
23 workers, and the Value Jet guy knew who was involved
24 in that. He was a Hispanic man, but he used to work
25 for -- he worked for jet, Value Jet.

---

1 A   Yeah. I was up there one time.
2 Q   Who is he?
3 A   He's a pastor of the Aryan Nations Church of
4 Jesus Christ Christian. I went up there to set up
5 table and sold a bunch of crap and made some money.
6 Q   Did you ever say that threats are counter
7 productive and it would hurt the Klan image?
8 A   Did he ever do that?
9 Q   Did you say that?
10 A   Did I ever make threats to hurt the Klan's
11 image?
12 Q   Let me rephrase. Did you ever say to anybody,
13 threats are counter productive and hurt the Klan
14 image?
15 A   I don't recall saying that.
16 Q   Do you believe that?
17 A   Threats -- I don't know. Threats are threats.
18 People do it all the time. Like I said, I wasn't
19 involved in the Klan that much except just to offer
20 a little bit of help with the video and audio. My
21 brother I think tried to reform it. He tried to ge
22 the crap out of it and tried to get people educated
23 and get off the violent talk, and he got beat up tw
24 times for that. Some of the people turned on him,
25 so he said probably -- there's going to be good and

---

Page 198

1 Q   That's specifically about you, isn't it?
2 A   Yeah, a lot of it is. This first two
3 paragraphs here is.
4 Q   Were you aware that Metzger was putting this
5 on his website and publishing it to the nation?
6 A   No. I don't have a computer at the time. I
7 still don't have one. I use one at work, but I
8 didn't know that this was put on there. Nobody at
9 American let me know about it. My brother doesn't
10 have any access to a computer.
11 Q   Is it your testimony, whether you looked at it
12 yourself on the computer or not, you weren't aware
13 that Metzger was talking about you?
14 A   I had no idea this was on his website at all.
15 I don't have --
16 Q   Do you approve of or endorse the comments that
17 he made about you in this article?
18 A   I don't approve of him putting my name in his
19 publication, no, or anything. I don't like him
20 using my name. Dennis is fine but I don't like him
21 using my name, and he was told about that. He's
22 another stubborn soul.
23 Q   Did you know the Reverend Bob Butler?
24 A   Robert Butler?
25 Q   Yes, sir.

---

Page 200

1 bad people. There's some Klansmen that I think are
2 -- some of them just want to be proud of who they
3 are.
4 Q   Have you ever expressed your views on racial
5 pride?
6 A   Publicly, no.
7 Q   Privately?
8 A   Privately, I just said we've done a lot for
9 the world, a lot of inventions, a lot of technology
10 but nothing derogatory to another. I never said
11 anybody is inferior, superior. I'm just saying the
12 white race had a lot of a creativity, and now I
13 think the Chinese and Japanese have taken over with
14 the advancements in electronics and technology, but
15 I've never said anything bad about any particular
16 other peoples.
17 Q   Have you ever expressed or said words to the
18 effect that if all white men took off three days
19 from work at the same time the country would stop?
20 A   I don't recall. I just said we needed to
21 unionize. The unions need to be stronger and star
22 getting more militant with the companies because
23 they're sending all this stuff overseas. I have
24 mentioned that several times to the union.
25 Q   But you never -- is it your testimony you

Page 201

Page 203

1  never said that in the context that without white
2  men, our economy as we know it could not function?
3  A    I don't recall saying that.
4  Q    Do you believe that?
5  A    Our economy right now, it would function --
6  without Mexican labor in this country, our economy
7  would fail because we don't have enough people to do
8  it.  That's kind of the way things are going.  We're
9  depending on foreign labor to do all the manual
10  labor now.  Nobody wants to do the dirty work
11  anymore.  I've said that many times but I don't
12  know.  The white race to me is -- everybody is just
13  hanging on.  Everybody -- I got more in common with
14  poor working class blacks than I do with rich white
15  people.
16  Q    Look at Exhibit 13, please.  I'm going to hand
17  you.  This is the written statement of Keith Kelly
18  that was entered in your arbitration concerning the
19  events of the March 9, 1999 Caucasian employee
20  resource group.  Do you know the document I'm
21  talking about?
22  A    I'm not sure what we're --
23  Q    Please read it to yourself and my question, as
24  you are reading it so you can answer it afterwards,
25  is what about this, if anything, is untrue?

TULSA FREELANCE REPORTERS
918-587-2878

1  Q    So is that not true?
2  A    That's not true.  His brother was on the TV
3  show 20/20 discussing neo-Nazi philosophy in
4  Germany.  I don't know if he was on 20/20 or not.
5  He was on one show but it wasn't 20/20, and he
6  wasn't really talking neo-Nazi stuff in Germany.  He
7  was there visiting the bombed-out church and put a
8  bouquet of roses on it is what he did.  Offered me
9  book and tapes?  I offered him books and tapes on
10  Adolf Hitler.  Why would I want to offer somebody --
11  I mean I'd sell it to him.  If I had some history
12  books on that subject, I probably would sell it.  I
13  don't ever give that stuff away to anybody.  He
14  would have to go to a gun show to even see that kind
15  of stuff.  Tapes, I have a lot of German marching
16  songs of that era, Luftwaffe and the Kriegsmarine,
17  which is the German Navy.  I did collect a lot of
18  those old marching songs, but I told him -- his
19  brother is an ex-Grand Wizard.  He was never a Grand
20  Wizard of anything.  He was the -- they call it
21  Imperial but not a Grand.
22  Q    Is Imperial below the Grand?
23  A    I'm not really sure.  It's different, I know
24  that, in Missouri when he was in that thing.  A lot
25  of this stuff is all -- this thing about Internet,

TULSA FREELANCE REPORTERS
918-587-2878

Page 202

1  A    He was really good at doing research on the
2  library and Internet.  My brother was computer
3  illiterate.  That's definitely a false statement
4  there.  I don't know about the rest of it.
5  Q    Go ahead and read the rest of it.
6  A    Said talked about Carol Howe and a bombing at
7  a crew meeting.
8  Q    Did you?
9  A    No.  I never mentioned that woman at all.  I
10  saw his car and filmed a Second Amendment rally and
11  saw an AA sticker on his windshield.  Talked about
12  the trouble that caused him.  I don't have any
13  problem with that sticker.  What Second Amendment
14  foundation.  I haven't the slightest idea what he's
15  talking about.  Ten years ago he was wearing an
16  Aryan nations belt buckle and trying to talk to me
17  at great length about what he and his brother were
18  doing.  Dan offered me books and tapes.  This guy is
19  a supervisor.  He wasn't in my work area, this guy
20  Kelly.  He was not ever in my work area.  If he did
21  come over, he tried to entice me to talking about
22  selling books, World War II books and books about
23  Germany, and he was in violation of company
24  regulations to go out of his work area to incite
25  this type of talk.

TULSA FREELANCE REPORTERS
918-587-2878

Page 204

1  library Internet, that's totally inaccurate.  I mea
2  my brother didn't even know what a computer was bac
3  then.  Well, he also -- this individual got one of
4  the literature.  Instead of telling his people not
5  to let it go out, he let it out, and at that time
6  became -- flew to Dallas with it and created a big
7  stink, but this man could have stopped that thing
8  from going out because he saw it first.
9  Q    Tell me about that.
10  A    It came out in the arbitration.  It's all in
11  the arbitration notes.
12  Q    Did you give it to him to review before it was
13  published?
14  A    No.  Linda Dill and he came by the fair and
15  looked it over and just took it with them instead o
16  immediately come back and saying that's it.
17  Q    So you don't mean to say he was shown it
18  before you all actually showed up at the fair and
19  passed it out; right?
20  A    No.  He showed up right at the fair when it
21  started and reviewed it and instead of stopping
22  right there, he just kept it and let it go for a fe
23  hours and let more people get it.
24  Q    You don't know whether he looked at it, do
25  you?

TULSA FREELANCE REPORTERS
918-587-2878

Page 207

1  A    He took it. I would imagine he looked at it
2  if he took a copy of it. I think it's in the
3  arbitration notes on that.
4  Q    Do you recall his testimony when he said that
5  he took it and stuck it in his pocket and didn't
6  look at it until sometime later after he started
7  getting calls?    .
8  A    You can do that, too, if you want to, but I
9  would imagine someone getting that literature,
10 anything controversial would be looked at pretty
11 quickly.                .         .
12        MR. FRAZIER: David, we take a break?
13        MR. CORDELL: Sure.
14        (Following a short recess at 4:40 p.m.,
15 proceedings continued on the Record at 4:47 p.m.)
16 Q    Sir, I'm going to hand you a document marked
17 Defendant's Exhibit 33. It's some documents that
18 were produced out of your records. Identify that
19 for me, please.
20 A    Yes.
21 Q    What is it?
22 A    It's just kind of a compilation of the events
23 that took place at that April 20th meeting.
24 Q    It has your signature on the bottom, does it
25 not?

TULSA FREELANCE REPORTERS
918-587-2878

Page 207

1  knowledge what happened. I didn't have a tape
2  recorder going but I would say, yeah, I would say
3  it's factual.
4  Q    Could you testify any better about it today in
5  terms of your recollection than you could at the
6  time you were recalling the events on May 10, 1999?
7  A    Gosh, probably not. I mean we're talking five
8  years ago.
9  Q    I hand you what's marked as Defendant's
10 Exhibit 34. Identify that for the Record for me,
11 please.
12 A    It's just a rough copy of the chronological
13 history of some of what I feel is harassment and
14 intimidation at AA.
15 Q    It's dated May 12th, 1999; is that correct?
16 A    Did I put a date on it? May 12th, right.
17 Q    You certified that the previous statements are
18 factual and true; is that right?
19 A    I did.
20 Q    Who were you making the statement for?
21 A    I think I made this to the union and also to
22 any attorneys that might take a look at this case,
23 just to give added info to the case that this
24 harassment had been going on for numerous years
25 before I got terminated.

TULSA FREELANCE REPORTERS
918-587-2878

Page 206

1  A    Yeah, May 10th.
2  Q    So was this prepared the day that you were
3  terminated?
4  A    Right, that same day.
5  Q    Before or after the 29F meeting where you got
6  your final advisory?
7  A    Yeah, this was probably after the final
8  advisory came out, probably the very next day.
9  Q    Well, it's dated May 10. Was that the day you
10 wrote it?
11 A    That's what I said, yeah. Well, yeah, May
12 10th in the morning is when I got called in, that's
13 right. So it would have been later on that day,
14 that's right.
15 Q    What was the reason for you writing this
16 statement at the time?
17 A    Just to keep a current memory. It's kind of
18 like just what happened why it was still fresh in my
19 mind in print.
20 Q    Did somebody asked you to prepare it?
21 A    No. I did it on my own.
22 Q    Did you give a copy of it to the union?
23 A    I'm sure I did.
24 Q    Is it entirely factually correct?
25 A    I would say it's factual to the best of my

TULSA FREELANCE REPORTERS
918-587-2878

Page 208

1  Q    Were you consulting with lawyers between the
2  date of your termination, May 10, 1999, and the date
3  of arbitration in November of that year?
4  A    No, I wasn't. I really hadn't had any -- only
5  after the arbitration decision did I start a lawyer
6  hunt.
7  Q    Did you plan on suing American Airlines ever
8  since you got fired even if you got reinstated?
9  A    When -- after the arbitration, the union
10 committeeman said after this is all over, you need
11 to sue American from everything they've got.
12 Q    Is that Mr. Rial or J. C. Brown?
13 A    I think it was Mr. Rila, Mike Rial. He's no
14 longer in that position anymore. He's no longer a
15 union committeeman.
16 Q    I hand you what's marked as Defendant's
17 Exhibit 35, once again a set of notes produced from
18 your records dated February 14, 2001. Identify
19 that, please.
20 A    Something I wrote post day termination. I had
21 a flight I was on, a TWA flight, and the flight was
22 cancelled due to mechanical and I was directed to
23 the AA counter, and they -- this is way before 9-1-
24 They took me off to the side immediately and put me
25 off to the side and asked me to get my luggage and

TULSA FREELANCE REPORTERS
918-587-2878

Page 211

1  walk about 400 feet down the terminal to the X-ray
2  machine, and I thought it was a little unusual that
3  that happened. I thought it was somewhat
4  suspicious, and I just took note of it. That's all
5  there is.
6  Q   Is it completely -- is Exhibit 35 factually
7  correct?
8  A   For the most part, I would call it factually
9  correct. It's written right after it happened, so I
10  would say it's factual.
11  Q   Handing you what's been marked as Exhibit 36,
12  once again it's some more notes produced from your
13  files. Is that your handwriting?
14  A   It certainly is. It's my penmanship.
15  Q   Did you prepare this document?
16  A   This document, yes, I did.
17  Q   I know we've talked about some witnesses and I
18  don't want to go back over old ground. Look at No.
19  7, Eric Hanson. You say in part Eric was first to
20  tell me about the flyer, the notice on the bulletin
21  board the day of the April 20 CERG meeting. Eric
22  noted how surprised I was upon learning of the
23  bulletin board flyer.
24  A   Are we talking about --
25  Q   That page front page, yes.

TULSA FREELANCE REPORTERS
918-587-2878

Page 210

1  A   Am I on the right one here?
2  Q   It's on the back side of the first page, sir.
3  A   I'm sorry. Okay. I got it. Okay.
4  Q   And that is Mahon 149 for the Bates record
5  reference.
6  A   Yeah. Eric was on my crew. He told me about
7  the flyer on the bulletin board.
8  Q   What do you mean by Eric noted how surprised I
9  was upon learning of the bulletin board flyer?
10  A   Well, he noted that I had no idea about this
11  meeting because I jumped up and I said I got to ask
12  the supervisor if I can get off for a couple of
13  hours. So that's the first thing I said, I want to
14  go to the meeting, I need to get permission. So I
15  talked to my crew chief first because you go through
16  the crew chief and then go to the supervisor because
17  the crew chief knows how much work has to be done
18  and what the manpower is, so you go through him
19  first and then you go through the supervisor on the
20  dock to see if it's okay. Both said it was okay.
21  Q   Earlier today you mentioned the name of Floria
22  Washington. Did you know her prior to April 20,
23  1999?
24  A   Floria Washington, no. I never met her
25  before. She is from Dallas and she heads up the

TULSA FREELANCE REPORTERS
918-587-2878

Page 212

1  diversity program, one of the people that heads up
2  the diversity program, and she mentioned at the
3  arbitration that she didn't find anything unusually
4  bad about the letter. She said it didn't look like
5  a message of hatred is basically what she said. I
6  think she said it looked like they're just tooting
7  their own horn, which all of them do.
8  Q   The Record will reflect what in fact she
9  testified to, but let me ask you this: Did you know
10  that Floria Washington is African American?
11  A   Yeah. She was at the meeting, at the
12  diversity or the arbitration. She testified for
13  this.
14  Q   Do you recall her also being at the April 20,
15  1999 meeting where Greg Hall said certain things
16  that you testified about?
17  A   Yeah, I believe she was at another table,
18  right.
19  Q   Mr. Robert Hosey, do you know who that is?
20  A   Yeah, I certainly do. Most of the people
21  remember him there. He made a statement that was a
22  little bit shocking.
23  Q   And what was that statement?
24  A   The question arose at the meeting of why the
25  homosexual lesbian group received $75,000 cash to

TULSA FREELANCE REPORTERS
918-587-2878

Page 212

1  advertise in some of the gay publications around th
2  country. That was a big question. Mr. Robert Hose
3  answered that question, I quote verbatim, in the
4  '60's most of the people that flew our airline wer
5  fat white families he said, but now we have a
6  diversified flying public, including people of
7  different genders and different sexual -- what was
8  the words -- alternate lifestyles. Exactly what h
9  said, of alternate lifestyles, and this is the
10  reason why the GLEAN group, the gay lesbian employ
11  action something group, received this big grant of
12  money, and that was -- when he said that statement
13  about white fat families, there was a silence that
14  you could hear a feather hit the floor.
15  Q   Were you present in that meeting?
16  A   (Witness nods head up and down).
17  Q   Where did that meeting occur?
18  A   That was the last CERG meeting, last meeting
19  on April 20th.
20  Q   Are you sure about that or was this a report
21  that was given to you?
22  A   I heard it and several of these witnesses
23  heard it. There were numerous people that -- Warr
24  Taube was there; he heard it; he was sitting next
25  me. There were other members present that heard t

TULSA FREELANCE REPORTERS
918-587-2878

TULSA FREELANCE REPORTERS 918-587-2878

Page 213

1  statement.
2  Q    Through what you saw, what race is Mr. Hosey?
3  A    He's African American. I had never seen him
4  before. I think he comes from Dallas and he arrived
5  from Dallas for the meeting.
6  Q    Knowing what you did about The Turner Diaries
7  T-shirt and wearing it at that time, did it ever
8  occur to you that African American persons attending
9  that meeting might be greatly offended and
10  intimidated?
11  A    I don't think anybody knew anything about it.
12  Most people -- like I said, I didn't notice anyone
13  looking at me, except when I talked to Mr. Hall. I
14  didn't notice any unusual looks or any type of
15  gestures that would appear that anybody had a
16  problem. There was no complaints about the T-shirt
17  the rest of the work day.
18  Q    Look back at Defendant's Exhibit 33, please.
19  These are your May 10, 1999 notes. Two paragraphs
20  above your signature.
21  A    Which one is it? 33?
22  Q    Yes.
23  A    Here it is. The first page?
24  Q    Second page, two paragraphs above your
25  signature.

Page 215

1  Q    In the middle of the paragraph, it says Mr. --
2  anyway, during the meeting Mr. Hall described the
3  flyer as neo-Nazi and white supremacist, et cetera.
4  He said any belief system is recruiting and anyone
5  recruiting will be terminated. Is that true he said
6  that?
7  A    He did say that. He said any belief systems
8  that are recruited will not be tolerated.
9  Q    Do you then say in this regard, quote, I guess
10  anyone who may have personal beliefs that don't fit
11  his standards will have to go, exclamation mark?
12  A    Yeah. I had an opinion or the impression
13  that's what he was saying, that I make the decision
14  who believes what here. That's the impreseion I had
15  from the statement.
16  Q    And you don't agree with that I take it?
17  A    No. I don't believe anybody should dictate
18  other people's religions or belief systems.
19  Q    All right. At the bottom of that same page, I
20  hope you didn't put it away, you say normally the
21  company policy is to order the employee to go home
22  or to change or turn it inside out, referring to
23  T-shirts. I received no complaint from anyone the
24  day it was worn. I had worn on numerous times
25  before with no problems. Do you see that?

Page 214

1  A    Two paragraphs, okay.
2  Q    You state, quote, The Turner Diaries has not
3  been in the news or media in over four years. I
4  would estimate that nine out of ten people have not
5  heard of The Turner Diaries, let alone ever read
6  them, closed quote.
7  A    Yeah, I wrote that. Ever since the McVeigh
8  situation, there wasn't any mention of it that I
9  ever heard on the media, the TV or the newspaper.
10  Most people I think -- even the union said they were
11  asked questions and most people said Ted Turner, a
12  book about Ted Turner. They didn't have any idea
13  what the book was about.
14  Q    But you knew about it even back at the time it
15  first received media publicity, didn't you?
16  A    Yeah, I'd heard of it book, yeah. That's what
17  piqued my interest in picking up a copy of it
18  because somebody said McVeigh -- the book told
19  McVeigh what to do, but I think it wasn't a huge
20  part of the book, so --
21  Q    Turn now, if you will, to the long page
22  document we talked about some, Defendant's Exhibit
23  41. For the Record reference it's on Page 121, and
24  on your handwriting top right it says Page 7.
25  A    Okay. I have Page 7 here.

Page 216

1  A    I had worn on -- I had worn -- I don't know if
2  I was referring to that T-shirt or not. I had worn
3  something.
4  Q    Isn't it your testimony that the only time you
5  wore The Turner Diaries T shit was on April 20th?
6  A    Yeah. I had worn other T-shirts that were
7  controversiel. Like I said, I wore the one with
8  Clinton, several NRA T-shirts, but not that one. I
9  had worn similar T-shirts on numerous times but not
10  that one.
11  Q    But not ones that expressed --
12  A    Not The Turner Diaries.
13  Q    -- racial cleansing and murder of races;
14  right?
15  A    Yeah. I just wore pro-gun T-shirts.
16  Q    Let me hand you what's been marked as
17  Defendant's Exhibit 42. This was taken from your
18  files and begins with Bates stamp 131. Do you
19  recognize your signature on the second page?
20  A    Yeah.
21  Q    Is this a letter that you drafted?
22  A    Oh, I think this is -- I don't know who wrote
23  this letter, if it was -- to tell you the honest to
24  God truth, I don't know where this came from. I
25  didn't type it. I could never type that good. It

Page 217

1  doesn't say where this -- I can't recognize this
2  thing at all.
3  Q    But that is your signature on it?
4  A    Yeah. It was addressed to Turpen.
5  Q    Former attorney general of Oklahoma; correct?
6  A    Right. I went to him to check on this case to
7  see if he would take the case.
8  Q    Did you actually meet with him?
9  A    I met with his secretary and she took the
10  input in the input section, and then I got contacted
11  that he would not take the case, but I just don't --
12  this is obviously a very professionally done deal.
13  It had to be done by an office -- I may have had
14  people do it. I just don't remember doing this. I
15  didn't type this. I may have sent this in but it
16  had to be typed by another entity like Kinko's or
17  another supply company of some kind.
18  Q    Also looks like maybe you addressed it or sent
19  it to Mr. Rex Thompson. Who he is?
20  A    He's one of the attorneys.
21  Q    With whom?
22  A    With the Turpen group. He's one of their
23  associates. I mean I'm sure I did it. I just don't
24  remember typing this. I maybe went to an office
25  supply company and had them professionally --

TULSA FREELANCE REPORTERS
918-587-2878

Page 218

1  Q    The next to the last statement says, and I
2  quote, in point in fact, the company fired me
3  because of the company's perception, open paren,
4  albeit erroneous perception, closed paren, of my
5  social and political beliefs, closed quotes; is that
6  accurate?
7  A    Pretty much so. I think I was fired for --
8  not necessarily for beliefs but for the perception,
9  erroneous firing. I don't understand what point in
10  point in fact -- I don't think I could ever think --
11  what does that mean? I don't know what -- what does
12  that mean, in point in fact? I don't know. I just
13  don't know where that came from.
14  Q    Isn't that a pretty good summary of what this
15  is all about, that you feel like you were terminated
16  because of your political and religious beliefs?
17  A    Perceived religious and political beliefs, a
18  perception that people had are probably false. They
19  assumed that I believed certain things. They
20  assumed I did certain things, which I don't. It was
21  all probably a big misunderstanding for the most
22  part, but there was no offer of any type of
23  counseling or any type of -- there's no way they
24  tried to resolve the problem at all. It went all
25  the way to a termination rather than work with me.

TULSA FREELANCE REPORTERS
918-587-2878

Page 219

1  I'm sure we could have resolved that in some other
2  manner, but I'm very confused about this last one
3  here.
4  Q    Isn't it true this really all has to do with
5  how the company dealt with Dennis Mahon's -- excuse
6  me. Daniel Mahon, even though I made the mistake.
7  Isn't it true that this is all about how the company
8  dealt with Daniel Mahon; it doesn't have anything
9  else to do with anybody else at the company?
10  A    This should not -- my brother should never be
11  involved in this whole affair. He had really
12  nothing to do with it, and all the accusations and
13  innuendos about my brother, I think, were uncalled
14  for. I think the main thrust of this whole firing
15  was due to his activities. I've done nothing to
16  warrant that type of treatment. I've been s model
17  employee up until that point. If there was a
18  mistake made, it was a mistake in judgment. I thin
19  it could have been resolved in a much more
20  appropriate manner than how it turned out. That's
21  the only thing I can say about it.
22  Q    Mr. Mahon, nobody else did the same thing you
23  did at American and was treated any differently, d'
24  they?
25  A    Everybody else that wore a T-shirt that peopl

TULSA FREELANCE REPORTERS
918-587-2878

Page 220

1  found offensive, which were many, were asked to
2  kindly go home and change it, put s pair of -- che
3  out a pair of coveralls. There was no complaints
4  made that day it was worn. Another person wore th
5  same T-shirt, had no problem. American Airlines
6  should have went to a uniform policy, paid uniform
7  policy like the other airlines did many, many year
8  ago and they never would have had these problems
9  with T-shirt. Everyone I worked for since then,
10  even at the little tiny outfit in Rockford, Illino
11  supplied workshirts with your name. It's good for
12  morale to have everybody wearing the same apparel
13  anyway, but that's one solution I think they shoul
14  have looked at, and they never did anything about
15  that either.
16  Q    Are you aware that you have made the stat
17  that you believe that what happened to you er
18  you to be paid 10 million dollars?
19  A    That's a good long figure. There are
20  that made a lot more in litigation. I hr
21  resolve this in some other way. 10 mil'
22  high amount, it absolutely is, but som
23  corporations have to be taken to task
24  monetary judgments to not do same mi
25  think it was a mistake what they d'

TULSA FREELANCE REPOR
918-587-2878

TULSA FREELANCE REPORTERS 918-587-2878

Page 223

1  to see this happen to anybody ever again.  I have
2  hundreds of people I like out there, good
3  associates, good workers.  I don't want to see this
4  happen to anybody else, black, white, Muslim,
5  Christian, Jewish.  I don't want anybody to go
6  through what I've gone through for wearing a
7  T-shirt.
8  Q    We also asked you the question of in essence
9  whether you want to be reinstated or go back to work
10 for American Airlines.  Do you recall that?
11 A    Yes, I do recall that.  I wouldn't mind
12 getting reinstated but not in Tulsa, only in an out
13 station like Chicago.
14 Q    Do you believe that would be workable in light
15 of your history with the company?
16 A    An off station would be workable, not in
17 Tulsa.  Just too much I guess you call it bad blood,
18 too much controversy.
19 Q    I hand you what I'm marking as Defendant's
20 Exhibit 37 regarding your employment inquiries as of
21 October 9, 2000.  This is a collection of documents
22 from your files that have appeared to do with your
23 job search.  My question is simple.  Is this a
24 complete record of all the efforts as of October 9,
25 2000 you had made to find another job?

TULSA FREELANCE REPORTERS
918-587-2878

Page 222

1  A    I don't see United on here.  That's one that
2  appears to be missing is United.  The rest of them
3  are complete.
4  Q    Last page of this exhibit appears to be in
5  somebody's handwriting, probably not even yours,
6  that talks about what you were making where, how
7  much you had in life insurance, et cetera.  Do you
8  recognize that handwriting?
9  A    Last page?
10 Q    Of that same exhibit.
11 A    I don't see it.
12 Q    Maybe it came off.  It's the second page,
13 Bates 136.
14 A    Okay.
15 Q    Is that your handwriting?
16 A    Yeah, looks like it.
17 Q    Is this an accurate summary in what you were
18 making, where, et cetera, like we talked about
19 earlier today?
20 A    I never did work for Wisconsin Air but Aero
21 Taxi at 14.50, yeah.
22 Q    This appears to me to be at the point in time
23 where you were choosing to go to Alaska Airlines
24 lines?
25 A    Right, I think it was because this happened --

TULSA FREELANCE REPORTERS
918-587-2878

Page 223

1  Alaska called me before I even -- I applied with
2  Alaska before Aero Taxi went under and I went there
3  for an interview before we actually got laid off and
4  then they hired me about a month later.
5  Q    I hand you what's been marked as Defendant's
6  Exhibit 38, which appears to be minutes of a
7  Caucasian employee resource meeting dated February
8  9th, 1999.  This likewise came from your files,
9  Bates stamped 137.  Do you recognize that, sir?
10 A    Page 38 or Exhibit 38?
11 Q    Yes, sir.
12 A    I do recognize that.  That's their agenda for
13 that meeting I think it was or issues that were
14 presented.
15 Q    Are these minutes of the meeting or an agenda
16 for the meeting?  Let me give you a suggestion.
17 A    Must have been minutee because they had
18 attendance and they had time start and time stopped.
19 So it must have been the minutes of what took place
20 during that last meeting on the 9th.
21 Q    Did you start receiving minutes from the CERG
22 before you joined?
23 A    I think I got this at the first meeting that I
24 was allowed to go see or to -- I was a member at
25 this time but they have these there and were

TULSA FREELANCE REPORTERS
918-587-2878

Page 224

1  distributed to everybody.  They don't normally
2  distribute to these at every meeting.  The meeting
3  before they --
4  Q    Approved the minutes?
5  A    Must have approved these minutes.  That's what
6  they said basically the minutes look like.
7  Q    Did you circle the issue about the gay lesbian
8  alliance against defamation?
9  A    I don't remember circling that, but that was
10 one of the issues they were going to bring up.
11 Q    I hand you what's been marked as Defendant's
12 Exhibit 39, a memorandum to all base maintenance
13 employees dated January 28th, 1997 from Larry
14 Laster, also contained in your files.  Do you
15 recognize that document, sir?
16 A    Well, I don't recognize it but I'm sure it
17 looks like something that was put out by the
18 management, yeah.
19 Q    Do you understand this is evidence of a
20 communication by management as of the expectation o
21 all employees to adapt to and support a diverse
22 workplace?
23 A    It's not a read and sign.  It's just a general
24 handout that they put out at the base.
25 Q    And you kept a copy of that in your files for

TULSA FREELANCE REPORTERS
918-587-2878

Page 227

1   some reason; is that right?
2   A    I don't know how I got this, but January 28th,
3   '97. I don't know if I would have kept it that
4   long.
5   Q    Finally, let me hand you what's been marked as
6   Defendant's Exhibit 40. It's more housekeeping.
7   Handbook receipt and acknowledgement dated January
8   6th, 1988. Is that your signature?
9   A    That is my signature.
10  Q    And did you receive the handbook and
11  acknowledge that you read it and would abide by its
12  terms?
13  A    I don't recall what handbook but I'm sure I
14  probably went through it. I think I had the
15  contract. I know that. I don't have this handbook
16  handy. This came out in 1988. Wow. I'm sure I
17  don't have it now. 1988, that's twelve, thirteen
18  years ago.
19  Q    In one of your documents you made reference to
20  the fact that when you joined the Caucasian employee
21  resource group, you were given a form to fill out,
22  that among the questions asked were what you could
23  do to help the group?
24  A    I remember that form, right.
25  Q    Did you keep the form?

TULSA FREELANCE REPORTERS
918-587-2878

Page 226

1   A    No, but I know what it had on it. I put down
2   I would help with videotaping any picnics or any
3   activities, and I would present talks and
4   presentations on the history of aviation.
5   Q    Did you ever tell somebody that you and
6   someone else shot enough shotgun shells into a
7   Jewish businessman's house that it looked like Swiss
8   cheese?
9   A    A Jewish businessman's house?
10  Q    Yes.
11  A    When did this happen?
12  Q    My question is, did you ever tell anybody
13  that?
14  A    No, never.
15  Q    Did that in fact occur?
16  A    No. I don't normally shoot people's houses
17  up, even on Halloween wouldn't do that.
18  Q    Did the KKK ever tell you to get rid of your
19  wife and child?
20  A    Nope. They never even mentioned anything like
21  that. My brother never did. He was a little upset
22  that she wouldn't feed me right.
23  Q    What do you mean by that?
24  A    In Florida she gave me pee wee eggs in the
25  morning and he got mad because I was losing weight

TULSA FREELANCE REPORTERS
918-587-2878

Page 227

1   and blamed her for not feeding me right, and he got
2   into an argument. I'll never forget that.
3   Q    Did your brother live with you all in Florida
4   also?
5   A    He lived across the street with a lady friend
6   that he had met there, a real nice lady named Helen.
7   He was there with her from '81 right until the end,
8   '84 or '85 when we left Eastern.
9   Q    On our breaks have you had a chance to talk to
10  your lawyer about that it's important for you to
11  give me Lisa's last name in terms of the person who
12  destroyed the original shirt?
13  A    Well, her name is actually Millie. Her middle
14  name is -- she's a neighbor and she's a good friend.
15  Her sister died recently and I took care of her
16  home, took her to buy dog food, and she became like
17  kind of a real good friend, and she was there when
18  told her about the firing and she saw me basically
19  just throw the T-shirt in the dumpster and out it
20  went.
21  Q    But earlier you told me it was a married woman
22  you were having an affair with; is that correct?
23  A    Well, she had a guy living there. I thought
24  they were married, but she's just a very kind old
25  lady and kind of concerned about me, always looking

TULSA FREELANCE REPORTERS
918-587-2878

Page 228

1   in on us.
2   Q    Did you have a physical relationship with her?
3   A    No. It was just -- she kind of adopted us
4   like her own kids, you know.
5   Q    She was a neighbor. What's her last name?
6   A    Redman. It's on one of these --
7   Q    Millie Redman?
8   A    Mildred, yeah.
9   Q    Earlier today we talked about your explanation
10  of the grounds for why you feel like you were
11  treated unfairly. Do you remember we had three
12  categories; the last one we decided was no longer
13  part of this deal; right; do you remember those
14  three?
15  A    Uh-huh.
16  Q    Yes?
17  A    You'll have to review it. I'm a little bit
18  sleepy now. I'm not as alert as I should be.
19  You'll have to review what we're talking about now.
20  Q    I asked you to describe for me in your own
21  words how you felt like the company had
22  discriminated against you based on your race and yo
23  told me three things. No one else from the
24  Caucasian employee resource group was disciplined.
25  Second, other people had worn T-shirts that might

TULSA FREELANCE REPORTERS
918-587-2878

Page 229

1  considered offensive in the workplace and weren't
2  terminated and, three, the company hadn't followed
3  the peak performance and commitment?
4  A    Right, peak performance.
5  Q    We decided that peak performance was no longer
6  part of this because of what the court decided?
7  A    Right. That was one of the planks they didn't
8  go with us on.
9  Q    Sure. Have you told me everything today that
10 you know, believe or have evidence of that supports
11 your claims for the violation of Section 1981?
12 A    Yeah. I've gone through thoroughly all the
13 facets and all the particulars of this case that are
14 pertinent. Everything is there in the open.
15 Q    Have I exhausted your knowledge of this
16 perspective in terms of what evidence you might
17 possibly offer the court in addition to what you
18 testified in support of your 1981 claim?
19 A    Yeah. There's not anything else to offer, to
20 add to this. This is it. There's no more I can
21 think of at all.
22        MR. FRAZIER: I've got some brief cross
23 examination if you're finished.
24        MR. CORDELL: Give me a couple of minutes
25 with my client and I'll be right back before I turn
            TULSA FREELANCE REPORTERS
                918-587-2878

Page 231

1  Q    Turn the shirt around. What does it say on
2  the back of that shirt?
3  A    What will you do when your government comes to
4  take away your guns.
5  Q    That's not exactly what it says.
6  A    Comes to take away your guns.
7  Q    Would you start over on that?
8  A    What will you do when they come to take your
9  guns.
10 Q    What else does it say underneath that?
11 A    Warning. The FBI has labeled this the most
12 dangerous book in America.
13 Q    Under that?
14 A    Just National Vanguard Books and P. O. Box,
15 Hillsboro, West Virginia.
16 Q    So this is a book that's sold to the public?
17 A    Can I put it down now?
18 Q    Yeah, you can put it down.
19        MR. CORDELL: Do you want -- I'm sorry.
20 Since he didn't complete it, do you want him to rea
21 the rest of what's on the back?
22 Q    Sure. Go ahead end read the website also, Mr.
23 Mahon.
24 A    It says HTTP, diagonal, WWW.NATVAN.COM and the
25 other one says HTTP, diagonal, WWW.NATALL.COM.
            TULSA FREELANCE REPORTERS
                918-587-2878

Page 230

1  over the witness.
2        (Following a short recess at 5:24 p.m.,
3  proceedings continued on the Record at 5:28 p.m.)
4            EXAMINATION
5  BY MR. FRAZIER:
6  Q    Good afternoon, Mr. Mahon. It's been quite a
7  long day so I'll be brief if I can. I'm going to
8  hand you a T-shirt here that we've been talking
9  about and I'll ask you to please hold it up for the
10 camera, the front of it, and, if you would, please
11 describe what you see on the front of that T-shirt.
12 Begin with telling me what's written on that T-shirt
13 on the front.
14 A    On the front?
15 Q    Yes.
16 A    Just says --
17 Q    Other side.
18 A    Turner Diaries and with that guy's name,
19 Andrew McDonald.
20 Q    Okay, and is there a photograph on the cover?
21 A    Picture of two people, a book cover and two
22 people shooting a firearm or firearms.
23 Q    Did it look like they're shooting at a target
24 to you?
25 A    No. Just holding them.
            TULSA FREELANCE REPORTERS
                916-567-2878

Page 232

1  Q    Now, this book, The Turner Diaries -- well,
2  first of all, let me back up. What is it about the
3  shirt, if anything, in your opinion about that
4  particular shirt, what message of racial hatred do
5  you believe is sent by that shirt, if any?
6  A    The shirt itself just says --
7  Q    Do you believe that shirt sends a message of
8  racial hatred?
9  A    No. It's a message of gun control. It
10 discusses gun control.
11 Q    When you wore that shirt to the meeting, the
12 April 20th, '99 meeting, did you have any message
13 that you were trying to send of racial hatred when
14 you wore that shirt?
15 A    No. It was the only shirt I had to wear that
16 day and I wore it and nothing happened. I mean
17 nothing happened that day, nothing happened.
18 Q    So when you first started reading the back,
19 you said what will you do when the government come
20 to take your guns, but it actually says what will
21 you do when they come to take your guns.
22 A    They.
23 Q    Is it your opinion that that phrase means wha
24 will you do when the government comes to take your
25 guns?
            TULSA FREELANCE REPORTERS
                918-587-2878

Page 235

1   A      Pretty much because that is who normally comes
2   to take away guns is a government entity or
3   authorities.
4   Q      Now, being a historian of Germany, do you
5   recall before Adolph Hitler ultimately gained
6   control of the German government, do you recall him
7   taking the citizens' guns away?
8   A      Actually I have -- I used to have a Berliner
9   Achtung dated in '35 and it had adds for a Walther
10  PPK. It's my understanding from the National
11  Socialist period that he did take away guns from the
12  Communist groups because they were perceived as a
13  threat to the reforms.
14  Q      He took away the guns from the people that he
15  felt were a threat to his government?
16  A      Yeah, the Communist party at that time, yeah.
17  Q      To his Nazi party?
18  A      Yeah.
19  Q      This shirt -- in your opinion does this shirt
20  represent the right of Americans in their Second
21  Amendment to bear arms?
22  A      Yes. Basically it's the message that there's
23  always entities out there that would like to disarm
24  the American people to get more control over the
25  populous.

TULSA FREELANCE REPORTERS
918-587-2878

Page 234

1   Q      Would you agree with me that the founding
2   fathers when they put the Second Amendment in our
3   Constitution, that the whole notion behind the right
4   to keep and bear arms was to protect the American
5   way of life so that we would never have a repeat of
6   history like what happened in Germany?
7   A      Right.
8          MR. CORDELL: I object to the form of the
9   question. Unless you declare your own client as
10  being a hostile witness, you don't have the right to
11  lead him. Object as leading.
12  Q      What do you believe that the Second Amendment
13  is for?
14  A      Second Amendment was put in place by our
15  forefathers as an insurance policy because in their
16  infinite knowledge of governments, any government,
17  regardless of how benevolent, can sometimes turn
18  despotic. The Second Amendment guarantees the other
19  nine amendments. It guarantees the First Amendment
20  especially, the Third Amendment, all the amendments.
21  It was put in there as a last-minute ditch insurance
22  policy that big governments would have to deal with
23  an armed populous. It was strictly a freedom that
24  they thought should be in there just in case even
25  the best government in the world ever went bad and

TULSA FREELANCE REPORTERS
918-587-2878

Page 236

1   it was just there to ensure that those rights would
2   be upheld.
3   Q      I want to show you a photograph which has a
4   Mahon Bates No. 201 on it. Would you please take a
5   look at that photograph and tell me what that
6   photograph depicts.
7   A      Depicts around 1979 me and my wife at that
8   time.
9   Q      Can you hold that up for the camera?
10  A      (Witness complied).
11  Q      I notice your wife appears to be of an ethnic
12  origin that perhaps from -- is she from the
13  Philippines?
14  A      Yes, Polynesian. She's Philippine heritage.
15  That's where -- I met her in the Navy in Subic Bay,
16  Philippines. She is from a small town near Subic
17  Bay.
18  Q      You fell in love with her and you married her?
19  A      Yeah. Well, we got engaged there and I
20  married her here in Washington, the state of
21  Washington.
22  Q      And did you have any children from that union?
23  A      We had a son.
24  Q      And do you still have contact with your son?
25  A      Oh, absolutely. We go out at least twice a

TULSA FREELANCE REPORTERS
918-587-2878

Page 236

1   week for dinner and go gambling.
2   Q      So would it be fair on my part to conclude
3   that your son is half Polynesian and half -- of
4   mixed heritage?
5   A      Yeah, he's of mixed heritage, biracial.
6   Q      How does it make you feel that American
7   Airlines has accused you of being a white
8   supremacist?
9   A      Oh, they're misled; they're wrong. They've
10  got wrong information from someplace. Even today a
11  and my ex-wife get along just fine. Even her new
12  husband asks me to come over and work on the car el
13  the time for him when he can't fix it. Supremacy,
14  no, I'm definitely not a white supremacist.
15  Q      Now, the Turner Diaries, American Airlines has
16  made a big point about the fact that the book The
17  Turner Diaries makes mention of the systematic
18  killing of non-whites, Jews and race traitors. Now
19  according to the definition of a race traitor as
20  outlined in the Turner Diaries, wouldn't you be
21  considered a race traitor under the idealogy of Dr.
22  Pierce?
23  A      I think there's more people would betray their
24  race as a governmental entity to flood the country
25  with other peoples. I don't know if it was

TULSA FREELANCE REPORTERS
918-587-2878

Page 237

1  actually -- I never got to that part of the book but
2  as I said, I read the first chapter and that's as
3  far as I got but, yeah, I would be -- it would be
4  upsetting to have a total idealogy based on that,
5  yeah.
6  Q    And Dr. Pierce in his book talks about the day
7  of the rope. Have you ever read that section of the
8  book?
9  A    No, not that section. That was later in the
10 book. As far as I know, it wasn't in the first
11 chapter, anything about that. The book is a novel,
12 and there are a lot of ugly books out there in the
13 world. Road Warrior talks about killing thousands
14 of Arab people.
15 Q    Now, do you think Dr. Pierce, if he were
16 around today, would agree with marrying someone from
17 another country?
18 A    Well, he would probably not agree with it but
19 he wouldn't do anything to stop it. He wouldn't go
20 out of his way to hurt anybody in a mixed
21 relationship. He was a very gifted man, but he was
22 wrong in some of his idealogy I'm sure.
23 Q    Now, here's another photograph that's marked
24 Mahon Bates No. 190. Is that a photograph of your
25 son?

TULSA FREELANCE REPORTERS
918-587-2878

Page 238

1  A    Yeah. That's when we were watching the cruise
2  ships go out of Miami. That was just after I got
3  down there.
4  Q    Would you hold that up for the camera, please?
5  A    (Witness complied).
6  Q    Now, have you ever married a Caucasian woman?
7  A    I've had relationships with several since
8  then.
9  Q    But you've only been married once; correct?
10 A    Only been married once, correct.
11 Q    And she was a Polynesian woman?
12 A    Yeah.
13 Q    Are you a white supremacist?
14 A    No. I don't believe the white race is purer
15 than any other race. They're somewhat gifted in
16 some things, but every race I believe has gifts. A
17 lot of Japanese and Chinese right now I think are
18 tremendously gifted in the technologies.
19 Q    Let me ask you about an employee by the name
20 of Tim Vinson. You had some conversations with Mr.
21 Vinson; is that correct?
22 A    Yeah. I fixed his VCR, and he worked the next
23 hangar over to my hangar.
24 Q    Now, did Mr. Vinson tell you that he wore The
25 Turner Diaries T-shirt, and I'm talking about the

TULSA FREELANCE REPORTERS
918-587-2878

Page 239

1  same exact T-shirt that you just held up for the
2  camera, either four or five days in a row to
3  American Airlines?
4  A    At the arbitration he testified that he wore
5  this T-shirt I think four days in his work area,
6  which is heavily represented by management.
7  Q    And he's a Caucasian male?
8  A    Yeah. I think his wife is part Native
9  American.
10 Q    Do you know if he was ever terminated for
11 wearing this shirt or given any kind of --
12 A    He was not terminated or given any kind of
13 disciplinary action for wearing the T-shirt.
14 Q    Okay, and you said earlier that I believe
15 you're the first person that's ever been terminated
16 for wearing a T-shirt at American Airlines?
17 A    In the history of American, nobody has been
18 fired for a T-shirt.
19 Q    Now, was it the exact same shirt -- that Mr.
20 Vinson told you that he wore this exact same shirt
21 four to five days at American Airlines?
22 A    Yeah. At the arbitration he showed that
23 T-shirt and he said it was the exact same T-shirt h
24 wore.
25 Q    And no disciplinary action was taken?

TULSA FREELANCE REPORTERS
918-587-2878

Page 240

1  A    No disciplinary action whatsoever.
2  Q    Do you know how long he worked for the company
3  at that point?
4  A    I think five years.
5  Q    Okay, and how long had you worked for the
6  company at the time of your termination?
7  A    Just shy of fourteen years.
8  Q    Do you have the ability to dictate what, say,
9  for instance, what Tom Metzger puts on his website?
10 A    I have absolutely no ability at all. Tom
11 Metzger is just a vague personality that I really
12 don't know personally. I've talked to him on the
13 phone once or twice. Given the phone to my brother
14 I don't have any rapport or any type of tight
15 relationship with him at all. He is his own person
16 His own son left him. He's very, very domineering
17 very aggressive.
18 Q    On that same note, do you have any ability to
19 control what your twin brother, Dennis Mahon, says
20 either on his racist hotline; do you have any
21 ability to control that?
22 A    No. He puts on what he wants to do. He's no
23 a -- very straightforward, stubborn type of
24 individual, a very Alpha type personality. I can'
25 control any more what he does than he can control

TULSA FREELANCE REPORTERS
918-587-2878

1  me.

2  Q    So you can't control him going to Tom Metzger

3  and telling him about you being fired from American

4  Airlines if that in fact happened?

5  A    There's no way I could have stopped him

6  without having knowledge of it.

7  Q    Did you ever at any time ask Mr. Metzger to

8  put your story on his White Aryan Resistance

9  hotline?

10  A    No, not even once, not even entertain the

11  idea. Tom Metzger and me are not in any way

12  associated.

13  Q    Now, do you remember recently we went to

14  Denver to the United States Court of Appeals; do you

15  remember that?

16  A    Absolutely.

17  Q    And after the decision was rendered, there was

18  a newspaper article in the Daily Oklahoman. Do you

19  recall that newspaper article?

20  A    Absolutely. It was about ten paragraphs.

21  Q    Did you read that thoroughly?

22  A    Yeah, I read the article thoroughly.

23  Q    Do you remember what the American Airlines

24  company spokesman said with regard to why discipline

25  was taken against you for wearing the shirt as

TULSA FREELANCE REPORTERS

918-587-2878

Page 242

1  opposed to the other person?

2  A    In the article he claimed that the other

3  person wore the T-shirt without the same implied

4  meaning than I did. He said the other person didn't

5  wear it for the same reason that I wore it

6  basically.

7  Q    Do you believe that -- do you believe in ESP,

8  that people can read other people's minds?

9  A    Only in fairy tale books. It's generally not

10  an acceptable phenomenon.

11  Q    So in your opinion, Mr. Vinson wearing this

12  shirt four or five days in a row, do you think he

13  was intending on sending a message to American

14  Airlines?

15  A    I don't know his mind. I have no idea what

16  his -- what he was trying to convey; if he wore it

17  because it's the last thing he had to wear. Who

18  knows? I don't know the man that well, but I

19  couldn't say one way or the other.

20  Q    But you wore the shirt one time and were

21  fired?

22  A    One day, yeah.

23  Q    Now, the day that you wore this shirt, when

24  you put that shirt on that morning, when you left

25  for work, did you have any idea that there was going

TULSA FREELANCE REPORTERS

918-587-2878

Page 243

1  to be a Caucasian employee resource meeting to

2  discuss the pamphlet that had been handed out at the

3  diversity fair?

4  A    I had no idea if there was going to be a

5  meeting that day or not. Until I was notified by

6  Eric Hanson that there was a flyer on the bulletin

7  board that announced the meeting, I had no idea a

8  meeting was going to take place that day.

9  Q    And you already had that shirt on when you

10  found out about that meeting; correct?

11  A    I was already at work, yeah, already there.

12  Q    Did you ever have any confrontations of any

13  sort with Robert Hosey before the April 20th, '99

14  meeting?

15  A    I didn't know who he was even. I had no idea

16  who he was until he came into the meeting and he

17  said he was from Dallas and he was in the diversity

18  council.

19  Q    And he was an African American gentleman, was

20  he not?

21  A    Yes, he was.

22  Q    Now, at the meeting was it mentioned to you by

23  anyone in authority that that shirt had any racial

24  connotations?

25  A    Nobody made any comment about it or even

TULSA FREELANCE REPORTERS

918-587-2878

Page 244

1  looked at it that I could tell at the meeting.

2  Q    In fact, if I remember correctly from the

3  arbitration transcript, didn't they have to go look

4  up what The Turner Diaries were?

5         MR. CORDELL: Object to the form of the

6  question. The transcript says what it says.

7  Q    Do you believe Mr. Hosey or any of the other

8  members at that meeting even knew what The Turner

9  Diaries were?

10  A    Probably not because they had to put me out of

11  service to investigate it first. There was no

12  mention of the T-shirt, and they put me out of

13  service to determine if that was a bad T-shirt.

14  They had to search, probably heavily search the

15  Internet or whatever to find the T-shirt, the

16  meaning of the T-shirt.

17  Q    And is it your understanding that even after

18  Vinson testified at the arbitration that he wore

19  this same particular shirt four to five days in

20  row, do you know if there was ever any action

21  against him after that arbitration?

22  A    Not to my knowledge. Of course, I

23  work. I have no ability to find out, '

24  knowledge, there was no action taken

25  whatsoever.

TULSA FREELANCE REPORTERS

918-587-2878

Page 245

1 Q Would you agree that you're similarly situated
2 with Mr. Vinson in that you're both Caucasian males?
3 A Right, we're both Caucasian males.
4 Q And you both wore Turner Diaries T-shirts to
5 American Airlines?
6 A Yes.
7 Q He was not terminated; correct?
8 A He was not terminated.
9 Q You were terminated?
10 A I was terminated.
11 Q Do you feel like you were singled out?
12 A Yes, I do. I think I was targeted without
13 warrant and terminated without just cause.
14      MR. FRAZIER: That's all I have.
15           CONTINUED EXAMINATION
16 BY MR. CORDELL:
17 Q Just a few questions, sir, starting back
18 and -- starting now and going backwards. Is it
19 correct then for me to understand the person you
20 believe you're similarly situated with is Mr.
21 Vinson?
22 A Right. He basically wore the same T-shirt and
23 was not affected by that T-shirt by wearing it.
24 Q And is there anybody else that's similarly
25 situated to you in your opinion?

TULSA FREELANCE REPORTERS
918-587-2878

Page 247

1 addresses on the T-shirt, website, if you have a
2 computer.
3 Q What's the National Alliance?
4 A I don't know. It's some kind of a group.
5 Q What kind of group?
6 A Separatists of some kind obviously. I don't
7 know. Since this man died, I don't know if it's
8 been defunct or whether it's still a viable group.
9 I imagine it probably died at the same time he did.
10 A lot of these groups start up and if the founder
11 dies, his group dies, too.
12 Q I'm sorry, did you finish?
13 A Yes.
14 Q With respect to the day in question, April 20,
15 1999, obviously you testified that you hadn't known
16 about the meeting before you went to work that day;
17 correct?
18 A I didn't know the meeting was going to be that
19 day.
20 Q And you wore the T-shirt, went to the meeting
21 we know; correct?
22 A Yes, that's correct.
23 Q Was that the only T-shirt you had available to
24 wear to that meeting?
25 A That was the only T-shirt I had available to

TULSA FREELANCE REPORTERS
918-587-2878

Page 246

1 A As far as anybody wearing that T-shirt, I
2 don't know of any other person that wore that
3 T-shirt.
4 Q Okay. Andrew McDonald, the person whose name
5 appears on the bottom of the front side of the
6 T-shirt and under whose name The Turner Diaries is
7 penned is actually Dr. William Pierce; correct?
8 A Yeah. I know that now, yes.
9 Q In fact, here in the back of book you have
10 there's an article about the author and part of that
11 indicates very clearly that Dr. Pierce is the
12 chairman of the National Alliance?
13 A The book I had is a smaller version and it did
14 not have this stuff on the back. It did not have --
15 I never saw anything in the back of the book like
16 this page. It was a smaller version. It didn't
17 have any of that stuff I saw.
18 Q Do you recognize that Dr. Pierce was the head
19 of the National Alliance?
20 A Yeah, here it does. I see it there.
21 Q In fact, on this page that we're looking at
22 and one of the websites you read off the front of
23 the T-shirt is the website address for the National
24 Alliance; correct?
25 A Right, that right here, these two here are the

TULSA FREELANCE REPORTERS
918-567-2878

Page 248

1 wear that day. I had a big laundry load that I
2 didn't get a chance to get cleaned and that was the
3 only one I had to wear.
4 Q Directing your attention to Defendant's
5 Exhibit 33, please. These are your notes dated May
6 10, 1999, the day you got fired. Look at Page 2.
7 A Is that 32 or 33?
8 Q 33.
9 A Well, I don't see here it here. Here's 34.
10 Hold it. It must be right here.
11 Q Here's a copy of it.
12 A Okay. It's one page, okay.
13 Q We're looking at your May 10, 1999 notes;
14 correct?
15 A Uh-huh.
16 Q Yes?
17 A Yes, I see it here.
18 Q You've already testified that these are
19 accurate; correct?
20 A They're accurate to the best of my ability.
21 Q Top of the second page says that the very day
22 after two hours into the shift you found an area o
23 the right shoulder of the T-shirt that became
24 stained with Skydrol. At the time I changed The
25 Turner Diaries with an older faded AA shirt that I

TULSA FREELANCE REPORTERS
918-587-2878

1  always kept at the bottom of my toolbox.
2  A    Yeah.  It was my partner's toolbox but we
3  shared it, and we had a real old heavily soiled --
4  it was not an AA uniform shirt; it was an AA DC-10
5  T-shirt that we bought from this gentleman that sold
6  T-shirts and it was heavily soiled but didn't have
7  the Skydrol on it, so I had to put that on.
8  Q    So you could have worn that one to the
9  meeting?
10  A    I had no idea it was in there.  This is in the
11  very bottom, way back in the bottom of the toolbox.
12  I had to really dig for it.
13  Q    Doesn't it say an AA T-shirt that I always
14  kept in the bottom of my toolbox?
15  A    Well, that's wrong it was in there.  I don't
16  have that T-shirt.  That T-shirt I keep at the
17  house.  I don't have that T-shirt at work.  I don't
18  keep any of these T-shirts at work.
19  Q    Which version is correct, the version that you
20  wrote on May 10, 1999 or the one you just testified
21  to?
22  A    Well, just testified to.  There was a T-shirt
23  that I wore was in the bottom of my friend's
24  toolbox.
25  Q    And you had always kept it there, hadn't you?

---

1  Q    Now, let's just say for the sake of
2  discussion, let's just say you wore that shirt to
3  the meeting on purpose.  Let's say you intended to
4  wear that shirt and send a message that day.  I'm
5  not saying you did, but let's just assume for the
6  sake of argument that you intended to send a message
7  on April 20th of 1999.  Don't you still believe that
8  in order for you to get equal protection, that you
9  should be treated the same as Mr. Vinson, who wore
10  the same shirt?
11  A    Absolutely.  That's part of the fairness
12  doctrine of equal protection.
13         MR. FRAZIER:  That's all I have.
14              CONTINUED EXAMINATION
15  BY MR. CORDELL:
16  Q    One last question.  Mr. Vinson is white, isn't
17  he?
18  A    He's Caucasian.
19         MR. CORDELL:  Okay.
20         MR. FRAZIER:  Read and sign, please.
21         (Whereupon, the deposition was
22  concluded at 5:54 p.m.)
23
24
25

---

Page 250

1  A    Well, it was there but I had no idea it was
2  there until I dug for it.  I had to dig for it to
3  get it.  It was heavily soiled, very dirty, dusty
4  old T-shirt.
5  Q    Now, you compared yourself with Vinson and you
6  say he's the one who you are similarly situated with
7  and he wasn't terminated for wearing the T-shirt.
8  Once again, as you stated in Exhibit 42, is it your
9  belief that the reason the company fired you was
10  because of the company's perception, albeit an
11  erroneous perception, of my social and political
12  beliefs?
13  A    Right.  I think that's correct.
14         MR. CORDELL:  That's all I have.
15              CONTINUED EXAMINATION
16  BY MR. FRAZIER:
17  Q    Mr. Mahon, briefly what does the concept equal
18  protection mean to you?
19  A    Equal protection means basic fairness of
20  treating everyone equally.  If a certain issue comes
21  up, that everybody, no matter who they are, gets
22  treated the same under that condition, under that
23  issue.
24  Q    Do you believe in that idea?
25  A    Yes, absolutely, absolutely.

---

Page 252

1              SIGNATURE PAGE
2
3         I, Daniel W. Mahon, do hereby certify
4  that the foregoing deposition was presented to me b
5  Lisa A. Steinmeyer as a true and correct transcript
6  of the proceedings in the above styled and numbered
7  cause, and I now sign the same as true and correct.
8         WITNESS my hand this _____ day of
9  _____, 2003.
10
11
12
                              _____
                              DANIEL W. MAHON
13
14
15
16
17         SUBSCRIBED AND SWORN TO before me this
18  _____ day of _____, 2003.
19
20
21
                              _____
                              Notary Public
22
23  My Commission Expires:

24
25

1              C E R T I F I C A T E

2

STATE OF OKLAHOMA    )
3                    )    ss.
COUNTY OF TULSA      )

4

5              I, Lisa A. Steinmeyer, Certified
6    Shorthand Reporter within and for Tulsa County,
7    State of Oklahoma, do hereby certify that the above
8    named witness was by me first duly sworn to testify
9    the truth, the whole truth and nothing but the truth
10   in the case aforesaid, and that I reported in
11   stenograph his deposition; that my stenograph notes
12   were thereafter transcribed and reduced to
13   typewritten form under my supervision, as the same
14   appears herein.
15             I further certify that the foregoing 252
16   pages contain a full, true and correct transcript of
17   the deposition taken at such time and place.
18             I further certify that I am not attorney
19   for or relative to either of said parties, or
20   otherwise interested in the event of said action.
21             WITNESS MY HAND AND SEAL this 4th day of
22   November, 2003.
23           _____
                 LISA A. STEINMEYER, CRR
24               CSR No. 386
25

            TULSA FREELANCE REPORTERS
                 918-587-2878

Page 254
1         CORRECTIONS TO THE DEPOSITION OF
                 DANIEL W. MAHON
2

3    PAGE AND LINE NUMBER              CORRECTION

4

5

6

7

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
        TULSA FREELANCE REPORTERS
            918-587-2878

Revised 2/18/99



AMR's

Diversity Advisory

Council

*Respecting Differences*

---

## 1999 Diversity Advisory Council Members

**African-American**
Nathan Cage — 817-224-0212
Rose Striplin — 918-292-3277

**Asian Cultural Association**
Alan Yee — 817-967-4194
Alice Liu — 817-931-6912

**Caucasian Employees**
Craig Nichols — 918-292-0253
Linda Dill — 918-292-0258

**Christian Employees**
Sheila Yancey-Bicknell — 817-967-2035
Carol Kastner — 817-967-9831

**Employees With Disabilities**
Alan Thompson — 817-967-4060
Lorraine Bergen — 817-425-3225

**Gay, Lesbian, Bisexual, Transgender**
Robbin Burr — 972-425-7394
Randy Soderstrom — 817-931-7117

**Indian Employees**
Dinesh Parmar — 817-931-7680
Sukumar Bhasker — 817-264-7932

**Jewish Employees**
Michael Heymann — 817-931-6487
Francine Rubin — 817-963-5080

**Latino American**
Rafael Fantauzzi — 817-967-0876
Pedro Mari — 918-292-2264

**Muslim Employees**
Susan Odeh — 817-963-2489
Reza Hussain — 817-264-2368

**Native American Employees**
Jimmy Tramel — 918-292-2448

**Women In AAviation**
Regina Stewart — 918-292-3762
Barbara Bush — 817-224-0089

**Work & Family Balance**
Carole Sturm — 817-963-5668
Amy Hill — 817-967-2951

**40 Plus/Senior Employees**
Diane White — 972-266-1255

---

⇧ Promote tolerance and respect for all other employees.

⇧ Open membership to all AMR employees.

⇧ Have no financial or organizational relationship to groups outside of AMR.

⇧ Fill out an application with the Diversity Advisory Council.

Most importantly, the Employee Resource Group must be willing to identify business objectives that the group can help achieve, for example, the promotion or mentoring of minority employees, proposing flexible hours for working parents, proposing solutions for accommodating customers or employees with disabilities. Employee Resource Groups are not forums for the advancement of political or moral viewpoints — the work they do must relate to the business.

### How Do I Find Out More?

More detailed information about The Diversity Advisory Council can be found in SABRE Star Record F*DIV.

Diversity Advisory Council members are also eager to hear from you! You can reach them by sending an E-Mail to Diversity, boardmail to MD 5105 HDQ, or by calling the Diversity voice mail telephone number at 817-931-7117.

DEFENDANT'S DEPOSITION EXHIBIT
10

## AMR's Vision for Diversity

"To contribute to AMR's competitive edge by inspiring employees to value, respect, and celebrate the power of diverse experiences."

*Diversity Advisory Council*
*Mission Statement*

"AMR, a world-class corporation, must be a place where the best people have a real shot at contributing, at being heard, at moving up in the company. This means paying attention to what each of our employees has to offer, regardless of race, creed, gender or sexual orientation. We must be a place where people are truly judged on the basis on their intelligence, their skills, their ... work and their contributions."

*Don Carty*
*Chairman & CEO*
*AMR Corporation*

"The most important reason that a corporation ought to pay attention to diversity is that world-class companies ought to be color-blind, and visibility-blind, and age-blind and gender-blind."

*Tom Kiernan*
*Sr. VP, Human Resources*
*American Airlines*

## Why a Diversity Advisory Council?

We hear a lot about 'valuing' and 'embracing' diversity in the 1990s. But what does it mean?

Basically, it means that our workforce and our customer base are increasingly reflecting the diverse nature of society as a whole. As a company, we see the value in recognizing diversity both in the marketplace and in our workplace.

We can create an environment where differences among ourselves and our customers are respected -- and where the unique perspectives we bring to our jobs and our business are valued.

The Diversity Advisory Council (DAC) has been created to help achieve that goal by:

⇨ communicating diversity issues to senior management,

⇨ bringing the viewpoints of diverse employee groups to bear on business issues,

⇨ serving as a forum to help us focus on the strategic advantages of an effective, diverse population.

## How Does It Work?

The Diversity effort involves employees at all levels of AMR:

An Executive Steering Committee is responsible for establishing the direction for AMR's diversity initiatives. Its members are senior officers who head various AMR business units.

The Diversity Advisory Council advises and makes recommendations to the Executive Steering Committee. Employee Resource Groups represent employees, and representatives of Employee Resource Groups sit on the DAC.

**Employee Resource Groups.** The Resource Groups represent the various ethnic, cultural and religious backgrounds of our employees, older employees, employees with children, gay and lesbian employees or employees with disabilities.

Employee Resource Groups exist to promote diversity in the workplace, to provide support and community for their members, to support AMR's corporate values and to provide education, information and advice to the Diversity Council and AMR's Executive Steering Committee. Groups will have access to electronic bulletin boards, reference systems, company property for meetings and representation on the Diversity Advisory Council.

## Who Can Join a Resource Group?

Any AMR employee can form a Resource Group or join an already established one (see back page for groups that have already formed). Resource groups can operate at any AMR location.

There are some guidelines, however, which can be found in detail in SABRE Star Record F*DIV.

## Briefly, Employee Resource Groups Must:

⇨ Show consistency with AMR goals and the Diversity Advisory Council's vision, goals and objectives.

⇨ Support company policies on a Harassment Free Workplace and non-discrimination.

Revised 2/18/99

## QUESTIONS AND ANSWERS FOR DIVERSITY
### INFORMATION FAIRS

1. Q: What is the Diversity Council?

A: A group of AMR employees elected by their respective employee resource group members (ERG) to assist and educate the AMR Executive Steering Committee on issues important to AMR employees and customers. The council meets once per month to address issues and concerns of employees and customers throughout AMR.

Council members also participate in training activities specifically designed to help them perform their roles on the council and in their respective employee resource groups.

2. Q: Is the Diversity Council necessary?

A: Yes. Corporations around the world have realized the importance of understanding and utilizing the resources available from the people who come from many different cultures, backgrounds etc.

The AMR Diversity Programs allows employees to voluntarily organize and participate in employee resource groups that represent their interests. The council allows representatives from these groups from all levels of the organization to educate, present and inform senior management management of the issues most important to them. Sometimes these issues are also important to our customers. Therefore, we become a stronger and more competitive company because we benefit from the input of the diversity council.

3. Q: Does having separate employee resource groups (ERGs) promote more division and segregation among employees who are different?

A: No. As each group is represented, they will bring forward their input into issues of importance to their group and in turn issues common to other groups as well. Many employees thrive in employee resource groups where there are others who share their common culture, religion, interests, etc. As a result, some employees feel more a part of the AMR family. ERGs serve as sources of information about the company, career development and resources in the communities in which the employees live.



All ERGs are required to respect other resource group members and find areas of common interests. ERGs may work jointly on projects and issues of common concern. At the same time, ERG members learn more about others who are different from themselves. In other words, the AMR diversity community is growing and is a network of people who support not just their own group, but support each other throughout the AMR diversity community.

4. Q: Are you guys for real? How can all the different groups get along together?

A: Yes. We are for real. We are committed to have a workforce where differences are respected among employees and customers. OK. None of us are perfect, but those who participate in diversity try very hard to work through our differences. We do not always agree with one another. But, we respect that others may think and act in a matter that is different from our own. Some of our best ideas and solutions start with opposing opinions.

5. Q: Does upper management listen to what you say?

A: AMR executives are an active part of the diversity council. They currently meet with the council twice per year to address specific issues and concerns. Members of senior management also support employee resource groups as sponsors. Diversity Advisory Council members have access to senior managers through sponsorship and other activities all year. Upper management does listen and realizes the importance of diversity at AMR.

6. Q: What the employee resource groups represented on the council?

A: African-American ERG, (AAERG), Asian Cultural Assoc. (ACA), Caucasian ERG (CARG), Christian ERG (CERG), Work/Family Balance, Employees with Disabilities, Women in Aviation, Gay/Lesbian/Transgender Bisexual Employees (GLEAM), Indian Employees (IERG), Jewish Employees, Latin Employees (LERG), Muslim Employees (MERG), Native American Employees (NAERG), 40 Plus Employees.

7. Q: How do I start a resource group?

A: If there is a group represented at the info. fair that you would like to start at your location, contact the diversity council representatives for that resource group. Contact information should be located on the brochures available at the info. fair.

If you would like to start a brand new resource group, a petition should be made to the diversity council. The council will evaluate the petition based on the value the group would provide to employees and customers of AMR. The purpose of the group must be consistent with the vision, goals and initiatives of AMR diversity.

8. Q: How can I participate?

A: Anyone can participate. The success of employee resource groups depends on the energy and commitment of its members. You can join any ERG that you have in interest in supporting. Membership is open to all.

9. Q: Are all the council members management?

A: No. Membership in ERGs is open to all employees. The elected representatives to the council represent employees from various parts of our business and from all levels of the organization. There is no requirement that council members come from any particular part of the corporations or any particular level of management.

10. Q: Why is there a need for racial/ethnic employee resource groups?

A: Diversity as a concept is not designed to exclude any group of employees. All employee resource groups have goals and activities that are consistent with AMR's diversity vision and goals.

DAC Special Session
Talking Points for ERG Members
3/25/99

- At the DAC InfoFair held in Tulsa on March 11, the Caucasian Employee Resource Group (CERG) distributed a flyer celebrating "Caucasians in Aviation"

- We were informed by CERG officers/members that the flyer was developed by individuals believed to have an affiliation with local extremist groups. Some of the comments on the flyer were similar to rhetoric used by those groups in a racist nature

- The material was not made available to Diversity Programs for review prior to its distribution and leaders of the CERG indicate that they did not review the material. A number of employees and some members of management were offended by its message

- As a result of the ensuing controversy surrounding the flyer, effective immediately, the Caucasian Employees Resource Group has been suspended from participation on the Diversity Advisory Council and all privileges associated with being a recognized employee resource group have also been suspended for six months

- The six-month period will allow the CERG to review their mission and vision. They will be allowed to submit an application for re-admittance to the Council at the end of the six-month period

There are several issues associated with American Airlines' response to the content of the flyer and the action the company was required to take

- It is AMR's policy to provide a workplace free of all forms of harassment and discrimination

- ANY communication that suggests AMR tolerates racist attitudes or that AMR sanctions the formation of groups that espouse racist or extremist ideas is unacceptable

- Because the perspective that was suggested in the flyer is completely contrary to the principles and initiatives of diversity, action must be taken

- The Company is taking the action described above because:

    - The reputation of the Company is at stake

    - The reputation of the Diversity Advisory Council is at stake

    - The credibility of all Employee Resource Groups are at stake

1



The leaders of the CERG have indicated that the comments in the flyer do not reflect the values of their group. Nevertheless, the impact of the comments has made this issue one that must be dealt with at a corporate level rather than by the Council.

We are all saddened by the outcome of this issue. The CERG is a valuable member of the Diversity Advisory Council family and will receive the support necessary to enable it to return as a contributing member. We encourage CERG leaders and members to seek the advice and council of management and those Council members who are able to provide the guidance they need.

2

DAC25A

AMERICAN AIRLINES CAUCASIAN EMPLOYEES RESOURCE GROUP
SALUTE THE FOLLOWING AVIATION PIONEERS



Wilbur Wright
FIRST POWERED FLIGHT



Bleriot
FIRST TO FLY THE ENGLISH CHANNEL



James H. Doolittle
FIRST TO FLY MEDIUM
BOMBER OFF AIRCRAFT
CARRIER



Fransisco Brack-Papa
ITALIAN AIR RACE PIONEER



Werner Von Braun
PIONEERED MODERN ROCKETRY



Hugo Junkers
MADE FIRST ALL METAL
COMMERCIAL AIRLINER



Amelia Earhart
PIONEER WOMAN
AVIATOR



CONTINUED ON PAGE    TWO



Helene Dutrieu
SECOND WOMAN IN
HISTORY TO LEARN TO FLY



DEFENDANT'S DEPOSITION
EXHIBIT
12

AGE 2







OUND THE WORLD FLIGHT
SET ALTITUDE RECORD





Captain Edward Rickenbach
AMERICAN WWI ACE
AND LEADER OF E.A.L.







Gen. Chuck Yeager
FIRST TO BREAK
SOUND BARRIER



Charles A Lindbergh
FIRST TO FLY SOLO
ACROSS ATLANTIC OCEAN

These famous men and women who made aviation history all have one thing in common. They are all members of the White Race. A race of EXPLORERS , discoverers, scientists, and philosophers. We are proud of the accomplishments of our noble Race in the past, present, and future.

FOR MORE INFORMATION ON THE CAUCASION EMPLOYEE RESOURCE GROUP,

CONTACT:    LINDA DILL, ICS  292-0258
OR    CRAIG NICHOLS  ICS  292-0253
MAIL DROP 610 TULE

DEFENDANT'S DEPOSITION
EXHIBIT
15

Back



What will you do when they come to take your guns?

DATE:        May 10, 1999

TO:          Daniel W. Mahon
             Employee # 056628

REF:         Final Advisory (Discharge)

On Tuesday, April 20, 1999, you attended a meeting of the Caucasian Employee Resource Group. The purpose of the meeting, which senior Maintenance and Engineering management also attended, was to discuss the role of American Airlines' employee resource groups in supporting diversity in our workplace and to discuss the recent 6-month suspension of the Caucasian Employee Resource Group. American suspended the Group after it handed out a flyer that advocated white supremacy at the Diversity Info Fair, a company event. The Group's conduct violated a basic tenet of the AMR Diversity Advisory Council. This tenet is that no group can form and be recognized as an Employee Resource Group that is in opposition to another group. You admitted during the April 20 meeting that you wrote the flyer and supplied it to the group for distribution.

At the meeting, and at work on the day of the meeting, you wore a T-shirt with the words "The Turner Diaries" printed on it. "The Turner Diaries" is a book written by a leader of one of the largest and most organized neo-Nazi groups in the country. It is widely regarded as a white supremacist and anti-Semitic terrorist manual. "The Turner Diaries" describes the systematic killing of "Jews", "non-whites", and "race traitors" in order to establish an "Aryan" world. The book is also infamous as having been found in the car of Timothy McVeigh at the time of his arrest for bombing the Murrah Federal Building in Oklahoma City. The cover of the book shows a drawing of two people pointing firearms as if in combat. Your T-shirt also showed a rendition of that cover.

American received a number of complaints from other employees regarding your T-shirt, as well as the flyer that you wrote. In response to your actions and to the complaints received, American conducted an investigation. The 29(f) investigation was initiated on Monday, April 26, 1999. The investigation covered the complaints received, as well as your actions with white supremacist organizations and their members.

As a result of this investigation, American has concluded that:

• By writing the flyer and supplying it for distribution at the Diversity Info Fair and by wearing your "The Turner Diaries" T-shirt to work and to the April 20 meeting, you harassed and intimidated other employees in a manner that tended to create a racially hostile work environment.

1

DEFENDANT'S DEPOSITION
EXHIBIT

PENGAD 800-631-6989

Daniel W. Mahon - Final Advisory (Discharge)

- Your actions have adversely impacted the perception and reputation of American Airlines within our employee groups and in the community at large.

- Your actions as described above are a direct violation of American Airlines' Policy on Unlawful Harassment, which prohibits conduct that is harassing and that "creates an intimidating, hostile, or offensive work environment."

Your actions are also a direct violation of the following American Airlines' Policies and Procedures:

Rule 32 -   "Threatening, intimidating, interfering with, or violent behavior toward another employee while either on or off duty is prohibited."

Rule 24 -   "Consider the welfare of the Company and your fellow employees. Perform no act that is detrimental to either."

Rule 22 -   "See that your conduct reflects credit upon AA. This includes paying your just debts, thereby avoiding complaint from creditors or garnishment proceedings."

As an employer of a widely diverse workforce, as an employer in an industry that must guarantee the highest standard of safety to the flying public, and as an employer in the Tulsa, Oklahoma Community, American Airlines cannot and will not tolerate conduct of this type.

You are hereby discharged from your employment with American Airlines, effective this date. All Company property, including but not limited to, AA identification cards, badges of any kind, and keys assigned to you, are to be returned to me and are not to be used for any purpose after the date of this letter. Any pay due to you will be paid upon surrender of all Company property. Please contact me about any questions regarding benefits, Credit Union membership, etc., which you may have.

Tom Snyder, Production Supervisor

7867 / 2216
Business Unit / Shop

cc:    Field Human Resources
       Personnel File — MD 122 / TUL

2

Rex Thompson

Dear Mike Turpen, a Tty.

I have been terminated from my employment with American Airlines. Enclosed is a copy of the Opinion and Award of the Arbitration Panel (Exhibit "A"). As you will note, by a 2 to 1 vote, the Panel found that I was terminated for just cause. Succinctly stated, my termination was based upon my alleged political and social views

I was hired by American Airlines ("the company") on March 17, 1986, as an aircraft avionics mechanic. My employment record, as well as the statements of three crew chiefs, that I was an "exceptional if not model mechanic, and "never talked about the KKK or political views at work and never was intimidating."

In addition -- although not reflected in Exhibit "A" -- my wife, Myrna, is a Filipino. Although my twin brother, Dennis Mahon, has long been involved in such activities, I have never been a member of the Klan nor of any other white racialist organization.

By sorting through the verbose rhetoric of the Panel's majority opinion, you may glean the thin factual basis for my termination.

#### #1: The Diversity Fair Pamphlet.

By way of background, The company encourages the formation of Employee Resource Groups (ERG) to represent employees with "unique racial, ethnic, cultural or lifestyle differences." I was a member of the Caucasian Employee Resource Group (CERG) at The company. Other examples of the Tulsa groups include, inter alia: (1) African-American ERG, (2) Asian Cultural Association, (3) Christian ERG, (4) Employees with Disabilities ERG, (5) Gay. Lesbian, Bisexual, Transgender ERG, (6) Indian ERG, and (7) Jewish ERG.

On March 11, 1999, CERG was a participant in a "Diversity Fair" conducted by The company. CERG was encouraged by The company -- as were the other Employee Resource Groups -- to get a booth at the fair and do a project providing information and understanding about the ERG.

I was not present at this fair, although I did write a pamphlet entitled "Caucasians in Aviation" (Exhibit "B") which was distributed at the fair. Significantly, this pamphlet (Exhibit "B") was tendered by CERG to management prior to the Fair, and no objection was raised by the officials of the company. Nonetheless, after the Fair,

DEFENDANT'S DEPOSITION EXHIBIT

42

PENGAD 800-631-6989

management officials belatedly deemed the existence of "white supremacist/neo-nazi overtones" in the wording of the pamphlet.[1]  On this basis, The company suspended the privileges of CERG for six months.

### #2: The Turner Diary T-Shirt

On April 20, 1999, Robert Hosey, Manager of Diversity Programs for the Company, conducted a meeting to announce the suspension of CERG.  I attended that meeting, wearing a T-shirt that showed the cover to a book entitled The Turner Diaries.  Substantial evidence was submitted at the grievance hearing (Exhibit "A") that other employees had worn "offensive T-shirts" and were told by the Company to "change them or turn them inside out."  Regardless, the Arbitration Panel ruled in favor of the Company, finding that such conduct "was a deliberate expression of deeply held racist and social beliefs."

In summary, I have never been accused of verbally harassing or intimidating my fellow workers at The company.  Nor has anyone accused me of using racial epithets at work, or even discussing politics.  All I did was to write a pamphlet and wear a Turner Diaries T-shirt.  In retrospect, the latter was perhaps an error in judgment, but hardly a public display of my "racial and ethnic hatred oozing from its ugly depths."

In point if fact, The company fired me because of the Company's perception (albeit an erroneous perception) of my social and political beliefs.

I would greatly appreciate any information or assistance you can provide to me in this matter.

Sincerely,

Daniel W. Mahon

Daniel W. Mahon

---

[1]    "These famous men and women who made aviation history all have one thing in common.  They are all members of the White Race.  A race of EXPLORERS, discoverers, scientists, and philosophers.  We are proud of the accomplishments of our noble Race in the past, present, and future."